## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| JANET S. NORTHRUP,<br>AS CHAPTER 7 TRUSTEE OF<br>MOUNTAIN EXPRESS OIL<br>COMPANY, ET AL., | §<br>§<br>§<br>§<br>§ | |
| **Plaintiff,** | §<br>§ | |
| v. | §<br>§<br>§ | Civil Action No. _____<br>**DEMAND FOR JURY TRIAL** |
| BARRY BIERENBAUM; GAIL<br>BIERENBAUM; TAYLOR<br>MERCANTILE, LLC; MONGO<br>HOLDINGS, LLC; MONGO<br>HOLDINGS BG INVESTMENTS,<br>LLC; and 504N VENTURES, LLC, | §<br>§<br>§<br>§<br>§<br>§<br>§ | |
| **Defendants.** | § | |

## <u>COMPLAINT</u>

Plaintiff Janet Northrup, as duly appointed Chapter 7 Trustee (the "**Trustee**") of the substantively consolidated bankruptcy estates of Mountain Express Oil Company ("**MEX**" or the "**Company**") and its affiliated debtors (collectively with MEX, the "**Debtors**"), files this Complaint and shows as follows:

## I.    INTRODUCTION

1.    This action arises out of Defendants Barry Bierenbaum's and Gail Bierenbaum's (together, the "**Bierenbaums**") improper and unlawful siphoning of

more than $130 million dollars from MEX. The Bierenbaums, individually and through entities they own such as Taylor Mercantile, LLC ("**Taylor Mercantile**") and Mongo Holdings, LLC ("**Mongo**"), siphoned over $130 million from MEX through several different transactions.[1]

2.    First, the Bierenbaums caused MEX to engage in a leveraged buyout (the "**LBO**") wherein they received $99.5 million purportedly in exchange for their shares in the Company. MEX did not receive any value, let alone reasonably equivalent value, for the $99.5 million it provided to the Bierenbaums because MEX was insolvent at the time of the transaction and given the way the transaction was structured. At a high-level, the LBO worked as follows:

- In 2018, the Bierenbaums contrived a scheme to cause MEX to acquire their interests in the Company for $99.5 million. At the time the Bierenbaums contrived their scheme, MEX's audited financial statements showed that it was insolvent.

- MEX did not have sufficient funds to fully effectuate the LBO. Thus, to implement their scheme, the Bierenbaums caused MEX to obtain a $130 million term loan and use some of the proceeds therefrom to effectuate their $99.5 million buyout.

---

[1] As discussed in detail herein, Mongo BG Investments, LLC and 504N Ventures, LLC are alter egos of Taylor Mercantile and Mongo.

- From 2018 until March of 2020, the Bierenbaums caused MEX to transfer them funds as follows:

    (i)  On October 25, 2018, MEX paid $42,129,303.46 to the Bierenbaums;

    (ii)  On October 15, 2019, MEX paid $2,000,000 to the Bierenbaums; and

    (iii)  On or around March 12, 2020, MEX fully effectuated the LBO by transferring a final payment of $55,370,696.54 to Mongo (purportedly to pay for the Bierenbaums' remaining shares in MEX).

- At the time the LBO was effectuated, the Bierenbaums owned 98.46% of MEX, with Lamar Frady and Turjo Wadud each owning equal amounts of the remaining 1.54%. Notably, Frady and Wadud each acquired his 0.77% of MEX for only $500,000.

- Immediately after the LBO was completed in March of 2020, the Bierenbaums' shares were retired, leaving Frady and Wadud's 1.54% as the only outstanding shares in MEX. As a result, Frady and Wadud became MEX's sole owners. In other words, Frady and Wadud were able to obtain 100% ownership in MEX for $1 million even though the Bierenbaums caused MEX to pay themselves (and Mongo) $99.5 million for their 98.46% stake.

- The net result was that: (1) the Bierenbaums and Mongo received $99.5 million for the Bierenbaum's 98.46% stake in MEX; (2) Frady and Wadud

obtained 100% ownership in MEX for only $1 million; (3) MEX was saddled with at least $99.5 million in debt and the interest associated therewith; and (4) in 2023, MEX declared bankruptcy when, among other things, it was unable to pay the principal and interest owed on the $130 million term loan used to finance the LBO.

3.      Second, the Bierenbaums caused MEX to make at least $31,559,979.77 in purported shareholder distributions to themselves in 2018, 2019, and 2020.  MEX received no consideration for those distributions, which either caused MEX to become insolvent or pushed it further into insolvency.

4.      Third, the Bierenbaums also caused MEX to engage in real estate transactions with other companies they owned such as Taylor Mercantile and Mongo, with such transactions not only being unfair to MEX, but also putting it at unnecessary risk given that at least some of the transactions were unlawful tax avoidance schemes designed to reduce the Bierenbaums' personal tax liability and/or were intended to circumvent MEX's obligations to its lenders.

5.      Through this action, the Trustee seeks to, among other things, (i) avoid the fraudulent transfers to the Bierenbaums, Taylor Mercantile, and Mongo as permitted by applicable state and federal law; (ii) hold the Bierenbaums responsible for their breaches of fiduciary and Statutory Duties (as defined below), including, but not limited to, the breaches relating to the LBO; and (iii) obtain relief for Taylor

Mercantile's, Mongo's and 504N Ventures' aiding and abetting of the Bierenbaums' breaches of their fiduciary and Statutory Duties to MEX.

## II.    THE PARTIES, JURISDICTION, AND VENUE

6.    The Trustee is the duly appointed Chapter 7 Trustee of the Debtors, jointly administered under Case Number 23-90147, pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**").  The Debtors' bankruptcy cases were filed on March 18, 2023 (the "**Petition Date**") in the Bankruptcy Court.

7.    The Debtors' bankruptcy estates (collectively, the "**Estate**") have been substantively consolidated.

8.    The Debtors were based at 3650 Mansell Road, Suite 250, Alpharetta, GA 30022 (Fulton County) until their liquidation under Chapter 7 of the Bankruptcy Code began in August 2023, when their headquarters were shuttered following the Trustee's appointment.  Prior to the establishment of their Alpharetta headquarters, the Debtors were based in Acworth, Cobb County, Georgia.

9.    Barry Bierenbaum ("**Mr. Bierenbaum**") is currently a citizen of South Carolina, residing at 9237 Marina Parkway, Myrtle Beach, South Carolina 29572. Mr. Bierenbaum can be served with process at that address.

10.    This Court has jurisdiction over Mr. Bierenbaum because, among other things, during the relevant time period he (i) served as the Chief Executive Officer

and a Director of MEX, which is a Georgia corporation that maintained its principal place of business in Cobb County, Georgia and later in Fulton County, Georgia; (ii) resided in Georgia; (iii) took some of the improper actions that are the subject of this Complaint within Fulton and Cobb Counties, Georgia; (iv) worked from MEX's office in Fulton County and Cobb County, Georgia; (v) breached his fiduciary duty and Statutory Duty to MEX while in Fulton and Cobb Counties, Georgia (among other places); (vi) directed and/or caused the fraudulent transfers at issue while in Georgia; (vii) the fraudulent transfers involved moving funds from Georgia; (viii) directed his improper conduct toward Fulton and Cobb Counties, Georgia; (ix) caused funds to be fraudulently transferred from MEX, a company then based in Cobb County, Georgia, to Taylor Mercantile and Mongo, which had and still have their principal place of business in Fulton County, Georgia; and (x) damaged MEX in Georgia.

11.    Gail Bierenbaum ("**Ms. Bierenbaum**") is currently a citizen of South Carolina, residing at 9237 Marina Parkway, Myrtle Beach, South Carolina 29572. Ms. Bierenbaum can be served with process at that address.

12.    This Court has jurisdiction over Ms. Bierenbaum because, among other things, during the relevant time period she (i) served as the Executive Vice President and a Director of MEX, which is a Georgia corporation that maintained its principal place of business in Cobb County, Georgia and later in Fulton County, Georgia; (ii)

resided in Georgia; (iii) took some of the improper actions that are the subject of this Complaint within Fulton and Cobb Counties, Georgia; (iv) breached her fiduciary and Statutory Duty to MEX in Fulton and Cobb Counties, Georgia; (v) directed and/or caused the fraudulent transfers at issue while in Georgia; (vi) the fraudulent transfers involved moving funds from Georgia; (vii) directed her improper conduct toward Fulton and Cobb Counties, Georgia; (viii) caused funds to be fraudulently transferred from MEX, a company then based in Cobb County, Georgia, to Taylor Mercantile and Mongo, companies which had and still have their principal place of business in Fulton County, Georgia; and (ix) damaged MEX in Georgia.

13.    Taylor Mercantile is a Georgia limited liability company with its principal place of business located in Fulton County at 3495 Piedmont Road, Building 11, Suite 815, Atlanta, GA 30305. It can be served through its registered agent, Grant Jaax, who is located at that same address.

14.    Upon information and belief, Taylor Mercantile's sole Member is Mongo, which is a Nevada limited liability company with its principal place of business in Fulton County, Georgia. Mongo's members are trusts that are owned and controlled by and for the benefit of the Bierenbaums.

15.    Taylor Mercantile is subject to both general jurisdiction and specific jurisdiction in this Court. Among other things, it (i) is a Georgia limited liability company with is principal place of business in Fulton County, Georgia; (ii) regularly

conducts business, including business at issue in this Complaint, in Fulton County, Georgia; (iii) is registered to conduct business in Georgia; (iv) aided and abetted the Bierenbaums' breaches of fiduciary and Statutory Duties (as defined below) in and from Fulton County, Georgia; (v) directed its conducted toward MEX in Fulton and Cobb Counties; and (vi) damaged MEX in Fulton and Cobb Counties.

16.    504N Ventures, LLC ("**504N**") is a Delaware limited liability company with its principal place of business in Fulton County at 3495 Piedmont Road, Building 11, Suite 815, Atlanta, Georgia. 504N can be served with process through its registered agent Grant Jaax at the same address. Upon information and belief, 504N's members are trusts owned and controlled by and for the benefit of the Bierenbaums.

17.    This Court has general and specific jurisdiction over 504N because, among other things, (i) its Manager is located in, and manages 504N from, Fulton County, Georgia; (ii) its principal place of business and sole office is located at 3495 Piedmont Road, Building 11, Suite 815, Atlanta, Georgia, which is in Fulton County, Georgia; (iii) it is registered to conduct business in Georgia; and (iv) it is the alter ego of Taylor Mercantile and Mongo and, for that reason, the facts that establish jurisdiction as to those entities also establish jurisdiction as to 504N.

18.    Mongo is a Nevada limited liability company.  During the relevant time period, Mongo's principal place of business and sole office was located at 3495

8

Piedmont Road, Building 11, Suite 815, Atlanta, Georgia, which is in Fulton County, Georgia. Mongo can be served with process through its registered agent, Capital Corporate Services, Inc., at 716 N. Carson St. #B, Carson City, NV 89701. Upon information and belief, Mongo's members are trusts owned and controlled by and for the benefit of the Bierenbaums.

19.    This Court has general and specific jurisdiction over Mongo because, among other things, (i) its Manager is located in, and manages Mongo from, Fulton County, Georgia[2]; (ii) its principal place of business and sole office is at 3495 Piedmont Road, Building 11, Suite 815, Atlanta, Georgia, which is located in Fulton County, Georgia; (iii) it is operated from and regularly conducts business in Fulton County, Georgia; (iv) it aided and abetted the Bierenbaums' breaches of fiduciary and Statutory Duties (as defined below) from Fulton County, Georgia; (v) it assisted and/or facilitated its receipt of fraudulent transfers from Fulton County, Georgia; (vi) it directed its improper conduct from and toward Fulton and Cobb Counties, Georgia; and (vii) it caused damage to MEX in Fulton and Cobb Counties, Georgia.

20.    Mongo Holdings BG Investments, LLC ("**Mongo BG**") is a Georgia limited liability company with is principal place of business at 3495 Piedmont Road, Building 11, Suite 815, Atlanta, GA 30305. Mongo BG can be served through its

---

[22] At some points, Mongo was managed by 504N. At other points, it was managed by Grant Jaax, who is also based in Fulton County, Georgia.

registered agent, Grant Jaax, at that same address. Upon information and belief, Mongo's member are trusts owned and controlled by and for the benefit of the Bierenbaums.

21.    This Court has general and specific jurisdiction over Mongo BG because, among other things, (i) it is a Georgia limited liability company; (ii) its Manager is located in, and manages Mongo BG from, Fulton County, Georgia; (iii) its principal place of business and sole office is located at 3495 Piedmont Road, Building 11, Suite 815, Atlanta, Georgia, which is in Fulton County, Georgia; (iv) it regularly conducts business in Fulton County, Georgia; and (v) it is the alter ego of Taylor Mercantile, Mongo, and 504N, and, for that reason, the facts that establish jurisdiction as to those entities also establish jurisdiction as to Mongo BG.

22.    This Court has federal question jurisdiction. Specifically, this Court has jurisdiction over this case under 28 U.S.C. §§ 1334. Relief is sought pursuant to, among other things, 11 U.S.C. §§ 544, 550, and 551.

23.    This Court has jurisdiction to hear all non-bankruptcy claims under 28 U.S.C. § 1367(a).

24.    The Court additionally has jurisdiction over Taylor Mercantile, Mongo, Mongo BG, and 504N under the alter ego theory of jurisdiction. The allegations supporting alter ego jurisdiction are set forth in Count Ten below, which are incorporated as if fully set forth herein.

25.    Venue is proper in this district under 28 U.S.C. §§ 1391, 1408, and/or 1409(a) because, among other things, (i) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated in, this District; (ii) some of the improper conduct occurred in this District; (iii) the improper conduct was directed toward MEX in this District; (iv) the Defendants conducted business relevant to this case in this District; (v) MEX was harmed in this District; (vi) Defendants resided in this District during the relevant time period and (vii) Defendants are subject to personal jurisdiction in this District.

### III.    FACTUAL BACKGROUND
### MEX Prior to the LBO

26.    In 2000, the Bierenbaums formed MEX as a fuel and lubricant distributor.

27.    By 2010, MEX was supplying fuel to approximately 180 convenience stores ("**C-Stores**") and fuel stations.

28.    In 2010, the Bierenbaums sold a substantial number of MEX's assets to Empire Petroleum.

29.    In 2013, MEX re-entered the fuel supply business by re-acquiring thirty-three (33) fuel supply locations from Empire Petroleum.

30.    From 2013 until 2018, the Bierenbaums grew MEX's business

primarily by increasing the number of C-Stores and other fuel suppliers that purchased fuel from MEX.

31.     During their tenure as directors and officers of MEX, the Bierenbaums owed MEX (i) extra-contractual fiduciary duties imposed by law or the common law; (ii) Statutory Duties (as defined below) that are independent of any contracts; and (iii) fiduciary duties and other duties pursuant to various written agreements including, among others, MEX's Bylaws and Articles of Incorporation.

## The LBO

32.     In 2018, the Bierenbaums caused MEX to initiate a leveraged buyout ("**LBO**") of their 98.4615% ownership interest in MEX.  The terms of LBO are set forth in the Stock Redemption Plan and Agreement dated October 25, 2018 (the "**Redemption Agreement**").

33.     The Bierenbaums signed the Redemption Agreement as "Sellers" and Mr. Bierenbaum signed the Redemption Agreement as "Purchaser," *i.e.*, for MEX. In other words, the Bierenbaums were on both sides of the transaction.

34.     While the Bierenbaums caused MEX's roughly 1.5% owners to sign an attachment to the Redemption Agreement, those signatures are irrelevant for many reasons, including, but not limited to, (i) when the Redemption Agreement was executed, the Bierenbaums had a super majority 98.4615% interest in MEX; (ii) the minority 1.5% owners signed "in their individual capacities and not on behalf of

Purchaser [*i.e.,* MEX]"; (iii) the Bierenbaums, upon information and belief, failed to make full disclosure despite being fiduciaries; (iv) and the 1.5% owners were themselves conflicted because they had a self-interest in the transaction given that, once fully effectuated, they would become sole owners and co-CEOs of MEX. Moreover, the Redemption Agreement contains terms that are illegal, contrary to public policy, and/or constitute unlawful self-dealing.

35.     Through the Redemption Agreement, the Bierenbaums agreed to sell their 2,400 shares in MEX (representing 98.4615% of the Company) to MEX for $99,500,000.00, with the payments scheduled as follows: (i) $48 million on October 15, 2018; (ii) $3 million on October 15, 2019; (iii) $3 million on October 15, 2020; (iv) $3 million on October 15, 2021; and (v) $42 million on October 15, 2022.

36.     At the time the Redemption Agreement was executed, MEX could not afford to pay the Bierenbaums for their shares in MEX. This is confirmed by MEX's then counsel, James Johnston, who testified:

> Q:    Right. The only way that MEX could afford to pay the Bierenbaums for their shares is for MEX to go and get a loan, correct?
> A:    That's right.

37.     On October 25, 2018, MEX paid $48,653,135 to the Bierenbaums (the "**October 2018 Transfer**").

38.     Also on October 25, 2018, MEX paid $1,500,000 to the Bierenbaums in connection with stock purchases by Frady, Wadud, and Ali Husain (the "**Officers'**

**Stock Purchase Transfer**").

39.    On October 15, 2019, MEX paid $2,000,000 to the Bierenbaums (the

"**October 2019 Transfer**").

40.    In late 2019/early 2020, the Bierenbaums sought to accelerate MEX's

purchase of their shares.  Specifically, the Bierenbaums wanted to fully effectuate

the LBO and sell all their interests in the Company to MEX during March of 2020.

41.    To effectuate the accelerated LBO, the Bierenbaums, as MEX's

controlling shareholders and sole board members, caused MEX to enter into that

certain First Amendment to Stock Redemption Plan and Agreement dated March 12,

2020 (the "**Redemption Amendment**"). Indeed, then MEX counsel James Johnston

testified:

> Q:    And was it your understanding that the Bierenbaums caused
> MEX to enter into the First Amended Credit Agreement so MEX
> could obtain a loan to effectuate the Stock Redemption
> Agreement?
> A:    Yes.

42.    As above, while the Bierenbaums caused MEX's minority owners to

separately sign an attachment to the Redemption Amendment, those signatures are

irrelevant because, among other things, the Bierenbaums had a controlling interest

in MEX, the minority owners' signatures were in their individual capacities, and the

minority owners were conflicted and self-interested in the transaction. Moreover, the

Redemption Amendment contains terms that are illegal, contrary to public policy,

and/or constitute unlawful self-dealing and, upon information and belief, the Bierenbaums failed to make full disclosure despite being fiduciaries.

43.    Any debt or other obligations incurred by MEX to the Bierenbaums, and any rights, releases, or other benefits granted to the Bierenbaums, under or through the Redemption Agreement, the Redemption Amendment, or otherwise relating to the LBO, shall hereafter be referred to as the "**Redemption Obligations**."

44.    Pursuant to the Redemption Amendment, MEX agreed to redeem the Bierenbaums' remaining 1,850 shares for $55,370,696.54.

45.    At the time the Bierenbaums wanted to accelerate the completion of the LBO, they still owned 1,850 shares of MEX, meaning that, under the Redemption Agreement and Redemption Amendment, the remaining consideration to be paid at the closing of the LBO was $55,370,696.54.

46.    MEX did not have sufficient funds to complete and close the LBO in the Spring of 2020.

47.    Thus, the Bierenbaums, as MEX's controlling shareholders, caused MEX to request that its lender arrange approximately $160 million in senior credit facilities, including a $130 million term loan (the "**Term Loan**") and two $15 million revolving lines of credit (one purportedly for fuel purchases and the other purportedly for general working capital needs).  The $130 million Term Loan was purportedly to be used to refinance approximately $73 million in existing debt and

"to finance $55.4 million of the Management Buyout of Barry and Gail Bierenbaum's ownership" in MEX.

48.    To obtain financing for MEX, including, without limitation, the Term Loan, the Bierenbaums needed to create the impression that MEX was solvent, profitable, and generated revenues sufficient to cover its ongoing and future expenses, including, but not limited to, the expenses associated with the loans (*e.g.*, principal and interest payments).  In reality, MEX's business operations were unable to sustain MEX's ongoing and future expenses, particularly after excluding the improper, phantom, and unsustainable purported "revenues" from sale-leaseback transactions (discussed below).

49.    That created an issue for the Bierenbaums given that, according to MEX's audited financial statements, MEX was insolvent, would become insolvent if the Term Loan was effectuated, and/or MEX's revenues from normal operations were insufficient to cover its expenses, particularly once the expenses associated with the Term Loan were included.

50.    Thus, the Bierenbaums devised a scheme to misrepresent MEX's financial condition and viability as a going concern.

51.    For one, the Bierenbaums caused MEX to participate in unfavorable and sometimes contrived sale-leaseback transactions (hereafter, "**Sale-Leaseback Transactions**") wherein (i) MEX would acquire a property; (ii) contemporaneously

(or shortly thereafter) sell the property to a related or third party at a higher price; and (iii) execute a long-term lease with the purchaser of the property, typically at terms that were above fair market value, unsustainable over the long term, and otherwise unfair to MEX.

52.    The Bierenbaums caused MEX to effectuate Sale-Leaseback Transactions to, among other things, create phantom revenues for MEX, create the false impression that MEX could satisfy its obligations now and in the future, contrive an unlawful basis for the Bierenbaums to benefit from bonus depreciation in violation of the Internal Revenue Code, and allow the Bierenbaums to obtain illicit profits through their side companies like Taylor Mercantile and Mongo.

53.    In some cases, the Bierenbaums engaged in Sale-Leaseback Transactions using companies they owned or controlled, *e.g.*, they would have one of their companies sell MEX a property, then have MEX immediately sell that property to another company the Bierenbaums owned, and contemporaneously have MEX execute a long-term lease (often on unfavorable terms) with the Bierenbaum entity that purchased the property.

54.    For example, on January 31, 2020 (*i.e.*, on a single day), the Bierenbaums caused MEX to engage in the following transactions for six properties located in Alabama and Arkansas (the "**Alabama-Arkansas Properties**")[3]: (i) MEX

_____

[3] The Alabama-Arkansas Properties were located at 1199 N. Maple Street, Searcy,

purchased the properties from Taylor Mercantile for $7.25 million; (ii) MEX sold those same properties to Mongo for $10,345,191; and (iii) then MEX agreed to lease the properties back from Mongo for twenty years at a lease rate that was above a fair market rental value and, regardless, at a rate that caused MEX to suffer losses from this transaction over the long term. Because the Bierenbaums are 100% owners of Taylor Mercantile and Mongo, they effectively sold these properties to themselves.

55.     As stated above, one of the reasons the Bierenbaums caused MEX to execute some Sale-Leaseback Transactions was to inflate MEX's revenues and profitability to lure lenders to loan MEX funds (including the Term Loan) to finance the LBO.

56.     Specifically, when MEX sold a property as part of the Sale-Leaseback Transaction, it would do so at a higher price than it paid for the property, often millions of dollars more. The Bierenbaums would then cause MEX to reflect that difference between its purchase price and the sale price as revenue, creating the impression that MEX obtained materially higher revenues.

57.     For example, with respect to the Arkansas-Alabama properties, the Bierenbaums caused MEX to report a purported a "gain" and revenues of $6,218,795 **in a single day** through the transactions where Taylor Mercantile (a company 100%

---

AR; 2000 S. Main Street, Searcy, AR; 1514 N. Bankhead Drive, Carlisle, AR; 316 S. Benton Street, Searcy, AR; 3753 S. Alabama Ave., Monroeville, AL; and 1328 Hwy. 113, Brewton, AL.

owned by the Bierenbaums) sold the properties to MEX (owned 98.46% by the Bierenbaums) who then immediately sold them to Mongo (a company 100% owned by the Bierenbaums).  To contrive this purported $6,218,795 purported "gain," the Bierenbaums claimed that, when MEX acquired the Arkansas-Alabama Properties from Taylor Mercantile for $7.25 million, that price included $3,132,604 in fuel supply contracts that were not sold to Mongo.  Thus, the Bierenbaums caused MEX to claim that the "gain" was the difference between what MEX paid for the Arkansas-Alabama Properties without the fuel supply contracts (*i.e.*, $4,126,396) and what Mongo paid for those same properties without the fuel supply contracts that same day (*i.e.*, $10,345,191).

58.    The Bierenbaums caused MEX to report the purported revenues from the Sale-Leaseback Transactions on MEX's financial statements so they could represent to lenders and others that MEX obtained sufficient revenues to cover its current and future expenses, including, but not limited to, expenses relating to the Term Loan.

59.    However, as noted above, the Sale-Leaseback Transactions also required MEX to execute long-term leases on unfavorable terms that required MEX to pay millions of dollars in purported "rent" to the purchaser often over twenty years.  The amount of purported profit that MEX obtained through the initial sale was materially eclipsed by the amount of purported "rent" it was required to pay

under the terms of the lease, such that the net result of the Sale-Leaseback Transactions was that they caused MEX to lose millions of dollars.

60.    The Arkansas-Alabama Properties provide a clear example. After the January 31, 2020, transaction that the Bierenbaums used to contrive the $6.2 million purported "gain" referenced in Paragraph 57 above, MEX's lease rates materially increased:

| Address | Pre-Transaction Rent | Post-Transaction Rent | Percentage Increase |
|---|---|---|---|
| 1199 N. Maple | $9,333/month | $17,123/month | 83% |
| 2000 S. Main | $9,333/month | $17,123/month | 83% |
| 1514 N. Bankhead | $7,291/month | $13,337/month | 83% |
| 316 S. Benton | $9,333/month | $17,123/month | 83% |
| 3753 S. Alabama | $2,625/month | $4,815/month | 83% |
| 1328 Hwy. 113 | $4,375/month | $8,026/month | 83% |

61.    These high lease rates were above fair market value and harmful to MEX. Indeed, even assuming *arguendo* that MEX obtained the $6.2 million gain, under the lease terms above, MEX was required to pay Mongo (and a later different landlord) $931,044 in rent (increasing 2% per year) for twenty years.[4] As a result, under the leases created through the Sale-Leaseback Transaction, MEX would have

---

[4] Mongo later sold the properties back to MEX for the same $10,345,191 price and, thereafter, MEX sold the properties to a REIT for $10,345,191 with MEX still being obligated to pay unsustainably high lease rates post sale. But for the unsustainably high lease rates, MEX would not have been able to sell the properties to the REIT for $10,345,191.

lost all its purported "gain" in less than seven years through lease payments and was obligated to continue to pay inflated rents for at least an additional fourteen years.

62.    By causing MEX to engage in Sale-Leaseback Transactions, the Bierenbaums pushed MEX further into insolvency.

63.    Specifically, the Bierenbaums effectively used the Sale-Leaseback Transactions as cash flow financing but did so in a manner that was unsustainable and made it so that MEX could not remain a going concern through regular business operations.

64.    Among other things, because the leases executed in connection with Sale-Leaseback Transactions were based on the cap rate (typically seven to nine-and-a-half percent), the Bierenbaums were effectively causing MEX to assume interest-only loans at rates between seven and nine-and-a-half percent (depending on the cap rate) over the life of the lease. And notably, unlike a traditional mortgage where a borrower owns the property at the end of the mortgage term, the Sale-Leaseback Transactions directed by the Bierenbaums left MEX with no assets at all once the lease term expired.

65.    In 2018 and thereafter, MEX did not generate sufficient revenues from normal business operations to cover its ongoing obligations plus the seven to nine-and-a-half percent lease payments and triple net obligations created through the Sale-Leaseback Transactions.  Thus, to cover the lease and other obligations, MEX

needed to use the purported "gains" from the Sale-Leaseback Transactions to cover the first few years of lease obligations but, once those funds were depleted, MEX did not have sufficient revenues to cover the lease obligations going forward.

66.     Said differently, the Bierenbaums effectively created a Sale-Leaseback Ponzi scheme where, absent some undefined and unplanned material change in MEX's business, MEX could only (temporarily) survive by using purported "gains" from new Sale-Leaseback Transactions to pay the lease obligations resulting from prior Sale-Leaseback Transactions.

67.     The Bierenbaums' improper use of Sale-Leaseback Transactions in this manner is confirmed by the testimony of Andrew Ackerman (MEX's primary real estate broker for Sale-Leaseback Transactions) who testified:

> Q:     …you [could] continue to do that in perpetuity, by using new sale leaseback transactions to pay for old lease obligations from prior sale leaseback transactions, correct?
>
> A:     You can do that. It would become difficult at a certain point.
>
> Q:     Eventually, it would collapse, correct?
>
> A:     If you were not reinvesting in capital, you were not paying down other debt, you would – it's clear. Mathematically you would run out, and you would no longer be deemed creditworthy by the people writing you sale leaseback financing on it.
>
> Q:     **Because what you're doing is taking cash you obtained from new sale leaseback transactions and using it to pay obligations from old sale leaseback transactions, correct?**
>
> A:     **It's effectively equivalent to a Ponzi scheme. Like, you're taking new investor money and just paying off old investors and obligations, and not growing the actual capital, which is going to end, most likely, with you not be[ing] able to meet any obligations.**
>
> Q:     **And I assume you would not advise your clients to use sale leaseback transactions that way, correct?**

A:    **I would not advise people to do that**.

68.    The Bierenbaums improperly used Sale-Leaseback Transactions to try to create false impressions regarding MEX's financial status and viability by artificially increasing MEX's revenues in its financial statements while not adequately disclosing the impact of the liabilities associated with the leases. As Mr. Ackerman testified:

> Q:    Well, let's say a company purchased a property for $400,000. And the same day, sold it in a sale leaseback transaction for $500,000. It would report a gain of $100,000 roughly taking out closing costs?
> A:    They can, yes.
> Q:    And under the old rules about accounting for leases, the company would not have to put on its books the long-term liabilities associated with [the] lease, correct?
> A:    That would be my understanding of what it used to be like.
> Q:    So they can show an increase in assets through this roughly $100,000 gain without showing a comparable increase in liabilities?
> A:    That would be in a sense where that would work.
> …
> Q:    And before the law changed on leases, the company, rather than getting a traditional loan, could do sale leaseback transactions, show an increase in assets through the gain on the sale of the property, but not show an equivalent amount of liabilities, because it can have the lease off the balance sheet, correct?
> A:    I would say that is correct.
> **Q:    So in my hypothetical, the sale leaseback transaction could at least create the impression the company was no longer insolvent even though it was?**
> **A:    Yeah, I mean – yes, and that does happen.**

69.    As discussed in more detail below, the Bierenbaums engaged in at least some Sale-Leaseback Transactions not only to inflate MEX's revenues, but also to unlawfully reduce their personal tax liabilities.  Specifically, the Bierenbaums used

some of the transactions to (unlawfully) claim bonus depreciation, which reduced and/or delayed their personal tax liability.[5]

70.    Notably, because the tax laws precluded the Bierenbaums from having Mongo claim bonus depreciation for transactions with related parties, the Bierenbaums tried to hide from the IRS and others that they were on both sides of some of the Sale-Leaseback Transactions.

71.    For example, an email written in connection with the closing of the Arkansas-Alabama Properties states: "I don't want to change the Mongo signature blocks because nothing on the public record will reflect Barry and Gail being on both sides of the transaction." MEX's former counsel, James Johnston, who wrote this email testified with respect thereto:

> Q:    And that's because you didn't want the Bierenbaums being on the public record as being on both sides of the transaction?
> A:    There could have been other reasons.
> Q:    But that's one of them; is that fair?
> A:    It could be one of the reasons, yes.

72.    Upon information and belief, the Bierenbaums' improper attempt to obtain the benefits of bonus depreciation they were not entitled to obtain was not

---

[5] The Bierenbaums caused Taylor Mercantile and Mongo to claim bonus depreciation, which flowed through to their personal taxes as Taylor Mercantile and Mongo are S Corporations. As Jaax testified, "everything flows back up to Barry and Gail." Further, even assuming *arguendo* that the Bierenbaums later had to recapture the bonus depreciation they took, if that recapture occurred the next tax year, the Bierenbaums had the benefit of using the funds for at least one year.

limited to the Arkansas-Alabama Properties. Rather, they caused and directed Taylor Mercantile and Mongo to engage in other improper "transactions" with MEX for the purpose of, among other things, reducing their tax liabilities through taking artificially high depreciation.

73.    For example, on August 7, 2020, the Bierenbaums caused and effectuated the following transaction:

- Taylor Mercantile sold a property located at 240 Jordan Lane, Huntsville, Alabama (the "**Huntsville Property**") to MEX for Taylor Mercantile's cost of $535,000.

- **That same day**, MEX sold the Huntsville Property back to Taylor Mercantile for $750,000.

- **Also that same day**, MEX executed a twenty-year lease with Taylor Mercantile for the Huntsville Property with the lease rate based on a 9.5% cap-rate derived from the $750,000 sales price.[6]

74.    The Bierenbaums caused Taylor Mercantile and MEX to engage in the August 7, 2020, Huntsville Property transaction so the Bierenbaums could, among other things, unlawfully depreciate the property using a $750,000 basis instead of the true $535,000 basis. And, while MEX purportedly "gained" $215,000 from the sale back to Taylor Mercantile, it obligated itself to substantially higher rents (well exceeding the purported $215,000 gain) as confirmed by James Johnston in his Rule

---

[6] The Trustee recognizes this transaction occurred after the Bierenbaums sold their interest in MEX, but it nonetheless provides a simple example of how the Bierenbaums facilitated their improper conduct through MEX.

2004 examination:

> Q:    So on August 7th, the only thing that happened was MEX got
> $215,000 on August 7th and in exchange agreed to pay over
> $400,000 in higher rents?
>
> A:    I haven't done your math, but I will – based on what I've seen, I
> see where the rent went up to 50… That's—I think that's…
>
> Q:    So what I'm saying based on what I've shown you is correct, is
> that fair?
>
> A:    I believe that to be true.

75.    Grant Jaax ("**Jaax**"), the Manager for Taylor Mercantile and Mongo,

confirmed this fact during his Rule 2004 examination:[7]

> Q:    So one reason why Taylor sold the Huntsville property to
> MEX only to immediately buy it back is so Taylor can take
> greater depreciation for that property, correct?
>
> A:    It's one of several reasons.

76.    Further, in some instances, the Bierenbaums caused MEX to effectuate

Sale-Leaseback Transactions to circumvent MEX's loan covenants and obligations

to its lenders.

77.    MEX's Credit Agreement precluded MEX from obtaining loans from

other sources, including, but not limited to, Taylor. On this point, MEX's former

counsel James Johnston testified:

> Q:    And the reason you claim there were not any loans from Taylor
> to MEX is that the October 2018 credit agreement prohibited
> MEX from receiving loans from Taylor, correct?
>
> A:    My recollection is that the October of '18 credit agreement
> prevented MEX from receiving loans from any party other than
> Iberia.

---

[7] For readability, objections are omitted throughout this Complaint.

Q:      And that would include preventing MEX from getting a loan from Taylor, correct?

A:      I believe it would.

78.     To circumvent that covenant, the Bierenbaums would cause MEX to engage in Sale-Leaseback Transactions with their related companies (*e.g.*, Taylor Mercantile and Mongo) to avoid having to place another loan on MEX's books. Generally, the process worked as follows: (i) the Bierenbaums would cause MEX to obtain financing from a related company like Taylor Mercantile to fund the purchase of properties; (ii) to keep the financing off of MEX's books, on the day that MEX closed on the properties, the Bierenbaums would cause MEX to sell the properties to Taylor Mercantile so that MEX would show revenues from the sale (as opposed to a loan) on its books; (iii) MEX would lease the properties back from Taylor Mercantile; and (iv) when the properties were later sold to a third party as part of another Sale-Leaseback Transactions, some of the proceeds of that sale were transferred to Taylor Mercantile to repay it for the loan.

79.     The Bierenbaums (aided by Taylor Mercantile) improper use of Sale-Leaseback Transactions to circumvent MEX's loan covenants is confirmed in an email from MEX's auditor who wrote the following about the Arkansas-Alabama Properties transaction: "The transfer to Taylor Mercantile was solely for the purpose of complying with the Iberia Bank loan covenants (MEX cannot have additional debt from sources other than Iberia Bank). So recording the following entry on MEX

would have violated the loan covenants and required a waiver from the bank." It is confirmed by other documents as well. For example, a closing statement relating to MEX's sale of a property at 43 Spruce Street Hickory Flat, Mississippi, in September 2020, reflects that the proceeds of the sale were transmitted to Taylor Mercantile as a "Payoff to Taylor Mercantile, LLC" for a loan. Likewise, a closing statement relating to MEX's sale of ten properties (*e.g.*, 1311 E. Main Street, El Dorado, Arkansas) to 42 ARLA Stores, LP in 2019 reflects "Sale Proceeds to Taylor Mercantile, LLC" of $1,550,000.

80.    The Bierenbaums' (aided by Taylor Mercantile) improper use of Sale-Leaseback Transactions to hide MEX's debt covenant violations from its lenders is further confirmed by a letter Jaax wrote on January 21, 2020, relating to the Arkansas-Alabama Properties, reading:

> On December 30, 2019, Taylor Mercantile LLC purchased six properties for $7,250,000 from Marketplace Energy LLC, Marketplace Property #3 LLC, Marketplace Monroe LLC, and JPAL Holdings LLC. In the coming month(s), Taylor Mercantile LLC will sell the six properties to Mountain Express Oil Company for $7,250,000. Each of these transactions were/will be funded with 100% cash.
>
> Upon ownership by Mountain Express Oil Company, Mongo Holdings LLC will purchase the six properties for $10,200,000 from Mountain Express Oil Company. Note the tenant would remain Mountain Express Oil Company, which is an A+ credit. Mongo Holdings LLC has the same ownership structure as Taylor Mercantile LLC.
>
> This transaction will comply with the Accelerated Depreciation

code within the Business 2017 Tax Cuts and Jobs Act. This type of transaction is a standard process at Mountain Express Oil Company with Mongo Holdings LLC replacing the debt.

81.    Jaax's January 21, 2020, letter is notable for several reasons, including, but not limited to, (i) its reference to the "[a]ccelerated [d]epreciation code," *i.e.*, the Bierenbaums using Taylor Mercantile and Mongo to claim accelerated depreciation and (ii) its reference to "Mongo Holdings LLC **replacing the debt**," *i.e.*, confirming that the transactions was effectively a loan in violation of MEX's loan covenants.

82.    MEX's Credit Agreement also required MEX to use proceeds from transactions such as the Sale-Leaseback Transactions to pay down MEX's loan.[8]  In some cases, the Bierenbaums caused MEX to engage in Sale-Leaseback Transactions to circumvent that obligation.

83.    For example, in November 2018, the Bierenbaums caused MEX to purchase properties from Mid-State Distributing and South Arkansas Oil purportedly for the purpose of using them as part of a Sale-Leaseback Transaction with a company called Vault Equity Capital, LLC ("**Vault**").  Under the Credit Agreement, if MEX sold the Mid-State Distributing and South Arkansas Oil properties to Vault and immediately leased them back, MEX would have been

---

[8] Section 2.15(d) of the Credit Agreement states: "No later than the Business Day following the date of receipt by the Borrower or any of the Guarantors of any proceeds from any Sale/Leaseback Transaction by the Borrower or any of the Guarantors, the Borrower shall prepay the Obligations in an amount equal to fifty percent (50%) of such proceeds…."

required to use 50% of the proceeds from that transaction to pay down its loan with Iberia Bank. To avoid at least some of that obligation, the Bierenbaums caused MEX to sell the Mid-State Distributing and South Arkansas Oil Properties to their related company Taylor Mercantile on the very same day that MEX acquired them so that Taylor Mercantile (and not MEX) would be the entity later selling the properties to Vault. That process caused at least some of the proceeds from the sale to Vault not to go into MEX's bank account and thereby circumvented the obligation to use some of the proceeds to pay down MEX's loan.

84.    This is confirmed by an email from MEX's auditor who, in discussing the Arkansas-Alabama Properties transaction, wrote: "Also, when the stores were sold to Vault, the selling proceeds that would have gone into the MEX bank account would have been required to be used to pay down the Iberia Bank loan first, rather than repaying the shareholder [*i.e.*, Bierenbaum] loan."

85.    The Bierenbaums went to great lengths to hide their improper conduct. In fact, MEX's own real estate broker, Andrew Ackerman ("**Ackerman**"), testified in his Rule 2004 examination that the Bierenbaums never informed him of several transactions where the Bierenbaums moved properties between MEX and Taylor Mercantile and that the first time he learned of those transactions was in the examination himself.

30

86.    Significantly, Ackerman testified that had he known about the Bierenbaums' conduct, he would have never participated in the Sale-Leaseback Transactions:

Q:    So with that knowledge, do you see where MEX was using the transaction with Taylor to avoid its obligations under the credit agreement with Iberia bank, that's what this says?

A:    Yeah, it seems – it seems that way.

…

Q:    Do you think it would be appropriate for MEX to try and circumvent its contractual obligations with its lenders?

A:    No.

Q:    Would you ever knowingly agree to engage in such a transaction?

A:    No.

…

Q:    Because if you knew that is what Mr. Bierenbaum and MEX [were] doing, you would have thought twice about participating in it; is that fair?

A:    Oh, a hundred percent. We would have – and we would have let the investor partners as well know, and just say, hey, like, we've got to think about whether we want to be a party to this, if this is what's going on.

87.    The Bierenbaums' improper conduct was not limited to Sale-Leaseback Transactions. The Bierenbaums also caused MEX to obtain and provide to lenders biased, inflated, and inaccurate valuations of MEX's fuel supply contracts for the purpose of securing financing including the Term Loan.

88.    One aspect of MEX's business involved the provision of fuel to C-Stores pursuant to fuel supply contracts through which the C-Stores would agree to purchase their fuel solely from MEX for a defined period (the "**Fuel Supply Contracts**").

89.     Given that MEX was balance-sheet insolvent in 2018, the Bierenbaums sought to inflate the value of their Fuel Supply Contracts to, among other things, allow MEX to obtain financing for the LBO.

90.     Thus, the Bierenbaums asked Ackerman of Sands Investment Group Atlanta, LLC ("**Sands**") to provide a purported independent valuation of MEX's Fuel Supply Contracts.

91.     But Sands' purported valuation was anything but independent.  Among other things, Sands, primarily through its Managing Partner Ackerman, had served as a purported real estate broker for MEX in connection with the Sale-Leaseback Transactions and received over $1,000,000 in commissions for that work.  Further, Sands and Ackerman stood to gain potentially millions more in commissions if MEX obtained financing that would allow it to continue assist MEX in engaging in Sale-Leaseback Transactions.  Indeed, Ackerman conceded in his Rule 2004 examination that he stood to personally gain financially if MEX obtained financing and continuing working with MEX on Sale-Leaseback Transactions:

Q:     And if the commission that Sands earned was paid to the Sands Atlanta office you personally gained, correct?
A:     Yes.
Q:     So you had a personal interest in hoping that MEX would continue to engage in sale leaseback transactions where the commissions were paid to Sands Atlanta office, correct?
A:     Yes.

92.     Setting aside Sands' and Ackerman's economic motive to inflate the value of MEX's Fuel Supply Contracts, there were also numerous flaws with Sands' Fuel Supply Contract valuation.

93.     For one, Ackerman (i) had no formal training on valuing Fuel Supply Contracts; (ii) had only attempted to value Fuel Supply Contracts on a standalone basis two or three times in twenty years; and (iii) was not knowledgeable of, and did not even attempt to comply with, any recognized valuation standards. In his Rule 2004 examination, Ackerman testified:

> Q:    Because you've never reviewed the American Society of Appraisers valuation standards, you've never attempted to perform a valuation in accordance with those standards, correct?
>
> A:    Yes.
>
> ….
>
> Q:    And you've never attempted to perform a valuation that complied with the AICPA standards for valuation services, correct?
>
> A:    No…I have not.
>
> ….
>
> Q:    So I assume you've never endeavored to perform a valuation in accordance with the appraisal found standards?
>
> A:    I have not.
>
> …
>
> Q:    And you've never attempted to perform a valuation that complied with USPAP, correct?
>
> A:    I have not.
>
> …
>
> Q:    And you've never endeavor[ed] to perform a valuation that complied with the standards set forth by the national association of certified valuators and analyses, correct?
>
> A:    Correct.
>
> ….
>
> Q:    And you've never endeavored to perform a valuation that complies with the standards set forth by the Institute of Business Appraisers, correct?

A:    Correct.

…

Q:    Have you ever received any formal training on how to value fuel supply contracts?

A:    No.

94.    Mr. Bierenbaum, who had worked with Ackerman for years, knew that Ackerman was not qualified to perform fuel supply contract valuations.

95.    Further, Ackerman did not review all of MEX's Fuel Supply Contracts to ascertain whether they were assignable.  Had Ackerman properly reviewed MEX's Fuel Supply Contracts, he would have learned that many of them did not contain a term permitting the transfer, assignment, or sale of the contracts.  Indeed, after reviewing some of MEX's Fuel Supply Contracts at his Rule 2004 examination, Ackerman conceded that they did not contain a clause stating that MEX could transfer, sell, or assign them:

Q:    …you didn't see anything in this fuel supply contract that expressly states that MEX can transfer, sell, or assign it, correct?

A:    Yes.

….

Q:    So MEX had fuel supply contracts prior to 2020 that did not expressly state they could be transferred, sold, or assigned, correct?

A:    Yes.

96.    Sands' failure to ascertain whether MEX's Fuel Supply Contracts contained an assignment clause is material because the Fuel Supply Contracts are service contracts that cannot be assigned without a contractual term expressly permitting assignment and full compliance therewith. Indeed, during his Rule 2004

examination, James Johnston, MEX's former counsel, testified that MEX's fuel

supply contracts were service contracts:

Q:     Did MEX provide C-stores with unique skills or services, like
       training or guidance, that would cause C-stores to select MEX
       over other jobbers?
A:     Yes.
....
**Q:     Is it fair to say that MEX offered a lot of services in
       connection  with its fuel supply contracts?**
**A:     It's fair to say it, yes.**
**Q:     And were those important components of the fuel supply
       contracts?**
**A:     I believe it was....**
Q.     Is it your understanding that the dealers stayed with Mountain
       Express because it provided all these services that it couldn't get
       from other jobbers?
A:     That's true….
Q:     Is it your understanding that MEX marketed itself as being
       particularly skilled and qualified to serve as a jobber because it
       can help C-stores with these various items?
A:     Yes.
Q:     And MEX tried to distinguish itself from other jobbers by saying
       it was uniquely qualified given its knowledge and experience in
       the field, correct?
A:     That was one of the ingredients, yes.

97.    The Sands valuation's failure to ascertain whether MEX's Fuel Supply

Contracts could be transferred, sold, or assigned is significant because, as Ackerman

conceded in his Rule 2004 examination, if a Fuel Supply Contract could not be

transferred, sold, or assigned, it had no value to anyone other than MEX, *i.e.*, it had

no value as collateral:

Q:     And in situations where a fuel supply contract does not provide for the
       contract to be transferred, sold or assigned by the jobber [*i.e.* MEX],

the contract has value to the jobber who is a party to the contract, but not to anybody else, correct, because nobody else can benefit from it?

A:    Yes, under the circumstances.

Q:    So there are situations where a fuel supply contract may have a lot of value to the jobber who holds the contract, but no value to anybody else, correct?

A:    I think, yes, based on what you've described.

98.    As a result, Sands purported valuation provides no information as to the value, if any, of MEX's Fuel Supply Contracts to any entity other than MEX:

Q:    And at any point in time, did anybody ever ask Sands to look at the value of the fuel supply contracts as held by anybody other than MEX?

A:    These exact contracts like being purchased by another person.

Q:    Yes.

A:    No, it was never specifically requested, I don't think.

99.    Thus, Sands' valuation did not value the Fuel Supply Contracts as standalone assets or collateral, but rather only valued them if they were owned and held by MEX.  The Sands' valuation does not disclose that fact.

100.    In addition, Sands' purported valuation was based upon information that it obtained from MEX that Sands failed to independently verify.  Ackerman admitted that if he "received inaccurate information from MEX, that would call into question the accuracy of the Sands fuel supply contract valuations."

101.    Sands' purported valuation was also flawed because Ackerman failed to consider all relevant valuation factors.  For example, although Ackerman testified that a proper valuation of Fuel Supply Contracts includes examining, among other things, "the strength of the operator of the C store," "the basis of the C store

counterparty," "the credit of the C store counterparty," "the profitability of the C store counterparty," "the amount of debt that the C store counterparty has" and the C Store's location, Ackerman conceded that he failed to consider most, if not all, of those factors when performing MEX's Fuel Supply Contract valuation.

102. The Bierenbaums had a close relationship with Sands and Ackerman. In fact, Ackerman co-owned side companies with Mr. Bierenbaum that participated in Sale-Leaseback Transactions, including a company called ANDBAR, LLC. The Bierenbaums used that relationship, and their ability to provide Sands and Ackerman with current and future profits, to influence Sands' Fuel Supply Contract valuation. The Bierenbaums worked closely with Sands to ensure that the valuation was sufficiently high to allow them to obtain the financing needed to effectuate the LBO.

103. The Bierenbaums knew that Sands' Fuel Supply Contract valuation was biased, flawed, and inaccurate for the reasons set forth above, yet they knowingly caused them to be forwarded to MEX's lenders with the intention that those lenders rely on the valuations when deciding whether to provide financing including the Term Loan.

104. Moreover, when MEX's lenders sought to have another valuation of the Fuel Supply Contracts performed, the Bierenbaums caused, directed, facilitated, and/or otherwise allowed false information and/or assumptions to be provided to the valuation company (the "**Second Valuator**") so that it would also reach an inflated

and inaccurate conclusion about the value of MEX's Fuel Supply Contracts.

105.   For example, the Bierenbaums caused, directed, facilitated, and/or otherwise allowed the Second Valuator to inaccurately base its valuation opinion on the belief or assumption that (i) MEX's Fuel Supply Contracts were all assignable (they were not); (ii) there was a market available through which MEX could sell its Fuel Supply Contracts if needed to raise cash (there was not); and/or (iii) the independent C-Stores to which MEX sold fuel were quality operators and thus would remain in business throughout the Fuel Supply Contract's term (many of the C-Stores were not owned by quality operators).

106.   The Bierenbaums also failed to adequately convey to the Second Valuator that, with respect to those C-Stores that were owned by MEX, if MEX went out of business, the Fuel Supply Contracts had no value since there would be no C-Stores operating to sell fuel.

107.   Moreover, the author of the second valuation stated, under oath, that: (i) his valuation "did not opine on whether MEX's fuel supply contracts are independently saleable outside of MEX"; (ii) that his valuation was "not intended to convey, and did not convey, any opinion as to whether the fuel supply contracts are themselves marketable assets that could be sold independent of MEX"; (iii) that he "did not conduct any investigation, study, or analysis into whether fuel supply contracts generally, or MEX's fuel supply contracts specifically, had independent,

standalone value," but rather was "simply asked to assume that was the case"; and (iv) that he was "not asked to conduct, and did not conduct, any solvency analysis" of MEX.

108.   The author of the second valuation further stated under oath that his valuations were dependent upon the information, data, and assumptions provided by MEX being accurate and, if they were not accurate, "it would materially impact the accuracy and reliability of the Valuations."

109.   Likewise, he stated that "if MEX's management entered into fuel supply contracts with entities that were not creditworthy, poor operators, or had other issues that raised concerns about their ability to remain a going concern, that would materially impact the Fuel Supply Contract Valuations."

110.   Had the Bierenbaums fully and accurately disclosed to the Second Valuator the facts and circumstances relating to its Fuel Supply Contracts, the Second Valuator would have reached a materially lower conclusion on the Fuel Supply Contracts' value.

111.   The Fuel Supply Contract valuations (that were based on the inaccurate information and assumptions the Bierenbaums provided to, or caused others to provide to, the valuators) were materially flawed, inaccurate, and contained misrepresentations. The Bierenbaums were aware of that fact.  The Bierenbaums nonetheless caused and directed them to be sent to MEX's lenders and others for the

purpose of, among other things, inducing them to provide MEX with the Term Loan.

112.   The inaccuracy of the Fuel Supply Contract valuations is perhaps best shown by what transpired after MEX declared bankruptcy.  While the valuations represented that MEX's Fuel Supply Contracts were worth over $170 million in 2020, post-bankruptcy MEX was not able to sell them for as little as $30 million.

## The Bierenbaums' Scheme Worked

113.   As outlined above and as will be further shown in this litigation, the Bierenbaums' conduct, which was aided by Taylor Mercantile and Mongo, was designed and intended to, among other things, cause MEX's lenders to provide MEX with financing, including the $130 million Term Loan of which roughly $55.4 million was earmarked to effectuate and close the LBO.

114.   The Bierenbaums' efforts were successful. They convinced their lenders to provide $160 million in financing, including the $130 million Term Loan.

115.   The $130 million Term Loan was syndicated among several lenders, with IberiaBank (n/k/a First Horizon Bank) as the administrative agent for the facility and a participating lender, and was evidenced by, among other documents, a credit agreement (the "**Credit Agreement**").

116.   After the Term Loan was finalized, the Bierenbaums caused MEX to effectuate and close the LBO.

117.   On or around March 12, 2020, MEX transferred $55,370,696.54 to Mongo (purportedly to pay for the Bierenbaums' remaining shares in MEX) (the "**March 2020 Transfer**", and collectively with the October 2018 Transfer, the Officers' Stock Purchase Transfer, the October 2019 Transfer, and all other transfers of money, property and other benefits to the Defendants or others in connection with the LBO, the Redemption Agreement, or the Redemption Amendment, the "**LBO Transfers**").

118.   The LBO Transfers and Redemption Obligations were concealed from the vast majority of MEX's creditors.  Indeed, Mr. Bierenbaum testified in his Rule 2004 examination that the Redemption Agreement was "a private agreement" that was not available in the public record and not provided to, among others, state and federal taxing authorities.

119.   In connection with the LBO, the Bierenbaums caused MEX to execute employment agreements with two employees, Frady and Wadud, pursuant to which they each received 12,500 MEX shares in exchange for $500,000 each.

120.   According to MEX's December 31, 2021, audited consolidated financial statements, MEX "elected to retire all treasury stock in the amount of $101,152,894 on the transaction [*i.e.*, LBO closing] date."

121.   Consequently, once the LBO was completed in March 2020, Frady and Wadud, each of whom owned 12,500 shares, were the sole owners of MEX.  In other

words, Frady and Wadud each obtained 50% ownership in MEX for $500,000 (as compared to the roughly $50 million the Bierenbaums caused MEX to pay for each of their roughly 50% shares of the Company).

122.   This was the Bierenbaums' plan all along: "[t]he end goal of the Stock Redemption Agreement is for all of [the Bierenbaums'] stock to be redeemed by the Company, and upon that occurrence the shares of Frady, Husain and Wadud would constitute all of the issued and outstanding shares of the Stock of the Company."[9]

123.   The net effect of the LBO was as follows: (i) the Bierenbaums obtained $99.5 million; (ii) MEX was saddled with tens of millions of dollars in debt that it needed to redeem the Bierenbaums' shares (which, post redemption, were immediately retired and rendered valueless); and (iii) MEX received only $1 million from Frady and Wadud for their 100% ownership in MEX.

124.   By implementing and effectuating the LBO, the Bierenbaums, aided by at least Mongo who received the March 2020 Transfer, placed their own personal financial interests over the interests of MEX.

125.   By implementing and effectuating the LBO, the Bierenbaums, aided by at least Mongo who received the March 2020 Transfer, took actions that benefited them personally even though they knew that such actions would harm (and

---

[9] In 2018, Ali Husain worked for MEX and was also provided 12,500 shares of MEX for $500,000 which was paid to the Bierenbaums. Prior to the closing of the LBO, the Bierenbaums caused MEX to repurchase Mr. Husain's shares.

eventually did harm) MEX.

## MEX's Financial Condition at the Time of the LBO

126.  At the time of the LBO, MEX was in financial distress.

127.  According to MEX's audited 2018 financial statements, as of December 31, 2018, MEX had assets of $87,006,857 and liabilities of $97,499,451. Accordingly, MEX was balance-sheet insolvent by nearly $10.5 million at the time that the Bierenbaums committed MEX to pay them $99.5 million, at the time the Redemption Agreement was signed, and at the time of the October 2018 Transfer.

128.  According to MEX's audited 2019 financial statements, as of December 31, 2019, it had assets of $96,616,944 and liabilities of $95,359,428.[10]

129.  However, to effectuate the remainder of the LBO, the Bierenbaums, as MEX's controlling shareholders, caused MEX to close a new credit facility which increased its long-term debt by nearly $70 million, resulting in MEX's clear insolvency at the time of the March 2020 Transfer.  That insolvency was worsened by the Sale-Leaseback Transactions that created what were in effect long-term "loan" obligations of seven to nine-and-a-half percent that MEX could not cover through its normal business operations and thus created a scenario where, absent

---

[10] MEX's asset values were inflated including, without limitation, the value of MEX's Fuel Supply Contracts, which proved to be nearly valueless during MEX's bankruptcy. Moreover, the balance sheet liabilities did not fully capture MEX's long term lease obligations, among other liabilities.

some material, undefined, and unplanned change in MEX's business, MEX had to continue to engage in new Sale-Leaseback Transactions so that the purported "gains" could be used to pay off lease obligations from previous Sale-Leaseback Transactions.

130.  In March 2020, MEX's existing revenue stream was insufficient to cover its expenses, particularly after excluding the phantom revenues from Sale-Leaseback Transactions.

131.  Even if the phantom revenues from Sale-Leaseback Transactions are considered, MEX still did not have sufficient revenues to cover its ongoing expenses, particularly after accounting for the increased expenses from the Term Loan and the lease and triple net obligations caused by the Sale-Leaseback Transactions.

132.  Given these facts, the Bierenbaums must have known in October 2018 when they caused MEX to execute the Redemption Agreement, and also must have known prior to causing MEX to sign the Redemption Amendment, that MEX's revenue stream would not be sufficient to sustain the Company's existing debts and the new Redemption Obligations created by the Redemption Agreement, Redemption Amendment, Term Loan, LBO, and/or Sale-Leaseback Transactions. Upon information and belief, the Bierenbaums did not disclose these facts when they caused MEX's other shareholders to sign attachments to the Redemption Agreement and Redemption Amendment.

133.  In short, the Bierenbaums intentionally, willfully, and knowingly caused MEX to assume substantial and unsustainable debt to benefit themselves, *i.e.*, to allow them to reap over $100 million from the Company. Further, the Bierenbaums acted in such a way as to put their own private interests above their obligations as corporate representatives and, for that reason, their knowledge is not imputed to MEX.

134.  By signing the Redemption Agreement and Redemption Amendment, and by effectuating the LBO, the Bierenbaums put their own personal interests above MEX's interests and, in so doing, caused MEX harm.

135.  Moreover, Ms. Bierenbaum has recently testified that she was not even aware that she was a director of MEX.

136.  Accordingly, she did not undertake the inquiry and diligence required of a director under Georgia law.

137.  Ms. Bierenbaum had significant control over MEX's affairs.  In his Rule 2004 Examination, Mr. Bierenbaum testified that:

- "Gail and I built [MEX] one store at a time . . ."

- "[Gail] managed the money [of MEX]."

- "So I wouldn't say I trusted anybody.  I ran a tight ship, a very tight ship, and I made everybody toe the line.  We had checkers checking the checkers, and that was mainly my wife and I."

138.  Likewise, Ms. Bierenbaum testified in her Rule 2004 Examination that

she "watched the money…and actually I kind of controlled the employees that were there when he had to hire or let someone go or anything of that capacity." Ms. Bierenbaum further testified that she and Mr. Bierenbaum were the only ones who wrote checks on MEX's bank accounts.

139.    Additionally, Jaax testified that he personally observed Ms. Bierenbaum's work for and at MEX and, based on those observations, she was actively involved in MEX's business, including, but no limited to, overseeing and/or managing MEX's finances and accounting. For example, he testified:

> Q:    What type of work did you see Mrs. Bierenbaum perform for MEX while she was still an owner of the company?
> A:    She oversaw their accounting.
> Q:    Is it fair to say that Mrs. Bierenbaum had an active role in MEX's finances and accounting until March of 2020?
> A:    Yes.

140.    At the time that the Bierenbaums caused MEX to engage in Sale-Leaseback Transactions so it could use the purported "gains" from new Sale-Leaseback Transactions to pay existing obligations from prior Sale-Leaseback Transactions, MEX continued to engage in at least some normal, legitimate business operations, including, but not limited to, its fuel distribution business.

## Shareholder Distributions to the Bierenbaums

141.    In the years leading up to the completion of the LBO, the Bierenbaums caused MEX to make tens of millions of dollars of transfers (the "**Distributions**",

and collectively with the LBO Transfers, the "**Transfers**") to, or for, their benefit, which amounts total at least $31,559,979.77.

142.   The following table summarizes the Distributions by year:

| Year | Amount |
|------|--------|
| 2018 | $13,805,894.66 |
| 2019 | $8,730,441.70 |
| 2020 | $9,023,643.41 |

Additional detail regarding the Distributions is set forth on **Exhibits A, B and C**, which is incorporated by reference as if fully set forth herein.

143.   The Distributions were classified by MEX's auditors as shareholder distributions to the Bierenbaums.

144.   The Bierenbaums provided little or no consideration for the Distributions.

145.   The vast majority of MEX's creditors, including the Predicate Creditors and the Government Predicate Creditors described below, were not advised of the existence of the Distributions.

146.   The Bierenbaums were conflicted in approving the LBO, the Redemption Obligations, and the Transfers, and put their own interests above the interests of MEX.

## Purported Payments to Taylor Mercantile

147. During the period between March 18, 2019, and the Chapter 11 Petition date (March 17, 2023), MEX transferred or otherwise provided the following funds to Taylor Mercantile (together with all other transfers of money or property from MEX to Taylor Mercantile, the "**Taylor Mercantile Transfers**"):

| 3/17/2019 - 3/17/2020 | 3/17/2020 - 3/17/2021 | 3/17/2021 - 3/17/2022 | 3/17/2022 - 3/17/2023 | Total |
|---|---|---|---|---|
| $1,145,080.55 | $1,604,156.79 | $876,891.39 | $26,281.94 | $3,652,410.67 |

Detail regarding the presently known Taylor Mercantile Transfers is contained on **Exhibit D** hereto, which is fully incorporated herein by reference.

## MEX's Demise

148. The LBO, and particularly the Term Loan associated therewith, created an ongoing financial strain for MEX. Among other things, as a result of the LBO and associated Term Loan, MEX was saddled with substantial interest and other payments. MEX's financial distress was further exacerbated by the lease and other obligations MEX was required to pay as a result of the Sale-Leaseback Transactions.

149. Ultimately, MEX was unable to make its loan payments under the Term Loan. MEX was also unable to pay its lease obligations from Sale-Leaseback Transactions, among other liabilities.

150. On December 21, 2022, the lenders notified MEX that it was in default of the Term Loan and the revolving lines of credit.

48

151.    Less than three years after the LBO was completed in March of 2020, MEX collapsed.

152.    On March 18, 2023, the Debtors filed for protection under Chapter 11 of the Bankruptcy Code. On August 24, 2023, MEX's Chapter 11 cases were converted to chapter 7 cases, and the Trustee was appointed.

153.    Defendants' conduct, as set forth throughout this Complaint, harmed MEX directly and indirectly harmed all MEX's creditors (as opposed to a specific creditor). If the Trustee was not permitted to assert these claims, it would result in harm to MEX's innocent creditors.[11]

### **Predicate Creditors**

154.    The Internal Revenue Service (the "**IRS**") has filed claims against the Estate for unpaid taxes.

155.    One or more creditors held claims against MEX at or prior to the time of the Redemption Agreement and the Transfers, including, without limitation, AFN ABSPROP001, LLC, ARG MESMOAR001, LLC, ARG MEVNAAL001, LLC, ARG ME19PCK001, LLC, Spirit SPE Portfolio CA C-Stores, LLC, State of Alabama, Department of Revenue, the Oklahoma Tax Commission, and the Georgia

---

[11] For the avoidance of doubt, the Trustee is not seeking recovery based on injury to MEX's innocent creditors. Rather, the Trustee is seeking relief for the harm done to MEX. Innocent creditors will benefit from this litigation when proceeds therefrom are distributed by MEX's Estate to and for the benefit of MEX's creditors.

Department of Revenue (collectively, the "**Predicate Creditors**").

156.   Moreover, certain creditors of MEX are government entities that are not subject to the limitations period set forth in the Bankruptcy Code or in O.C.G.A. § 18-2-79 (the "**Government Predicate Creditors**"). These Government Predicate Creditors include, but are not limited to, the following:

a.  The State of Alabama, Department of Revenue, is exempt from the statute of limitations.  This creditor holds a claim against MEX for $440,904.75. Alabama law embraces the doctrine of *nullum tempus*.  *See Board of School Comm. v. Architects Group*, 752 So. 2d 489 (Ala. 1999) (holding that *nullum tempus* does not apply to a county as a political subdivision of the state but <u>does</u> apply to the state) (citing *State v. Estate of Crocker*, 38 Ala. App. 306, 308-09, 83 So.2d 261, 262 (1955)); *see also Cox v. Board of Trustees of the University of Alabama*, 161 Ala. 639, 656, 49 So. 814, 820 (1909).

b.  The Oklahoma Tax Commission is exempt from the statute of limitations, as Oklahoma law also embraces the doctrine of *nullum tempus*.  *See State ex rel. Schones v. Town of Canute*, 858 P.2d 436 (Okla. 1993).  This creditor holds a claim against MEX for $4,370.26.

157.   Neither the Predicate Creditors nor the IRS were provided with notice of the LBO, the Transfers, or the Obligations before their occurrence.

## IV.   CLAIMS FOR RELIEF

158.   The following causes of action are asserted against the Bierenbaums, Taylor Mercantile, Mongo, Mongo BG and/or 504N, as stated in each claim, without prejudice to any rights the Trustee or the Debtors may have against the Bierenbaums, Taylor Mercantile, Mongo, Mongo BG, 504N, or any other persons or entities and without prejudice to any rights this Court or the Bankruptcy Court may grant to the Trustee or the Debtors to assert additional causes of action or allegations based on facts disclosed in documents, testimony, or other information made available to the Trustee or the Debtors or developed as a result of discovery or otherwise.

159.   All conditions precedent to the maintenance of this action, the filing of this Complaint, and to the following claims have been performed, been waived, satisfied, have occurred, or have otherwise been met.

### COUNT I:
### VOIDABLE TRANSFERS AND OBLIGATIONS
### (11 U.S.C. § 544(b) & 28 U.S.C. § 3304(a)(1))

160.   The Trustee restates and incorporates herein by reference the allegations contained in paragraphs 1 through 159 above.

161.   The Transfers and Taylor Mercantile Transfers were made, and the Redemption Obligations incurred, without MEX receiving reasonably equivalent value.

162.   MEX was insolvent at the time of the Transfers and Redemption Obligations, or MEX became insolvent as a result of the Transfers and Redemption Obligations.

163.   MEX was insolvent at the time of the Taylor Mercantile Transfers or became insolvent as a result of those transfers.

164.   Pursuant to 28 U.S.C. § 3304(a)(1), the Transfers and Taylor Mercantile Transfers are fraudulent transfers, and the Redemption Obligations are fraudulent obligations.

165.   Pursuant to 28 U.S.C. § 3304(a)(1) and the Federal Debt Collection Procedure Act, the Transfers, Taylor Mercantile Transfers, and Redemption Obligations are avoidable by the IRS.

166.   Pursuant to 11 U.S.C. § 544(b), the Trustee has standing to avoid any transfer of an interest of MEX in property that is avoidable under applicable law by a creditor holding an allowable unsecured claim.

167.   MEX is indebted to the IRS which holds an unsecured claim that is allowable under 11 U.S.C § 502.

168.   The Trustee is entitled to avoid the Transfers, Taylor Mercantile Transfers, and the Redemption Obligations pursuant to at least 11 U.S.C. § 544(b), 28 U.S.C. § 3304(a)(1) and the Federal Debt Collection Procedure Act.

## COUNT II:
## VOIDABLE TRANSFERS AND OBLIGATIONS –
## CONSTRUCTIVE FRAUD
## (11 U.S.C. § 544(b) and O.C.G.A. § 18-2-75(a))

169.    The Trustee restates and incorporates herein by reference the allegations contained in paragraphs 1 through 159 above.

170.    Pursuant to 11 U.S.C. § 544, the Trustee brings this claim on behalf of the Debtors' estates and their creditors under the Georgia Uniform Voidable Transfer Act, O.C.G.A. §§ 18-2-75, *et seq.*[12]

171.    As set forth above, the Bierenbaums, aided by Taylor Mercantile and Mongo, engaged in fraud and caused fraudulent transfers to be made by, *inter alia*, (i) entering into and effectuating the Redemption Agreement with the knowledge that MEX was insolvent at the time of the agreement and/or that implementing the Redemption Agreement and Redemption Amendment would cause MEX to become insolvent; (ii) directing payments to be made to themselves and their companies (Taylor Mercantile and Mongo) pursuant to and under the Redemption Agreement and Redemption Amendment as well as in connection with Sale-Leaseback Transactions and leases thereafter; (iii) causing MEX to make the Distributions

---

[12] Pursuant to O.C.G.A. § 18-2-80(b), "a cause of action in the nature of a claim for relief under [the Uniform Voidable Transactions Act] is governed by the law of the jurisdiction in which the debtor is located when the transfer is made or the obligation is incurred. The Debtors' chief executive office and principal place of business was located Alpharetta, Georgia, and thus the Debtors were located in Georgia when the obligations for each of the transfers was incurred pursuant to O.C.G.A. § 18-2-80(a).

when MEX was insolvent or which caused MEX to become insolvent; (iv) engaging in Sale-Leaseback Transactions that, *inter alia*, artificially inflated MEX's revenues and created false impressions about MEX's viability as a going concern for the purpose of obtaining the Term Loan used to finance part of the Redemption Agreement and the Redemption Amendment; (v) engaging in Sale-Leaseback Transactions to favor themselves over MEX and which put MEX at risk with the IRS and its lenders; and (vi) facilitating the provision and dissemination of knowingly biased, flawed, and/or inaccurate Fuel Supply Contract valuations.

172. The Bierenbaums' fraudulent conduct, and Taylor Mercantile's and Mongo's aiding and abetting of some of that conduct, is further described in Paragraphs 31 through 159 above, which are incorporated herein by reference as if fully set forth herein.

173. The Bierenbaums' fraudulent conduct, some of which was aided by Taylor Mercantile and Mongo, was successful in obtaining the Bierenbaum's illicit goals. Among other things, MEX's lenders relied on, *inter alia*, MEX's audited financial statements (which included the inflated "revenues" from Sale-Leaseback Transactions) and the Fuel Supply Contract valuations in deciding to lend MEX at least $160 million, a material portion of which was then transmitted to the Bierenbaums and Mongo in connection with the Redemption Agreement and the Redemption Amendment.

174.   MEX has one or more creditors for whom the Trustee can act whose claim arose before or within a reasonable time after the Obligations were incurred or the Transfers and/or Taylor Mercantile Transfers were made, including, without limitation, the Predicate Creditors.

175.   Under O.C.G.A. § 18-2-75, "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

176.   MEX made transfers or incurred obligations to and for the benefit of the Bierenbaums and their side companies Taylor Mercantile and Mongo.  These fraudulent transfers include, without limitation, the Transfers and the Taylor Mercantile Transfers.  The fraudulent obligations include, without limitation, the Redemption Obligations.

177.   MEX received less than a reasonably equivalent value in exchange for the Transfers, the Taylor Mercantile Transfers, and the Redemption Obligations. Further, MEX (i) was insolvent on the date of each of the Transfers, Taylor Mercantile Transfers, and Redemption Obligations, or became insolvent as a result of the Transfers, Taylor Mercantile Transfers, or Redemption Obligations; (ii) was

engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with MEX was an unreasonably small capital; and/or (iii) intended to incur, or believed that MEX would incur, debts that would be beyond MEX's ability to pay as such debts matured.

178. MEX made the Transfers, the Taylor Mercantile Transfers, and incurred the Redemption Obligations, within four (4) years of the Petition Date or, alternatively, the four-year lookback period contained in O.C.G.A. § 18-2-79(2) can be extended through equitable tolling or *nullum tempus*.

179. The four-year lookback period contained in O.C.G.A. § 18-2-79(2) is a statute of limitation that is subject to equitable tolling under Georgia law. *See, e.g., Post-Confirmation Comm. for Small Loans, Inc. v. Martin,* 2016 U.S. Dist. LEXIS 43974 (M.D. Ga., Mar. 13, 2016) (compiling cases).

180. The Transfers, Taylor Mercantile Transfers, and Redemption Obligations, including the October 2018 Transfer and the Redemption Agreement, were hidden from many of MEX's creditors, including, without limitation, the Predicate Creditors.

181. The Predicate Creditors, among other creditors of MEX, had no reasonable means of discovering the Transfers, the Taylor Mercantile Transfers, and the Redemption Obligations.

182.   The Transfers, Taylor Mercantile Transfers, and Redemption Obligations incurred constitute transfers of interests of MEX in property.

183.   At the time the Transfers and Taylor Mercantile Transfers were made, and the Redemption Obligations were incurred, there existed one or more actual and/or future creditors of MEX holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

184.   The Transfers, Taylor Mercantile Transfers, and Redemption Obligations caused MEX harm.

## COUNT III:
## VOIDABLE TRANSFERS AND OBLIGATIONS – ACTUAL FRAUD
## (11 U.S.C. § 544(b) and O.C.G.A. § 18-2-74(a)(1))

185.   The Trustee restates and incorporates herein by reference the allegations contained in paragraphs 1 through 159 above.

186.   As set forth above, the Bierenbaums, aided by Taylor Mercantile and Mongo, engaged in fraud and caused fraudulent transfers to be made by, *inter alia*, (i) entering into and effectuating the Redemption Agreement and Redemption Amendment with the knowledge that MEX was insolvent at the time of those agreements and/or that implementing the Redemption Agreement and Redemption Amendment would cause MEX to become insolvent; (ii) directing payments to be made to themselves and their companies (Taylor Mercantile and Mongo) pursuant to and under the Redemption Agreement and Redemption Amendment as well as in

connection with Sale-Leaseback Transactions; (iii) causing MEX to make the Transfers, Taylor Mercantile Transfers, and Distributions when MEX was insolvent or which caused MEX to become insolvent; (iv) engaging in Sale-Leaseback Transactions that, *inter alia*, artificially inflated MEX's revenues and created false impressions about MEX's viability as a going concern for the purpose of obtaining the Term Loan used to finance part of the Redemption Agreement and Redemption Amendment; (v) engaging in Sale-Leaseback Transactions to benefit themselves over MEX and which created risk for MEX with the IRS and its lenders; and (vi) facilitating the provision and dissemination of knowingly biased, flawed, and/or inaccurate Fuel Supply Contract valuations.

187.   The Bierenbaums' fraudulent conduct, and Taylor Mercantile's and Mongo's aiding in some of that conduct, is further described in Paragraphs 31 through 159 above, which are incorporated herein by reference as if fully set forth herein.

188.   The Bierenbaums' fraudulent conduct, as aided by Taylor Mercantile and Mongo, was successful in obtaining the Bierenbaum's illicit goals.  Among other things, MEX's lenders relied on, *inter alia*, MEX's audited financial statements (which included the inflated "revenues" from Sale-Leaseback Transactions) and the Fuel Supply Contract valuations in deciding to lend MEX at least $160 million, a material portion of which was then transmitted to the Bierenbaums and Mongo in

connection with the Redemption Agreement and the Redemption Amendment.

189.    Pursuant to 11 U.S.C. § 544, the Trustee brings this claim on behalf of the Debtors' estates and their creditors under O.C.G.A. §§ 18-2-74, *et seq.*

190.    MEX made transfers for the benefit of the Bierenbaums.    These fraudulent transfers include but are not limited to the Transfers and the Taylor Mercantile Transfers.

191.    The Transfers and Taylor Mercantile Transfers were made, and the Redemption Obligations were incurred, with the actual intent to hinder, delay, or defraud entities to which MEX was obligated to, or became obligated to, on or after the date of such Transfers, Taylor Mercantile Transfers, or Redemption Obligations.

192.    The Transfers, Taylor Mercantile Transfers, and Redemption Obligations constitute transfers of interests of MEX in property.

193.    The Transfers and Taylor Mercantile Transfers were made, and the Redemption Obligations were incurred, within four years (4) before the Petition Date.

194.    With respect to the Redemption Agreement, the October 2018 Transfer, and the Distributions outside of the four (4) years prior to the Petition Date, the Trustee has brought this action within one year of the Redemption Agreement, the October 2018 Transfer, and the Distributions being reasonably discoverable by, without limitation, the Trustee or the Predicate Creditors.

195.   The time for a transfer or obligation being reasonably discoverable runs from the time the last creditor could have discovered the transfer. *See Field v. Estate of Rose Kepoikai (In re Maui Indus. Loan & Fin. Co.)*, 454 B.R. 133, 138 (Bankr. D. Haw. 2011) ("[T]he period for the trustee [begins] to run when the *last* creditor could reasonably have discovered the fraudulent nature of a particular transfer.") (citing *Picard v. Chais (In re Madoff)*, 445 B.R. 206, 219 (Bankr. S.D.N.Y 2011); *G-I Holdings Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings)*, 313 B.R. 612, 639 (Bankr. D. N.J. 2004) (emphasis in original)).

196.   Accordingly, even if some of MEX's creditors could have discovered the Transfers, the Taylor Mercantile Transfers, and Redemption Obligations earlier, that will not prevent the Trustee from standing in the shoes of other creditors who could not have reasonably discovered the Transfers, Taylor Mercantile Transfers, and Redemption Obligations prior to the Petition Date.

197.   Moreover, the Trustee has two years following the Petition Date to commence actions under section 544 of the Bankruptcy Code.  *See* 11 U.S.C. 546(a)(1)(A).

198.   The Transfers and Taylor Mercantile Transfers were made, and the Redemption Obligations were incurred, to or for the benefit of the Bierenbaums.

199.   MEX did not receive reasonably equivalent value in exchange for the Transfers, the Taylor Mercantile Transfers, or the Redemption Obligations.

200.   MEX was insolvent prior to, or as a result of, the Transfers, the Taylor Mercantile Transfers, and/or the Redemption Obligations.

201.   The Trustee is entitled to a judgment under O.C.G.A. §§ 18-2-74(a)(1) and 18-2-77(a), avoiding the Transfers, Taylor Mercantile Transfers, and the Redemption Obligations.

202.   At the time the Transfers and Taylor Mercantile Transfers were made, and the Redemption Obligations were incurred, there existed one or more actual and/or future creditors of MEX holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

203.   The Transfers, Taylor Mercantile Transfers, and Redemption Obligations caused MEX harm.

## COUNT IV:
## VOIDABLE TRANSFERS AND OBLIGATIONS AS TO PRESENT OR FUTURE CREDITORS
## (11 U.S.C. § 544(b) and O.C.G.A. § 18-2-74(a)(2))

204.   The Trustee restates and incorporates herein by reference the allegations contained in paragraphs 1 through 159.

205.   Pursuant to 11 U.S.C. § 544, the Trustee brings this claim on behalf of the Debtors' estates and their creditors under O.C.G.A. §§ 18-2-74, *et seq.*

206.   MEX made transfers or incurred obligations for the benefit of the Bierenbaums.  These fraudulent transfers include but are not limited to the Transfers, the Taylor Mercantile Transfers, and Redemption Obligations.

207.   The Transfers, the Taylor Mercantile Transfers, and Redemption Obligations constitute transfers of interests of MEX in property.

208.   At or around the time at which the Transfers and Taylor Mercantile Transfers were made, and the Redemption Obligations were incurred, MEX was engaged or was about to be engaged in a business or transaction for which its remaining assets were unreasonably small in relation to the business or transaction.

209.   At or around the time at which the Transfers and Taylor Mercantile Transfers were made and the Redemption Obligations were incurred, MEX intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

210.   The Trustee is entitled to a judgment under O.C.G.A. §§ 18-2-74(a)(2) and 18-2-77(a), avoiding the Transfers, the Taylor Mercantile Transfers, and the Redemption Obligations.

211.   At the time the Transfers and Taylor Mercantile Transfers were made, and the Redemption Obligations were incurred, there existed one or more actual and/or future creditors of MEX holding unsecured claims allowable within the meaning of 11 U.S.C. §§ 502 and 544(b).

## COUNT V:
## RECOVERY OF TRANSFERS
## (11 U.S.C. § 550)

212.   The Trustee restates and incorporates herein by reference the

allegations contained in paragraphs 1 through 159 above.

213.    Pursuant to 11 U.S.C. § 550, in a fraudulent transfer action commenced under 11 U.S.C. § 544, the Trustee may recover, for the benefit of the estate, the property transferred, or, if the Court so orders, the value of such property, from (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.

214.    The Transfers and Taylor Mercantile Transfers are avoidable pursuant to 11 U.S.C. §§ 544 and 550.

215.    Pursuant to 11 U.S.C. § 544, the Trustee brings this claim on behalf of MEX's estate and its creditors under O.C.G.A. §§ 18-2-74, *et seq.*

216.    The Bierenbaums and Mongo were the initial transferee of the Transfers or the immediate or mediate transferee of such initial transferee or the person for whose benefit the Transfers were made. Taylor Mercantile was the initial transferee of the Taylor Mercantile Transfers.

217.    Upon information and belief, Taylor Mercantile, 504N, and/or Mongo BG were immediate or mediate transferees of some or all the Transfers and/or Taylor Mercantile transfers, *i.e.*, some or all the Transfers and/or Taylor Mercantile Transfers went first to the Bierenbaums and/or Mongo and then to Taylor Mercantile and/or Mongo BG. Further, 504N and Mongo BG are alter egos of Taylor Mercantile and Mongo as set forth in Count Ten below, which is fully incorporated herein by

reference.

218.   The Trustee is entitled to a judgment against the Bierenbaums, Mongo, Taylor Mercantile, 504N, and Mongo BG in an amount of the Transfers and Taylor Mercantile Transfers pursuant to 11 U.S.C. § 550, for the respective amounts transferred, plus interest thereon at the legal rate from the date of the filing of this Complaint.

## COUNT VI:
## PRESERVATION OF AVOIDED TRANSFERS
## (11 U.S.C. § 551)

219.   The Trustee restates and incorporates herein by reference the allegations contained in paragraphs 1 through 159 above.

220.   Pursuant to 11 U.S.C. § 551, any transfer avoided is preserved for the benefit of the Estates, but only with respect to property of the Estates.

221.   As a result of the foregoing, the Trustee is entitled to a judgment pursuant to 11 U.S.C. § 544, 550(a) and 551 (a) avoiding and preserving each of the Transfers and Taylor Mercantile Transfers to the Bierenbaums, Taylor Mercantile, and Mongo (and Mongo BG and 504N as alter egos) and (b) directing that those Transfers and Taylor Mercantile Transfers be set aside.[13]

---

[13] With respect to Counts I-VI, should additional transfers or transferees be discovered, the Trustee reserves the right to seek leave from the Court to amend the Complaint and name such transferees as defendants in this action.

## COUNT VII – BREACH OF STATUTORY DUTIES

222.   The Trustee restates and incorporates herein by reference the allegations contained in paragraphs 1 through 159 above.

223.   While serving as officers or directors of MEX to and through March 12, 2020, the Bierenbaums each owed MEX statutory duties, including, without limitation, the duties owed under O.C.G.A. §§ 14-2-830, 14-2-831, 14-2-640, 14-2-842, or 14-2-860 (the "**Statutory Duties**").

224.   The Bierenbaums each breached their Statutory Duties to MEX as described in Paragraphs 31 through 159 above, which are expressly incorporated herein by reference as if fully set forth herein.

225.   O.C.G.A. § 14-2-830 provides that "[a] director shall perform his [] duties as a director in good faith and with the degree of care an ordinarily prudent person in a like position would exercise under similar circumstances."

226.   The Bierenbaums breached their duties to MEX under O.C.G.A. § 14-2-830 by, *inter alia*, directing, facilitating, causing, and approving MEX to (i) implement, effectuate, and close the LBO, (ii) incur the Redemption Obligations, (iii) pay the Transfers, (iv) pay the Taylor Mercantile Transfers, (v) execute and perform under the Redemption Agreement and Redemption Amendment, (vi) engage in the Sale-Leaseback Transactions (which, as stated herein, were engaged in to, among other things, personally benefit the Bierenbaums and their side

companies (Taylor Mercantile and Mongo) to the detriment of MEX); (vii) obtain and utilize Fuel Supply Contract valuations that the Bierenbaums knew were biased, flawed, and/or inaccurate; and (viii) assume unsustainable debt in the form of, among other things, the Redemption Agreement, Redemption Amendment, Term Loan, Credit Agreement and lease and other obligations associated with the Sale-Leaseback Transactions.

227.    The Bierenbaums further breached their duties to MEX under O.C.G.A. § 14-2-830 because, *inter alia*, the net result of the LBO and associated transactions was: (i) the Bierenbaums reaped $99.5 million from MEX in connection with the redemption of their MEX shares; (ii) the shares MEX redeemed from the Bierenbaums were retired (further devaluing the LBO to MEX); (iii) MEX was saddled with substantial debt from the Term Loan that was used to redeem a large percentage of the Bierenbaums' shares; and (iv) MEX received only one million dollars from Frady and Lamar for their 100% ownership of MEX at the close of the LBO. In other words, MEX paid $100 million to redeem 98.5% of the shares and then effectively sold that ownership to Frady and Lamar for 1% of what it paid.

228.    By causing, directing, and authorizing MEX to execute the Redemption Agreement, execute the Redemption Amendment, and effectuate and close on the LBO, the Bierenbaums put their personal interests above MEX's interests. Among other things, they put their personal interest in receiving roughly $99.5 million from

MEX above the material harm the LBO caused MEX, including, without limitation, the harm caused by MEX assuming substantial debt through the Term Loan.

229.   The Bierenbaums further breached their duties under O.C.G.A. § 14-2-830 by causing, directing, and authorizing MEX to execute Sale-Leaseback Transactions with their side companies Taylor Mercantile and Mongo. By effectuating those transactions, the Bierenbaums put their personal interests above MEX's interests and caused MEX harm in numerous ways, including, but not limited to, (i) the Bierenbaums put their personal interest in having Taylor Mercantile and Mongo earn a yield (*i.e.*, profit) of at least eight percent (and typically nine-and-a-half percent) through leases with MEX above the damage and harm MEX suffered as a result of such leases, which were at above market rates and created unsustainable lease expenses and obligations; (ii) the Bierenbaums put their personal interest in lowering or delaying their individual tax liabilities through the Sale-Leaseback Transactions above MEX's interests, particularly given the costs associated with such transactions, including, but not limited to, the closing costs, lease costs, risks associated with MEX violating its bank covenants, and risks of penalties and other consequences from the IRS; (iii) the Bierenbaums put their personal interest in having their shareholder loans repaid above MEX's financial interests and MEX's interest in complying with its loan covenants; and (iv) the Bierenbaums put their personal interest above MEX's interests by causing MEX to pay for the due diligence

associated with the transactions, including due diligence that Taylor Mercantile and Mongo used and relied upon.

230.   A MEX director operating in good faith and with the degree of care of an ordinarily prudent person would not have caused, directed, and authorized MEX to execute the Redemption Agreement and Redemption Amendment and engage in the LBO and the transactions associated therewith as they (i) put the Bierenbaums' self-interests above MEX's interests; (ii) involved transactions where MEX lost materially more than it gained; (iii) caused MEX to unnecessarily assume substantial debt for the purpose of advancing the Bierenbaums' personal interests; and (iv) otherwise caused MEX harm.

231.   A MEX director operating in good faith and with the degree of care of an ordinarily prudent person would not have caused, directed, or authorized MEX to engage in the Sale-Leaseback Transactions as they (i) involved self-interested, conflicted transactions (*i.e.*, they were with side companies owned by the Bierenbaums); (ii) in some cases usurped opportunities and profits that should have gone to MEX and not to the Bierenbaums' side companies; (iii) were entered into to personally benefit the Bierenbaums to the detriment of MEX; (iv) created unnecessary and undue risk for MEX given the Internal Revenue Code violations and Credit Agreement breaches associated therewith; (v) caused MEX to agree to transactions and leases that were not only economically irrational, but unsustainable

over time; and (vi) pushed MEX further into insolvency.

232. Further, in connection with Sale-Leaseback Transactions, the Bierenbaums failed to cause MEX to obtain, review, and/or properly analyze the C-Stores' financials to evaluate whether associated the C-Store, once leased by MEX, could sustain paying the lease rate and triple net obligations. In fact, in some cases, the Bierenbaums caused MEX to engage in Sale-Leaseback Transactions without obtaining full and/or complete financials from or about the associated C-Store. This was a further breach of the Bierenbaums' duty to operate in good faith and with the degree of care of an ordinarily prudent person.

233. Moreover, a MEX director operating in good faith and with the degree of care of an ordinarily prudent person would not have caused, directed, or authorized MEX to engage in the Sale-Leaseback Transactions without (i) having an independent third party evaluate the fairness of the transactions to MEX; (ii) having an independent third party evaluate whether MEX's purchases and lease rates were above fair market levels; and (iii) ensuring that the C-Stores underlying the Sale-Leaseback Transactions generated sufficient revenues and profits to cover the lease rate and triple net obligations, and thereafter still earn sufficient profit as a cushion and to make the transaction economically viable.

234. Further, a MEX director operating in good faith and with the degree of care of an ordinarily prudent person would not have (i) caused, directed, and

transmitted the Sands' fuel supply contract valuations given that they were performed by Ackerman who lacked the qualifications and expertise to perform the valuations, failed to comply with applicable standards, and did not consider the relevant valuation factors or (ii) transmitted the Second Valuator's valuations because they were based on inaccurate, incomplete, and/or flawed data and assumptions.

235.   Additionally, a MEX director operating in good faith and with the degree of care of an ordinarily prudent person would have ensured that Sands and the Second Valuator received full, complete, and accurate information, and relied on accurate assumptions, when performing their valuations. Instead, the Bierenbaums caused, directed, and facilitated their use of incomplete and inaccurate information because using such information benefited the Bierenbaums personally (even though it harmed MEX).

236.   O.C.G.A. § 14-2-640 provides that "[a] board of directors may authorize and the corporation may make distributions to its shareholders subject to restriction by the articles of incorporation and the limitation in subsection I of this Code section." Subsection I(c) states that "[n]o distribution may be made if, after giving it effect: (1) [t]he corporation would not be able to pay its debts as they become due in the usual course of business; or (2) [t]he corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of

incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution."

237.  The Bierenbaums each breached the duties they owed MEX under O.C.G.A. § 14-2-640.

238.  The Bierenbaums each breached their duties under O.C.G.A. § 14-2-640 by, *inter alia*, voting for and authorizing the LBO, the Redemption Agreement, the Redemption Amendment, the Transfers, the Taylor Mercantile Transfers, and the Redemption Obligations.

239.  O.C.G.A. § 14-2-842(a) provides that "[a]n officer shall perform his or her duties in good faith and with the degree of care which an ordinarily prudent person in a like position would use under similar circumstances."

240.  The Bierenbaums breached their duties as MEX officers under O.C.G.A. § 14-2-842 for the same reasons they breached their duties as MEX directors under O.C.G.A. §§ 14-2-830 and 14-2-640. Those reasons are set forth above, which are incorporated by reference as if set forth fully herein.

241.  O.C.G.A. § 14-2-860 states that a "'[c]onflicting interest' with respect to a corporation means the interest a director of the corporation has respecting a transaction effected or proposed to be effected by the corporation (or by a subsidiary

of the corporation or any other entity in which the corporation has a controlling interest) if:

> Whether or not the transaction is brought before the board of directors of the corporation for action, to the knowledge of the director at the time of commitment he or a related person is a party to the transaction or has a beneficial financial interest in or so closely linked to the transaction and of such financial significance to the director or a related person that it would reasonably be expected to exert an influence on the director's judgment if he were called upon to vote on the transaction; or

> The transaction is brought (or is of such character and significance to the corporation that it would in the normal course be brought) before the board of directors of the corporation for action, and to the knowledge of the director at the time of commitment any of the following persons is either a party to the transaction or has a beneficial financial interest so closely linked to the transaction and of such financial significance to that person that it would reasonably be expected to exert an influence on the director's judgment if he were called upon to vote on the transaction: (i) an entity (other than the corporation) of which the director is a director, general partner, agent, or employee; (ii) a person that controls one or more of the entities specified in division (i) or an entity that is controlled by, or is under common control with, one or more of the entities specified in division (i) of this subparagraph; or (iii) an individual who is a general partner, principal, or employer of the director.

242. O.C.G.A. § 14-2-860 states that a "'Director's conflicting interest transaction' with respect to a corporation means a transaction effected or proposed to be effected by the corporation (or by a subsidiary of the corporation or any other entity in which the corporation has a controlling interest) respecting which a director of the corporation has a conflicting interest."

243. The Bierenbaums each breached the duties they owed MEX under O.C.G.A. §§ 14-2-860, 14-2-861, 14-2-862, and 14-2-864 by voting for, authorizing, or otherwise assenting to Director's conflicting interest transactions and by effectuating, facilitating, or permitting such transactions.

244. The Director's conflicting interest transactions that the Bierenbaums voted for, assented to, authorized, effectuated, or permitted included, without limitation, the LBO, the Redemption Agreement, the Redemption Amendment, the Transfers, the Taylor Mercantile Transfers, and the Redemption Obligations. They also include the Sale-Leaseback Transactions with Taylor Mercantile and Mongo as described throughout this Complaint.

245. Through the actions and omissions particularly described in Paragraphs 31 through 159, the Bierenbaums neglected, failed to perform, or otherwise violated their Statutory Duties in the management of MEX or in the disposition of corporate assets.

246. The Bierenbaums also breached their Statutory Duties to MEX by engaging in conflicted, self-dealing transactions for their own personal benefit, particularly without having an independent party evaluate whether such transactions were at fair market value or otherwise fair to MEX.

247. For example, while the Bierenbaums were officers and directors of MEX and thereby owed it Statutory Duties, the Bierenbaums caused MEX to enter

into real property and Sale-Leaseback transactions with Taylor Mercantile and Mongo for their own personal gain regardless of the damage it could cause and did cause to MEX.

248.   Indeed, Grant Jaax, the Manager of both Taylor Mercantile and Mongo, testified in his Rule 2004 examination that when Taylor Mercantile and Mongo engaged in Sale-Leaseback Transactions and other transactions with MEX:

(i)   The Bierenbaums typically negotiated the purchase price and sale price with themselves, *e.g.*, the Bierenbaums decided (i) the price that Taylor Mercantile/Mongo would purchase properties from MEX *and* (ii) the price that MEX would sell the properties to Taylor Mercantile/Mongo. The same was true when Taylor Mercantile/Mongo sold properties to MEX.

(ii)   The Bierenbaums typically negotiated the lease terms with themselves, *e.g.*, the Bierenbaums decided for both Taylor Mercantile/Mongo and MEX how much MEX would pay for rent.

(iii)   When Taylor Mercantile and Mongo engaged in transactions with MEX, the Bierenbaums were focused on "earning their yield," *i.e.*, ensuring that their side companies earned at least 8% on the transactions, and for that reason, the Bierenbaums did not cause an independent third party to analyze or otherwise ascertain whether the transactions were fair to MEX (even though the Bierenbaums were negotiating for both sides of the transactions and personally stood to gain therefrom).

(iv)   When determining the lease rate that MEX would pay Taylor Mercantile and Mongo, the Bierenbaums did not consider the underlying C-stores financials or whether MEX could afford to pay. Instead, the Bierenbaums focused solely on the yield and return their companies Taylor Mercantile and Mongo would make, *i.e.*, the Bierenbaums favored their personal interests over MEX's interests.

(v)     Because MEX's lease rate was based on the higher price at which it sold properties to Taylor Mercantile and Mongo Holdings, MEX paid artificially higher lease rates that were unprofitable and unsustainable over time.

249.    Here are just a few quotes from Jaax's Rule 2004 examination on these issues:

Q:     …So prior to March of 2020, When Taylor Mercantile purchased properties from MEX, Mr. Bierenbaum decided the price the price that Taylor Mercantile would pay and the price that MEX would sell, correct?

A:     Theoretically, yes.

....

Q:     When MEX purchased properties from Taylor Mercantile prior to March of 2020, Mr. Bierenbaum decided the price that Taylor Mercantile would sell the properties and the price that MEX would buy the properties, correct?

A:     Yes.

....

Q:     So the sale-leaseback transactions between Taylor Mercantile and MEX prior to March of 2020 were intended to be very profitable to Taylor Mercantile, correct?

Q:     And that's why he engaged in the transactions?

A:     Yes....

.....

Q:     But in some transactions between Taylor Mercantile and MEX prior to March of 2020, Taylor Mercantile would earn the 8-9.5% yield, plus all appreciation on the real property itself, correct?

A:     If it, if it appreciated.

Q:     And it typically did, didn't it?

A:     Typically.

....

**Q:     Mr. Bierenbaum's goal prior to March of 2020,**

75

> **when engaging in transactions with MEX, was to earn as much profit as he could for Taylor Mercantile or Mongo Holdings, correct?**
>
> **A:** **Every investment is to try to maximize your returns.**
>
> **Q:** **Is that just a different way of saying yes?**
>
> **A:** **I guess so….**
>
> ….
>
> Q:  And with respect to lease terms, prior to March of 2020, there were instances where Mr. Bierenbaum decide[d] the lease terms for both Taylor Mercantile and MEX, correct?
>
> A:  Yes.
>
> Q:  And prior to March of 2020, there were instances where Mr. Bierenbaum decided lease terms for both Mongo Holdings and MEX, correct?
>
> A:  Same answer.
>
> **Q:** **When Mr. Bierenbaum decided the lease terms Taylor Mercantile and Mongo Holdings in their transactions with MEX, Mr. Bierenbaum was trying to get profitable return for Taylor Mercantile and Mongo Holdings, correct?**
>
> **A:** **Every investment we're trying to make a return, so yes.**

250.   Further, the Bierenbaums caused MEX to pay for and bear all the due diligence and closing costs associated with the transactions, including, but not limited to, diligence costs that Taylor Mercantile and Mongo Holdings used for their own benefit:

> Q:  And all the costs associated with title work and environmentals and surveys was paid for by MEX, correct?
>
> A:  Typically, yes.
>
> Q:  Taylor and Mongo would rely on that work in deciding whether to perform the transaction, correct?

A:    It would be part of the process, yes.

Q:    And that was true prior to March of 2020, correct?

A:    Correct.

251.   The Bierenbaums engaged in other conflicted, self-dealing transactions while they were officers or directors of MEX for at least the following transactions: (i) 2018 transactions involving properties acquired from Mid-State Distributing and South Arkansas Oil; (ii) 2019 transactions involve a property at 1800 Lorene Street, Dorado, Arkansas and (iii) December 2019 and January 2020 transactions involving properties at 1199 N. Maple Street, Searcy, Arkansas; 2000 S. Main Street, Searcy, Arkansas; 1514 N. Bankhead Drive, Carlisle, Arkansas; 316 S. Benton Street, Searcy, Arkansas, 3753 S. Alabama Ave., Monroeville, AL, and 1327 Hwy. 113, Brewton, AL.

252.   For each of the transactions described in the preceding four paragraphs and in Paragraphs 31 through 159 above, the Bierenbaums breached their Statutory duties by (i) putting their personal interests above the interests of MEX; (ii) engaging in conflicted, self-dealing transactions without an independent review or analysis; (iii) causing MEX to enter into purchase, sale, and lease transactions under economic terms that were less favorable them MEX could have otherwise obtained (the Bierenbaums chose these less economically favorable transactions because they personally benefited therefrom); and (iv) committing MEX to unsustainable debt through the Term Loan and lease obligations associated with the Sale-Leaseback

Transactions for the purpose of benefiting themselves and effectuating the LBO.

253.    The Bierenbaums also breached their Statutory Duties by causing MEX to participate in Sale-Leaseback Transactions for the purpose of (i) artificially inflating MEX's revenues; (ii) reducing the Bierenbaums' personal tax liability and (iii) circumventing MEX's loan covenants described in more detail in Paragraphs 48 through 86 above.  Those paragraphs are incorporated herein by reference.

254.    Through their actions and omissions, the Bierenbaums transferred, lost, or wasted corporate assets and, in so doing, neglected, failed to perform, and violated their Statutory Duties to MEX.

255.    The conduct by the Bierenbaums constitutes gross negligence and a gross deviation of the standard of care of an officer in a like position under the circumstances.

256.    The Bierenbaums' conduct described herein was done without fair and reasonable deliberation, without the requisite diligence to ascertain and assess the facts and circumstances upon which their decisions were based, and/or in bad faith.

257.    As described in the aiding and abetting Count below, which is incorporated herein by reference, Taylor Mercantile and Mongo aided and abetted the Bierenbaums in their breaches of their Statutory Duties.

258.    MEX suffered harm as a result of the Bierenbaums breaching their Statutory Duties.

259.   Pursuant to O.C.G.A. § 14-2-831(a)(3), this Court should, among other things, set aside all unlawful conveyances, assignments, and transfers of corporate assets where the Bierenbaums knew of the unlawfulness of those conveyances, assignments, and transfers.   This includes, without limitation, all conveyances, assignments, and transfers of corporate assets to the Bierenbaums pursuant to the Transfers and Taylor Mercantile Transfers.

260.   O.C.G.A. § 14-2-831 provides that a corporation may bring an action "against one or more directors or officers of the corporation to procure for the benefit of the corporation a judgment for the following relief:

1.   …to compel the defendant to account for official conduct or decree any other relief called for by his or her official conduct in the following cases:

   A.   The neglect of, failure to perform, or other violation of his or her duties in the management of the corporation or in the disposition of corporate assets;

   B.   The acquisition, transfer to others, loss, or waste of corporate assets due to any neglect of, failure to perform, or other violation of duties; or

   C.   The appropriation, in violation of his or her duties, of any business opportunity of the corporation.

…

2.   To set aside an unlawful conveyance, assignment, or transfer of corporate assets where the transferee knew of its unlawfulness and is made a party to the action.

261.   Through this Complaint, the Trustee seeks and is entitled to receive the relief permitted by, among other things, O.C.G.A. § 14-2-831.

## COUNT VIII – BREACH OF FIDUCIARY DUTY
## (AGAINST THE BIERENBAUMS)

262.   The Trustee restates and incorporates herein by reference the allegations contained in paragraphs 1 through 159 above.

263.   As officers, directors, and members of MEX until March 12, 2020, the Bierenbaums owed MEX a fiduciary duty.

264.   The facts set forth in Count VII above relating to the Bierenbaums' breaches of their Statutory Duties also show that the Bierenbaums breached their fiduciary duties. Thus, all the allegations in Count VII are incorporated into this Count as if fully set forth herein.

265.   The Bierenbaums breached their fiduciary duty to MEX by, *inter alia*, causing, directing, facilitating, and authorizing MEX to (i) effectuate and close on the LBO; (ii) assume substantial debt through the Term Loan for the purpose of using such funds to effectuate the LBO, *i.e.*, to benefit themselves over MEX; (ii) execute and implement the Redemption Agreement and the Redemption Amendment; (iii) effectuate the Transfers; (iv) effectuate the Taylor Mercantile Transfers; (v) assume the unlawful and illegal Redemption Obligations that violate public policy and which were intended to, among other things, improperly exculpate the Bierenbaums from their fraudulent, tortious, and improper conduct; and (vi) participate in the Sale-

80

Leaseback Transactions that committed MEX to unsustainable debt for the purpose of benefiting the Bierenbaums and their side companies through tax benefits, inflated rents, and/or securing financing to effectuate the LBO.

266.   By causing, directing, and authorizing MEX to execute the Redemption Agreement and Redemption Amendment and effectuate and close on the LBO, the Bierenbaums put their personal interests above MEX's interests. Among other things, they put their personal interest in receiving roughly $99.5 million from MEX above the material harm the LBO caused MEX, including, without limitation, the harm caused by MEX assuming substantial debt through the Term Loan.

267.   Additionally, the net result of the LBO was: (i) the Bierenbaums reaped $99.5 million from MEX in connection with the redemption of their MEX shares; (ii) the shares MEX redeemed from the Bierenbaums were retired (further devaluing the LBO to MEX); (iii) MEX was saddled with substantial debt from the Term Loan that was used to redeem a large percentage of the Bierenbaums' shares; and (iv) MEX received only one million dollars from Frady and Wadud for their 100% ownership of MEX at the close of the LBO. In other words, MEX paid $99.5 million to redeem 98.5% of the shares and then effectively sold that ownership to Frady and Wadud for 1% of what it paid.

268.   By directing, causing, facilitating, and approving (i) MEX executing and implementing the Redemption Agreement and Redemption Amendment and (ii)

the LBO and the associated transactions (including, without limitation, those described in the immediately preceding Paragraph), the Bierenbaums breached their fiduciary duty to MEX.

269. When directing, causing, facilitating, and approving the execution of the Redemption Agreement and Redemption Agreement as well as the LBO and transactions associated therewith, the Bierenbaums did not act in good faith or in the best interests of MEX. Instead, they engaged in a self-interested and conflicted transactions wherein they placed their own self-interests above MEX's interest.

270. The Bierenbaums used the Redemption Agreement and Redemption Amendment to siphon funds from MEX with full knowledge that such action would (and ultimately did) harm MEX and all MEX's creditors (as opposed to a specific creditor).

271. The Bierenbaums, aided by Taylor Mercantile and Mongo, also breached their fiduciary duty to MEX by engaging in the conduct described in Paragraphs 31 through 159, which are incorporated by reference as if fully set forth herein. The Bierenbaums also usurped MEX's corporate opportunities for their own benefit, including, upon information and belief, taking profits that MEX should have received in connection with certain transactions.

272. The Bierenbaums further breached their fiduciary duties to MEX by directing and causing it to enter into Sale-Leaseback Transactions with their side

companies Taylor Mercantile and Mongo.

273.    The Bierenbaums caused MEX to enter into real property and Sale-Leaseback transactions with Taylor Mercantile and Mongo for their own personal gain regardless of the damage it could cause and did cause to MEX.

274.    Indeed, in his Rule 2004 examination, Jaax testified that when Taylor Mercantile and Mongo engaged in Sale-Leaseback Transactions and other transactions with MEX:

(i)     The Bierenbaums typically negotiated the purchase price and sale price with themselves, *e.g.*, the Bierenbaums decided (i) the price that Taylor Mercantile/Mongo would purchase properties from MEX *and* (ii) the price that MEX would sell the properties to Taylor Mercantile/Mongo. The same was true when Taylor Mercantile/Mongo sold properties to MEX.

(ii)    The Bierenbaums typically negotiated the lease terms with themselves, *e.g.*, the Bierenbaums decided for both Taylor Mercantile/Mongo and MEX how much MEX would pay for rent.

(iii)   When Taylor Mercantile and Mongo engaged in transactions with MEX, the Bierenbaums were focused on "earning their yield," *i.e.*, ensuring that their side companies earned at least 8% on the transactions, and for that reason, the Bierenbaums did not cause an independent third party to analyze or otherwise ascertain whether the transactions were fair to MEX (even though the Bierenbaums were negotiating for both sides of the transactions and personally stood to gain therefrom).

(iv)    When determining the lease rate that MEX would pay Taylor Mercantile and Mongo, the Bierenbaums did not consider the underlying C-stores' financials or whether MEX could afford to pay. Instead, the Bierenbaums focused solely on the yield and return their companies Taylor Mercantile and Mongo would

make.

(v)     Because MEX's lease rate was based on the higher price at which it sold properties to Taylor Mercantile and Mongo Holdings, MEX paid artificially higher lease rates that were unprofitable and unsustainable over time.

275.    Here are just a few quotes from Jaax's Rule 2004 examination on these

issues:

> Q:      …So prior to March of 2020, When Taylor Mercantile purchased properties from MEX, Mr. Bierenbaum decided the price the price that Taylor Mercantile would pay and the price that MEX would sell, correct?
>
> A:      Theoretically, yes.
>
> ....
>
> Q:      When MEX purchased properties from Taylor Mercantile prior to March of 2020, Mr. Bierenbaum decided the price that Taylor Mercantile would sell the properties and the price that MEX would buy the properties, correct?
>
> A:      Yes.
>
> ....
>
> Q:      So the sale-leaseback transactions between Taylor Mercantile and MEX prior to March of 2020 were intended to be very profitable to Taylor Mercantile, correct?
>
> Q:      And that's why he engaged in the transactions?
>
> A:      Yes....
>
> .....
>
> Q:      But in some transactions between Taylor Mercantile and MEX prior to March of 2020, Taylor Mercantile would earn the 8-9.5% yield, plus all appreciation on the real property itself, correct?
>
> A:      If it, if it appreciated.
>
> Q:      And it typically did, didn't it?
>
> A:      Typically.
>
> ....

> **Q:** **Mr. Bierenbaum's goal prior to March of 2020, when engaging in transactions with MEX, was to earn as much profit as he could for Taylor Mercantile or Mongo Holdings, correct?**
>
> **A:** **Every investment is to try to maximize your returns.**
>
> **Q:** **Is that just a different way of saying yes?**
>
> **A:** **I guess so….**
>
> ….
>
> **Q:** And with respect to lease terms, prior to March of 2020, there were instances where Mr. Bierenbaum decide[d] the lease terms for both Taylor Mercantile and MEX, correct?
>
> **A:** Yes.
>
> **Q:** And prior to March of 2020, there were instances where Mr. Bierenbaum decided lease terms for both Mongo Holdings and MEX, correct?
>
> **A:** Same answer.
>
> **Q:** **When Mr. Bierenbaum decided the lease terms Taylor Mercantile and Mongo Holdings in their transactions with MEX, Mr. Bierenbaum was trying to get profitable return for Taylor Mercantile and Mongo Holdings, correct?**
>
> **A:** **Every investment we're trying to make a return, so yes.**

276. Further, the Bierenbaums caused MEX to pay for and bear all the due diligence and closing costs associated with the transactions, including, but not limited to, diligence costs that Taylor Mercantile and Mongo Holdings used for their own benefit:

> **Q:** And all the costs associated with title work and environmentals and surveys was paid for by MEX, correct?
>
> **A:** Typically, yes.
>
> **Q:** Taylor and Mongo would rely on that work in deciding whether to perform the transaction,

correct?

A:   It would be part of the process, yes.

Q:   And that was true prior to March of 2020, correct?

A:   Correct.

277.   The Bierenbaums engaged in other conflicted, self-dealing transactions while they were officers or directors of MEX for at least the following transactions: (i) 2018 transactions involving properties acquired from Mid-State Distributing and South Arkansas Oil; (ii) 2019 transactions involve a property at 1800 Lorene Street, Dorado, Arkansas and (iii) December 2019 and January 2020 transactions involving properties at 1199 N. Maple Street, Searcy, Arkansas; 2000 S. Main Street, Searcy, Arkansas; 1514 N. Bankhead Drive, Carlisle, Arkansas; 316 S. Benton Street, Searcy, Arkansas, 3753 S. Alabama Ave., Monroeville, AL, and 1327 Hwy. 113, Brewton, AL.

278.   The Bierenbaums also breached their fiduciary duty to MEX by engaging in transactions that were intended to use MEX as a pawn to effectuate an improper and unlawful tax avoidance scheme that benefited the Bierenbaums personally.  That scheme generally operated as follows: (i) Taylor Mercantile would acquire properties; (ii) MEX would then purchase those properties from Taylor Mercantile at its cost; and (iii) MEX would then sell the properties to Mongo at a higher price.  The Bierenbaums would then use that transaction to unlawfully claim artificially high and/or accelerated depreciation, which the Bierenbaums then used to reduce and/or delay their personal tax liability.

279.   Taylor Mercantile and Mongo Manager Grant Jaax confirmed that one goal of the Sale-Leaseback Transactions was so that "Barry [Bierenbaum] can take advantage of depreciation which helps his personal tax burden."

280.   The nefarious nature of the transaction is confirmed by an email from Barry Bierenbaum's attorney, who wrote: "I don't want to change the Mongo signature blocks because nothing on the public record will reflect Barry and Gail [Bierenbaum] being on both sides of the transaction."  The attorney knew that if the IRS saw the Bierenbaums on both sides of the deal, it would identify the fraudulent nature of the transaction.

281.   By causing and facilitating MEX to enter into these transactions, the Bierenbaums breached their fiduciary duty because, among other things, (i) they put MEX at unnecessary risk for participating in unlawful tax avoidance schemes; (ii) they negotiated both sides of the transaction with the goal and intent of having their side companies earn the desired profit without regard to whether the transactions were fair to MEX or created unsustainable debt to MEX; (iii) they failed to have an independent third party analyze whether the transactions were fair to MEX;  and (iv) in fact, the transactions were not favorable to MEX, *e.g.*, they resulted in higher than market lease rates and/or further pushed MEX into insolvency.

282.   The Bierenbaums further breached their fiduciary duty to MEX by causing MEX to pay for their personal legal expenses. For example, James Johnston

testified:

> Q: And if you look at May 24th, do you see that there's a time entry for edits to BB's LWT, BB's living trust.
> A: Uh-hum. Yes.
> Q: BB refers to Barry Bierenbaum, correct?
> A: Yeah, I see that.
> Q: That's work you charged MEX for, correct?
> A: Apparently so, yes. It appeared on the bill, and it was paid, as far as I know…
> Q: And if you look at June 6th, do you see there's a time entry for draft Katie Holly Bierenbaum Trust Agreement?
> A: Yes, I see that.
> **Q: And that's work you performed for the Bierenbaums that you charged to MEX, correct?**
> **A: Correct.**

283. The Bierenbaums' conduct described herein was done without fair and reasonable deliberation, without the requisite diligence to ascertain and assess the facts and circumstances upon which their decisions were based, and were in bad faith.

284. The Bierenbaums' conduct that constitutes breaches of their Statutory Duties as described within this Count Eight was knowing, intentional, and in bad faith, warranting the imposition of punitive damages.

285. MEX suffered damages as a result of the Bierenbaums' breaches of fiduciary duty.

## COUNT IX – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY AND STATUTORY DUTIES
## (AGAINST TAYLOR MERCANTILE, MONGO, MONGO BG, and 504N)

286.   Paragraphs 1 through 159 are incorporated herein by reference as if fully set forth herein.

287.   Mongo is owned, directly or indirectly, by the Bierenbaums.

288.   Until 2018, Taylor Mercantile was owned by the Bierenbaums. Thereafter, it was owned by Mongo, which the Bierenbaums own directly or indirectly.

289.   Mongo BG and 504N are owned, directly or indirectly, by the Bierenbaums.

290.   As a result, Taylor Mercantile, Mongo and 504N knew that, until March 2020, the Bierenbaums were officers and directors of MEX and owed MEX a fiduciary duty and owed MEX the Statutory Duties.

291.   To benefit itself, Mongo procured, induced, persuaded, and/or facilitated (together, "**Procured**") the Bierenbaums to breach their fiduciary duties and Statutory Duties to MEX in connection with real estate purchases, sales, or leases involving Mongo that were unfavorable to and harmed MEX. Mongo also Procured the Bierenbaums to breach their fiduciary duties in connection with the LBO, Redemption Agreement, and Redemption Amendment by accepting the March 2020 Transfer.

292.  To benefit itself, Taylor Mercantile Procured the Bierenbaums to breach their fiduciary duties and Statutory Duties to MEX in connection with real estate purchases, sales, or leases involving Taylor Mercantile that were unfavorable to and harmed MEX.

293.  To benefit itself, 504N Procured the Bierenbaums to breach their fiduciary duties and Statutory Duties to MEX in connection with real estate purchases, sales, or leases involving Taylor Mercantile and Mongo that were unfavorable to and harmed MEX.

294.  For example, in December 2019 and January 2020, Taylor Mercantile, Mongo, and 504N aided and abetted the Bierenbaums in the following transaction that constituted a breach of the Bierenbaums' fiduciary duty and Statutory Duties to MEX:

a.  In December 2019, the Bierenbaums caused their company Taylor Mercantile to acquire certain properties for $7.25 million.[14]

b.  The next month, the Bierenbaums caused MEX to purchase those same properties from Taylor Mercantile for $7.25 million.

c.  Mongo then Procured the Bierenbaums to cause MEX to sell those

---

[14] The properties were located at 1199 North Maple Street, Searcy, Arkansas; 2000 South Maple Street, Searcy, Arkansas; 1514 North Bankhead Drive, Carlisle, Arkansas; 316 South Benton Street, Searcy, Arkansas; 3783 South Alabama Avenue, Monroeville, Alabama; and 13288 Highway 113, Brewton, Alabama.

properties to Mongo for $10,345,191 and to contemporaneously agree to lease those properties back to MEX for twenty years. Upon information and belief, most, if not all, of the lease rates are above market value and, regardless, they caused MEX to incur lease and other obligations that (i) caused the transaction to harm MEX in the long term and (ii) along with other transactions were unsustainable over time.

295.   Taylor Mercantile and Mongo, facilitated by 504N, engaged in the transactions in the immediately preceding paragraph, and other similar Sale-Leaseback transactions described in this Complaint to effectuate an improper and unlawful tax avoidance scheme that personally benefited the Bierenbaums.   It generally operated as follows: (i) Taylor Mercantile would acquire properties; (ii) MEX would then purchase those properties from Taylor Mercantile at its cost; and (iii) MEX would then sell the properties to Mongo at a higher price. The Bierenbaums would then use that transaction to unlawfully claim artificially high and/or accelerated depreciation, which the Bierenbaums then used to reduce or delay their personal tax liability.

296.   This is evidenced by email to Taylor Mercantile/Mongo Manager Grant Jaax confirming his statement that one of the goals of the Sale-Leaseback Transactions with Taylor Mercantile, Mongo, and MEX were so that "Barry [Bierenbaum] can take advantage of depreciation which helps his personal tax

burden."

297.    The nefarious nature of the transaction is confirmed by an email from Barry Bierenbaum's attorney, who wrote: "I don't want to change the Mongo signature blocks because nothing on the public record will reflect Barry and Gail [Bierenbaum] being on both sides of the transaction."  The attorney knew that if the IRS saw the Bierenbaums on both sides of the deal, it would identify the fraudulent nature of the transaction.

298.    Jaax similarly tried to hide the fact that the Bierenbaums were on both sides of this transaction, writing: "Can you have it where I sign as the purchaser for Mongo Holdings so Barry isn't listed as the seller and buyer?"

299.    By causing and facilitating MEX to enter into the Sale-Leaseback Transactions described throughout this Complaint, the Bierenbaums breached their fiduciary duty and Statutory Duties as alleged in the breach of Statutory Duties and breach of fiduciary duty claims against them above (those allegations are incorporated herein by reference). As set forth in those allegations, the Bierenbaums breached their fiduciary duty and Statutory Duties to MEX because, among other things, (i) they put MEX at unnecessary risk for participating in unlawful tax avoidance schemes; (ii) they negotiated both sides of the transaction with the goal and intent of having their side companies earn the desired profit without regard to whether the transactions were fair to MEX or created unsustainable debt to MEX;

(iii) they failed to have an independent third party analyze whether the transactions were fair to MEX; and (iv) the transactions were not favorable to MEX, *e.g.*, they resulted in higher than market lease rates and caused MEX to incur obligations that were unsustainable.

300.   Taylor Mercantile, Mongo and 504N also Procured the Bierenbaums to breach their fiduciary duties and Statutory Duties by participating in transactions that the Bierenbaums directed and/or caused to circumvent MEX's loan obligations as described above. For example, the Bierenbaums, aided by Taylor Mercantile, Mongo, and 504N, circumvented MEX's loan covenants that (i) prevented MEX from obtaining loans from other sources and (ii) required MEX to use 50% of the proceeds from Sale-Leaseback Transactions to pay down the loan.

301.   For example, in 2018, the Bierenbaums, aided by Taylor Mercantile, caused MEX to purchase and immediately sell to Taylor Mercantile a number of properties that the Bierenbaums knew would shortly thereafter be sold to and then leased back from a company called Vault. Because that transaction was a Sale-Leaseback Transaction, if it was effectuated by MEX, fifty percent of the proceeds would have to be paid to the bank to pay down the loan. To avoid that obligation, the Bierenbaums, aided by Taylor Mercantile, caused MEX to sell the properties to Taylor Mercantile and then had Taylor Mercantile sell them to Vault. Immediately thereafter, Vault leased the properties to MEX. Thus, the Bierenbaums used Taylor

Mercantile to create the impression that the transaction was not a MEX Sale-Leaseback Transaction when, in effect, it was.

302.  Taylor Mercantile, and 504N who aided in the transaction and who is the alter ego of Taylor Mercantile as shown in Count Ten below (the allegations of which are incorporated herein by reference), knew that, through this transaction, the Bierenbaums were breaching their fiduciary duties and Statutory Duties to MEX, but nonetheless Procured and effectuated the transaction because it (and ultimately the Bierenbaums) financially gained therefrom taking depreciation, receiving profits from the transaction, and/or receiving (artificially high) rents until the properties were resold.

303.  Taylor Mercantile, Mongo, and 504N knew that the Bierenbaums were breaching their fiduciary duties and Statutory Duties when engaging in these transactions and nonetheless Procured the breaches because they inured to their benefit.  Among other things, Taylor Mercantile and Mongo obtained ownership of the properties, received (artificially high) lease payments, and obtained the benefits of depreciation on the properties.

304.  But for Taylor Mercantile's, Mongo's and 504N's assistance, the Bierenbaums would not have been able to effectuate their scheme at least with respect to many of the Sale-Leaseback Transactions.

305.  Mongo also Procured the Bierenbaums' breach of fiduciary duty and

Statutory Duty to agreeing to accept the final $55 million payment relating to the effectuation of the LBO.

306.  Taylor Mercantile, Mongo, and 504N further aided and abetted the Bierenbaums breaches of their fiduciary and Statutory Duties as set forth in Paragraphs 31 through 159 above, which are incorporated herein by reference. Those breaches caused MEX harm.

307.  Taylor Mercantile is a stranger to the fiduciary relationship between the Bierenbaums and MEX.

308.  Mongo is a stranger to the fiduciary relationship between the Bierenbaums and MEX.

309.  504N is a stranger to the fiduciary relationship between the Bierenbaums and MEX.

310.  Mongo BG is a stranger to the fiduciary relationship between the Bierenbaums and MEX.

311.  Mongo BG and 504N are liable to the Trustee for these claims given that they are the alter egos of Taylor Mercantile and Mongo as shown by Count Ten below, the allegations of which are incorporated by reference as if fully set forth herein.

## COUNT X – DECLARATORY JUDGMENT RELATING TO
## ALTER EGO/PIERCING THE CORPORATE VEIL
## (AGAINST TAYLOR MERCANTILE, MONGO, MONGO BG AND
## 504N VENTURES, LLC)

312.   Paragraphs 1 through 159 are incorporated herein by reference as if fully set forth herein.

313.   The Trustee seeks a Declaratory Judgment that Taylor Mercantile, Mongo, Mongo BG, and 504N are alter egos for purposes of, among other things, obtaining the relief sought through this Complaint, including, but not limiting to, (i) avoiding the Transfers, the Taylor Mercantile Transfers, and the Redemption Obligations and (ii) recovering funds belonging to or owed to the Estate.

314.   There is a bona fide dispute between the Trustee, on the one hand, and Taylor Mercantile, Mongo, Mongo BG, and 504N, on the other hand, as to whether Taylor Mercantile, Mongo, Mongo BG and 504N are alter egos.

315.   The Trustee has a justiciable question as to some fact upon which the existence or non-existence of her rights, status, immunity, power, or privilege, *i.e.*, her right to recover from certain entities, does or may depend.

316.   Because Taylor Mercantile, Mongo, Mongo BG, and 504N deny that they are alter egos, the Trustee is in doubt as to her right, status, immunity, power, or privilege.

317.   There is a bona fide actual dispute as to whether Taylor Mercantile, Mongo, Mongo BG, and 504N are alter egos which creates a need for a Declaratory

Judgment.

318.   Taylor Mercantile, Mongo, Mongo BG, and 504N are alter egos and indistinguishable.

319.   Taylor Mercantile, Mongo, Mongo BG, and 504N are all ultimately owned by the same persons, *i.e.*, the Bierenbaums.

320.   Taylor Mercantile, Mongo, Mongo BG, and 504N have common officers and directors. For example, Jaax is the Manager of all the entities.

321.   The Bierenbaums caused and directed the formation of Taylor Mercantile, Mongo, Mongo BG, and 504N.

322.   504N pays Jaax's salary and bonuses not only for the work he performs for 504N, but also for the work he performs for Taylor Mercantile, Mongo, and Mongo BG.

323.   504N pays expenses incurred by Taylor Mercantile, Mongo, and Mongo BG, including, but not limited to, rent, utilities, computers, technology, furniture, email services, and other equipment.

324.   Taylor Mercantile, Mongo, Mongo BG, and 504N each use 504N's assets as its own.

325.   The daily operations of Taylor Mercantile, Mongo, Mongo BG, and 504N are not kept separate. Rather, as discussed below, they all operate from the Piedmont Office (defined below) using the same personnel, telephones, computers,

furniture, and other equipment.

326.   Taylor Mercantile, Mongo, Mongo BG, and 504N do not honor the corporate form. Among other things, as discussed further below, they have not held formal Board meetings.

327.   Taylor Mercantile, Mongo, Mongo BG, and 504N all (i) operate from 3495 Piedmont Road, Building 11, Suite 815 (the "Piedmont Office"); (ii) use the same personnel, with Grant Jaax serving as the purported Manager of each; (iii) have common ownership (the Bierenbaums, directly or indirectly); (iv) have common officers and directors; (v) have the same phone number; and (vi) share and use the same computers, technology, furniture, and other equipment.

328.   The only entity named on the lease for the Piedmont Office is 504N. There is no sublease for Taylor Mercantile, Mongo, or Mongo BG.

329.   At least until 2021, Taylor Mercantile and Mongo did not pay anything for the use of the Piedmont Office. Rather, all costs associated with the Piedmont Office (*e.g.*, rent and utilities) were paid for by 504N. Taylor Mercantile and Mongo did not reimburse and have no obligation to reimburse 504N for those costs.

330.   During his Rule 2004 examination, Jaax testified:

> Q:   So Mongo Holdings, Taylor Mercantile, and 504N
>      all operate out of 3495 Piedmont Road, Building 11,
>      Suite 815 or 805?
> A:   It's 815.
> Q:   Is that correct?
> A:   Yes.

Q:  And is it your understanding that the only entity on the lease is 504N?

A:  Yes, it is.

Q:  And is 504N the sole entity that pays the rent?

A:  Yes, it is.

Q:  Is 504N the sole entity that pays for the utilities?

A:  Yes, it is.

….

Q:  And Mongo Holdings BG Investments does not pay anything toward the rent or lease or utilities, correct?

A:  Correct.

331.    Upon information and belief, 504N continues to pay for most, if not all, of the costs associated with the Piedmont Office.

332.    The computers, furniture, and other equipment that Taylor Mercantile, Mongo, Mongo BG, and 504N use at the Piedmont Office were all paid for by 504N. Taylor Mercantile, Mongo, and Mongo BG did not reimburse and have no obligation to reimburse 504N for those costs.

333.    On this point, Jaax testified:

Q:  And when you're performing work for Taylor Mercantile, you use the same computers and equipment that you use when [you] work for Mongo Holdings and 504N, correct?

A:  Yes.

….

Q:  Any work you do at the Piedmont Office for Mongo Holdings BG Investments you do using the same computers and furniture that were paid for by 504N, correct?

A:  Yes.

….

Q:  Is there furniture at the office at Piedmont Road?

> A:     There is.
> Q:     And was that paid for by 504N?
> A:     Yes, it was.

334.   Taylor Mercantile, Mongo, Mongo BG, and 504N have not held a formal Board meeting. Jaax testified:

> Q:     So you're not aware of any instance where Taylor Mercantile held a formal board meeting, correct?
> A:     Correct.
> ….
> Q:     Are you aware of any instance where Mongo Holdings held a formal meeting of its Board of Directors?
> A:     No, I'm not.
> Q:     Has 504N held a formal meeting of its Board of Directors?
> A:     It has not.

335.   Although Grant Jaax performs work and services for Taylor Mercantile, Mongo, Mongo BG, and 504N, he is solely employed by 504N and solely paid by 504N. Taylor Mercantile, Mongo, and Mongo BG have not paid Jaax for the work and services he has performed for and on their behalf. Indeed, Jaax testified:

> Q:     And the salary you received from 504N paid for the work you did for Taylor and Mongo also, correct?
> A:     Correct.
> Q:     And it also paid you for the work you do for Mongo Investments BG, correct?
> A:     For everything.
> Q:     So that was a yes?
> A:     Yes…
> ….
> Q:     Is your work for Mongo BG Investments paid for by 504N?
> A:     Theoretically, everything I do for Barry and Gail is

> paid for by [] 504N.
>
> Q:    And would that include any work you do relating to
>       Mongo Holdings BG Investments, correct?
> A:    Correct.

336.   At least until 2021, Mongo did not reimburse 504N for the compensation it provided to Jaax and had no obligation to do so.

337.   Upon information and belief, Mongo and Mongo BG still do not reimburse 504N for all the compensation Jaax is paid for the work Jaax performs for and on their behalf.

338.   At no point has Taylor Mercantile reimbursed 504N for the compensation it provided to Jaax and it has no obligation to do so.

339.   Because Taylor Mercantile's work is performed by Jaax, who is paid by 504N, Taylor Mercantile does not have its own employees per Jaax's testimony: "Q: Does Taylor Mercantile have any employees? A: It does not, no."

340.   During his Rule 2004 examination, Jaax admitted that Taylor Mercantile, Mongo, Mongo BG, and 504B are the "same" and hold themselves out to the public as being the same. For example, Jaax testified:

> Q:    When you sent this email, were you working for or
>       on behalf of Taylor or Mongo?
> A:    It's the same.
> ….
> Q:    So it's your testimony that 504N Ventures does
>       business as Mongo Holdings, LLC, correct?
> Q:    Is that your understanding?
> A:    It is….We do business as Mongo Holdings to the
>       general public.

341.   Consistent with that testimony, when Jaax performs work for or on behalf of Mongo, Mongo BG, or 504N, he uses his Mongo email address and Mongo signature block which identifies him as "Chief Investment Officer & Chief Operating Officer, Mongo Holdings, LLC."

342.   On this point, Jaax testified:

> Q:    When you perform services for Taylor Mercantile, you do so using your Mongo Holdings email address, correct?
> A:    Correct.
> Q:    And that includes a signature block that says Mongo Holdings, correct?
> A:    Correct.
> Q:    And you would agree with me that that creates the impression that Mongo Holdings and Taylor Mercantile are one and the same, correct?
> A:    Correct.
> Q:    And when you perform work for 504N, you also use your Mongo Holdings email address and signature, correct?
> A:    Correct.
> Q:    And that also creates the impression that Mongo Holdings and 504N are one and the same, correct?
> A:    Correct.

343.   Mongo's website and press releases further create the impression that Taylor Mercantile, Mongo, Mongo BG, and 504N are all the same entity with a unity of interests. For example, in a January 2024 press release that was written by Mongo and available on Mongo's website, Mongo represents that it purchased a property located at 275 21st Avenue, North Myrtle Beach, South Carolina. But Mongo is not

the owner of that property. Rather, it was acquired by a wholly owned subsidiary of Taylor Mercantile.

344.   Jaax admitted that Mongo's website and press releases create the public impression that Mongo and Taylor Mercantile are one and the same:

> Q:   So in this PR release, Mongo Holdings is saying it purchased property that in reality was purchased by Taylor Mercantile Medical One, correct?
> A:   Correct.
> Q:   You would agree with me that this press release from Mongo Holdings at least creates the impression to the public that Mongo Holdings and Taylor Mercantile are one and the same, correct?
> A:   Correct.

345.   504N pays for the website that is used by Mongo and Taylor per Jaax's testimony: "Q: Has 504N paid for the website that Mongo Holdings uses? A: I believe so, yes."

346.   Mongo, Mongo BG, Taylor Mercantile and 504N have made intercompany transfers to each other. Upon information and belief, those transfers include the movement of funds for which the transferring entity has not charged interest to the transferee.

347.   Upon information and belief, Mongo BG was funded, in whole or in part, by Mongo.

348.   There is such a unity of interest between Taylor Mercantile, Mongo, Mongo BG, and 504N such that the separate personalities of those entities do not

exist.

349.   For the reasons set forth in this Count, the Bierenbaums disregarded the corporate form for Mongo, Mongo BG, Taylor Mercantile, and 504N and instead used them as mere instrumentalities for the transaction of their own affairs.

350.   For the reasons set forth in this Count, adhering to the doctrine of the corporate entities for Mongo, Mongo BG, Taylor Mercantile, and 504N would promote injustice and protect fraud.

351.   All of the allegations in this Count that support alter ego equally support and show the need for piercing the corporate veil (in the alternative).

352.   To the extent Taylor Mercantile, Mongo, and/or 504N do not have sufficient assets to pay any judgment in this case, the Trustee is without an adequate remedy at law as to Taylor Mercantile, Mongo, and/or 504N.

353.   Thus, finding that Taylor Mercantile, Mongo, Mongo BG, and 504N are alter egos or piercing the corporate veil as to those entities, is warranted and equitable.

### COUNT XI – CIVIL CONSPIRACY
### (AGAINST THE BIERENBAUMS, TAYLOR MERCANTILE, MONGO, AND 504N VENTURES, LLC)

354.   Paragraphs 1 through 159 are incorporated herein by reference as if fully set forth herein.

355.   The Bierenbaums, Mongo, Taylor Mercantile, and 504N, acting in concert, engaged in tortious conduct.

356.   Specifically, the Bierenbaums, Mongo, Taylor Mercantile, and 504N, engaged in conduct that constitute breaches of fiduciary and Statutory Duties and aiding and abetting those breaches. They also engaged in fraudulent transfers.

357.   The conduct that constitutes the tort underlying this civil conspiracy count is set forth in Paragraphs 1 through 159 and 286 through 311 above, which are incorporated by reference as if fully set forth herein.

358.   The Bierenbaums, Mongo, Taylor Mercantile, and 504N had an implicit or explicit meeting of the minds to carry out the tortious conduct as co-conspirators.

359.   Indeed, the Bierenbaums, Mongo, Taylor Mercantile, and 504N intentionally worked together to develop, implement, and effectuate transactions, including the LBO and the Sale-Leaseback Transactions described herein, that they knew were improper and unlawful and would cause MEX harm.

360.   The Bierenbaums, as owners, officers, and directors of Taylor Mercantile, Mongo, and 504N, were sophisticated investors who knew and understood that they transactions they were engaging in were fraudulent, unsustainable, in violation of the Internal Revenue Code, and would cause MEX to be unable to meet its creditor and other obligations. Nonetheless, they worked in

concert to effectuate the transactions because of the personally benefits they obtained.

361.   The Bierenbaums, Taylor Mercantile, Mongo, and 504N worked together to implement and effectuate their tortious plan.

362.   The Bierenbaums, Taylor Mercantile, Mongo, and 504N's conspiracy caused MEX harm.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee respectfully requests that this Court grant judgment as follows:

(a)   Award actual, compensatory, and punitive damages for the Bierenbaums' breaches of their Statutory Duties and fiduciary duty;

(b)   Award actual, compensatory, and punitive damages against Mongo and Taylor Mercantile for aiding and abetting the Bierenbaums' breaches of their Statutory Duties and fiduciary duty;

(c)   Declare the Transfers, the Taylor Mercantile Transfers, and Redemption Obligations to be invalid and avoided;

(d)   Enter judgment against the Bierenbaums, Mongo, Taylor Mercantile, Mongo BG, and 504N for all claims asserted against each and in the amount of the Transfers and Taylor Mercantile Transfers plus all other damage suffered by MEX;

(e)     Award the Trustee all direct, consequential, and punitive damages;

(f)     Declare that Mongo, Taylor Mercantile, Mongo BG, and 504N are alter egos of each other and thus all liable for any judgment entered into against any one of them;

(g)     Declare that the corporate veil should be pierced as to Mongo, Taylor Mercantile, Mongo BG and 504N and thus all liable for any judgment entered into against any one of them; and

(h)     Award pre-judgment and post-judgment interest;

(i)     Award the Trustee the reasonable attorneys' fees incurred in connection with this action; and

(j)     Grant such other and further relief to the Trustee as may be just and proper.

Dated:  February 24, 2025

[*Signature on Following Page*]

Respectfully submitted,

**GREENBERG TRAURIG, LLP**

_/s/ Steven J. Rosenwasser_
Steven J. Rosenwasser
Georgia Bar No. 614908
John D. Elrod
Georgia Bar No.  246604
William E. Eye
Georgia Bar No. 688914
Terminus 200
3333 Piedmont Road NE, Suite 2500
Atlanta, GA 30305
Telephone: (678) 553-2100
Facsimile: (678) 553-2269
Email:
Steven.Rosenwasser@gtlaw.com
ElrodJ@gtlaw.com
Eyew@gtlaw.com

_Counsel for the Plaintiff Janet_
_Northrup, as Chapter 7 Trustee_