## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| JANET NORTHRUP, as Chapter 7 Trustee for the Estate of Mountain Express Oil Company and affiliated debtors, <br><br> *Plaintiff*, <br><br> v. <br><br> BARRY BIERENBAUM, GAIL BIERENBAUM, TAYLOR MERCANTILE, LLC, MONGO HOLDINGS, LLC, MONGO HOLDINGS BG INVESTMENTS, LLC, and 504N VENTURES, LLC, <br><br> *Defendants*. | Civil Action No. 1:25-cv-00943-SEG |

## JOINT PRELIMINARY REPORT AND DISCOVERY PLAN

The Parties submit the following Joint Preliminary Report and Discovery Plan pursuant to Federal Rule of Civil Procedure 26(f) and Civil Local Rule 16.2.

1. **Description of Case:**

   **a. Describe briefly the nature of this action.**

For Plaintiff:  Plaintiff Janet Northrup, as Chapter 7 Trustee of Mountain Express Oil Company ("MEX") and its affiliated debtors (the "Trustee"), brings this action against Defendants Barry and Gail Bierenbaum (the "Bierenbaums"), as well as four companies that the Bierenbaums own and control: Taylor Mercantile, LLC,

1

Mongo Holdings, LLC, Mongo Holdings BG Investments, LLC, and 504N Ventures, LLC. The Bierenbaums are the founders and former owners of MEX.

The Trustee alleges, *inter alia*, that the Bierenbaums breached their fiduciary and statutory duties to MEX by engaging in conflicted, self-interested, and/or unlawful transactions that enriched themselves to the detriment of MEX, both directly and indirectly through entities the Bierenbaums own and control.

The Trustee asserts eleven causes of action, including, without limitation: (i) breach of fiduciary duty (Count VIII); (ii) aiding and abetting breach of fiduciary duty (Count IX); (iii) civil conspiracy (Count XI); (iv) breach of statutory duties (Count VII); (v) voiding fraudulent transfers and obligations under federal and state law Counts I, II, III, IV); (vi) recovery of transfers under federal law (Count V); (vii) preservation of avoided transfers under federal law (Count VI); and (viii) declaratory judgment on certain alter-ego and veil-piercing claims (Count X).

<u>For Defendants</u>: Defendants Barry Bierenbaum, Gail Bierenbaum, Taylor Mercantile, LLC, Mongo Holdings, LLC, Mongo Holdings BG Investments, LLC, and 504N Ventures, LLC deny the allegations in the Complaint, deny that the Trustee has any basis to assert any claim against any of them, deny that any of them caused MEX any harm, and deny the Trustee is entitled to any relief. And even if the Trustee could recover anything on her state law claims, Defendants maintain that

any such recovery would be subject to their contractual rights of set off and recoupment.

b. **Summarize, in the space provided below, the facts of this case. The summary should not be argumentative nor recite evidence.**

**Plaintiff'' Summary:**

The Trustee's Complaint sets out 362 paragraphs (108 pages) detailing Defendants' misconduct, and as a result, a full description of the Trustee's claims and the facts supporting them are beyond the scope of the JPPR. The Trustee provides a high-level overview of her allegations below and incorporates the Complaint by reference given that it contains a more fulsome description of her claims.

MEX was a wholesale fuel distributor. From 2013 until March 2020, the Bierenbaums owned a controlling interest in MEX and owed MEX statutory and fiduciary duties. The Bierenbaums breached those duties, both directly and indirectly through entities the Bierenbaums own and control, in several ways, including, *inter alia*: (i) causing and directing MEX to borrow over $100 million dollars to effectuate a $99.5 million leveraged buyout (the "LBO") of their controlling interest in MEX, with such LBO occurring a time that MEX was insolvent or causing MEX to become insolvent; (ii) causing and directing MEX to engage in a series of sale-leaseback transactions (the "Sale-Leaseback Transactions") that effectively amounted to a

Ponzi scheme wherein MEX would use the proceeds from purported "gains" from new Sale-Leaseback Transactions to pay its existing debts from prior Sale-Leaseback Transactions and other loans in an ongoing cycle; (iii) causing and directing MEX to engage in conflicted, self-interested transactions with their side companies that harmed MEX and benefited themselves; and (iv) causing MEX to pay the Bierenbaums shareholder distributions (the "Distributions") totaling more than $31,559,979.77 for little or no consideration.

The Trustee further alleges that the corporate Defendants aided and abetted the Bierenbaums in breaching their fiduciary duties and Statutory Duties and were the recipients of unlawful and/or fraudulent transfers.

As stated above, the Trustee refers the Court and Defendants to her 108-page Complaint, which contains extensive evidence supporting her claims, including, but not limited to, detailed transactional data relating to many of Defendants unlawful acts. The Trustee further provides a high-level overview of some of the key components of the Bierenbaums' scheme immediately below:

By no later than 2018, the Bierenbaums schemed to caused MEX to pay them $99.5 million for their 98.46% share of MEX. But the Bierenbaums faced a material problem – MEX's fuel supply business had, at best, thin margins and, consequently, (i) the Company did not have tens of millions of dollars to pay the Bierenbaums and (ii) MEX was not worth anywhere near $99.5 million. In fact, according to MEX's

2018 audited financial statements, MEX was balance sheet insolvent at the time, *i.e.*, its current assets were $10,383,159, while its current liabilities were $21,387,766. Likewise, MEX's current assets in 2019 were $11,192,963, while its current liabilities were $24,974,979. As one of MEX's former Chief Financial Officer's testified via Affidavit: "MEX's current liabilities exceeding its current assets was one indication of MEX"s inability to pay its Debts as they came due…."

Thus, to effectuate their scheme, the Bierenbaums had to convince banks to loan MEX money that MEX would then use to implement the LBO. To prop up MEX's financial statements, the Bierenbaums caused MEX to effectuate Sale-Leaseback Transactions through which the Bierenbaums caused MEX to report illusory "gains" from those transactions that were, in effect, loans that had to be repaid with interest. The Sale-Leaseback Transactions were usually structured like this: (i) MEX acquired one or more properties from a third party; (ii) shortly after purchase, if not contemporaneously, MEX sold the property to another entity; and (iii) in connection with the sale, MEX agreed to lease the property back, typically for a period of twenty years.

The Bierenbaums' use of Sale-Leaseback Transactions as a scheme is shown through the Affidavit of Vic Lacy, MEX's former Chief Financial Officer who worked at MEX when the LBO was fully effectuated in March of 2020. His Affidavit states, among other things, the following:

5

10.      When MEX engaged in a Sale-Leaseback Transaction, it would treat the difference between the price that it paid for the property and the price that it sold the property as a gain on its Financial Statements. Thus, by way of generalized hypothetical example, if, in connection with a Sale-Leaseback Transaction, MEX acquired 123 Main Street for $500,000 and then sold it for $700,000, MEX would treat the $200,000 difference as a gain in its Financial Statements.

….

12.      However, as discussed in detail below, the "gains" were akin to cash inflows from financing (*i.e.*, loans) that needed to be repaid with interest.

13.      When MEX engaged in Sale-Leaseback Transactions, it would typically agree to rental payments that were higher than the rental payments that existed immediately prior to the Sale-Leaseback Transaction. Thus, by way of generalized hypothetical example, if the tenant at a convenience store ("C-Store") located at 456 Davis Street was paying $800/month in rent immediately before the Sale-Leaseback Transaction, MEX would agree to pay rent of $1,400/month for that same C-Store (typically with annual increases of 2%). An example of this type of activity is discussed in Paragraphs 59 and 60 of the Bierebaum Complaint (while I have not investigated the accuracy of the numbers in those Paragraphs, the concept is accurate).

14.      It is my understanding that one of the reasons MEX agreed to higher rental payments is that such rates allowed MEX to sell the properties at a higher price and thereby book a higher "gain" at closing. Specifically, MEX typically sold and leased properties based on a cap rate, *i.e.,* the sale price was based on the rent MEX was willing to pay. Thus, as a generalized example, if MEX was willing to pay $80,000/year in rent on a property with an 8% cap rate, MEX could sell that property for $1 million, *i.e.*, $1 million times 8% equals the $80,000/year ($6,667/month) rent.

15.      While MEX's agreement to pay higher rents allowed it to sell properties for a higher price and book a higher "gain" at closing, it is my understanding (without having completed a detailed analysis) that the transaction cost MEX over time more money that it "gained"

because the leases that resulted from the Sale-Leaseback Transactions were effectively loan payments with interest. This concept can be illustrated through a generalized hypothetical example where, in connection with a Sale-Leaseback Transaction, MEX purchased a property for $175,000 that, immediately before the purchase, was rented for $16,000/year. Consider two scenarios:

Scenario One: If MEX agreed to lease property at its the existing fair market value rent of $16,000/year, using an 8% cap rate, MEX could sell the property for $200,000, *i.e.*, $200,000 x 8% results in annual rent of $16,000. Under this Scenario, MEX would have a "gain" of $25,000 at closing, *i.e.*, $200,000 - $175,000.

Scenario Two: If MEX is willing to pay higher rent of $32,000/year, using the same 8% cap rate, MEX could sell the property for $400,000, *i.e.*, $400,000 x 8% results in annual rent of $32,000. Under this Scenario, MEX would have a "gain" of $225,000 at closing, *i.e.*, $400,000 - $175,000.

While Scenario Two (with the higher sales price) provides MEX with a larger "gain" at the closing of the Sale-Leaseback Transaction, over the life of the Sale-Leaseback Transaction, that Scenario costs MEX more money. Indeed, over the twenty-year life of the lease, MEX pays rent of $320,000 under Scenario One as compared to the $640,000 in rent it would be required to pay under Scenario Two. Said differently, the net result over the entire transaction is:

Scenario One: $320,000 rents minus $25,000 "gain" at closing - $295,000 loss

Scenario Two: $640,000 rents minus $225,000 "gain" at closing - $415,000 loss

As these Scenarios show, when MEX agreed to sell properties at a higher price through Sale-Leaseback Transactions, MEX was not improving its long-term financial position. Rather, MEX was increasing its Debt obligations over time.

16.    In this respect, MEX's Sale-Leaseback Transactions were

effectively used as, and can accurately be characterized as, a form of financing. Using the example in Paragraph 15 immediately above, MEX effectively borrowed $225,000 through the Sale-Leaseback Transaction and paid back $640,000 over time through its monthly rent payments.

17.     While MEX typically booked a "gain" from Sale-Leaseback Transactions as discussed in Paragraph 11 above, I understand (without having completed a detailed analysis) that the "gain" was less than the rents and other obligations MEX committed itself to through the triple net leases and other expenses associated with purchasing, leasing and, in some cases operating, the C-Stores. *See* Paragraphs 12 and 16 above. As a result, over time, MEX's Sale-Leaseback Transactions cost MEX more than the one time "gain" MEX booked at the time the transaction closed. Given this, from a practical perspective, MEX's Sale-Leaseback Transactions are accurately characterized as loans that MEX paid back with interest over time (as opposed to true income from operations).

18.     Looking back at MEX's operations in hindsight, it had characteristics of a Ponzi scheme in that MEX was using funds from new Sale-Leaseback Transactions to pay debts incurred through prior Sale-Leaseback Transactions and owed under the Credit Agreement. That is:

*   MEX did not earn sufficient income from its fuel distribution and retail operations to pay its Debts as they became due.

*   As a result, MEX engaged in Sale-Leaseback Transactions to obtain the funds (*i.e.*, "gains") needed to pay its existing Debts.

*   But the "gains" from Sale-Leaseback Transactions were effectively loans that had to be repaid with interest through monthly rent payments. As a result, the Sale-Leaseback Transactions only increased MEX's Debt.

*   Thus, MEX had to engage in more and more Sale-Leaseback Transactions to pay its growing Debts. If MEX ceased Sale-Leaseback Transactions, it could not pay its Debts as they

became due.

\*    MEX was thus using the funds from its new Sale-Leaseback Transactions to pay the Debts from its old Sale-Leaseback Transactions and from the Credit Agreement so that it could try to remain a going concern.[1]

The Trustee will produce Mr. Lacy's Affidavit, along with a similar affidavit from another former MEX Chief Financial Officer, with her Initial Disclosures.

Likewise, MEX's former commercial real estate broker, and one of the Bierenbaums' business partners, Andrew Ackerman, testified that using Sale-Leaseback Transactions in the manner they were used by the Bierenbaums is "effectively equivalent to a Ponzi scheme." *See* Complaint ¶ 67.

The Bierenbaums' scheme worked: they were able to cause MEX to obtain $85 million in loans in 2018 to fund the LBO. Originally, the LBO was to be effectuated over a five-year period. However, in 2020, likely recognizing that MEX could not remain a going concern under the Ponzi scheme discussed above, the Bierenbaums caused MEX to materially alter the LBO with a new agreement. Specifically, in March of 2020, the Bierenbaums caused MEX to (i) agree to a new redemption plan and agreement through which the Bierenbaums would receive over $55 million for the remainder of their MEX shares in March of 2020 and (ii) obtain a new loan, this time for $160 million. These new actions were themselves breaches

---

[1] For readability, the footnotes have been omitted.

of the Bierenbaums' fiduciary and Statutory Duties.

There are other aspects to the Bierenbaums' scheme as well. For example, the Bierenbaums caused MEX to engage in conflicted, self-interested transactions with the Bierenbaums' side companies that, among other things, benefited the Bierenbaums to the detriment of MEX and put MEX at risk with the IRS. For example, as detailed in Paragraphs 54 through 62 of the Complaint, the Bierenbaums caused MEX to participate in the following transaction relating to six properties *on a single day* (January 31, 2020):

- Taylor Mercantile, a company owned by the Bierenbaums, sold six properties to MEX for $7.25 million

- MEX, owned 98.46% by the Bierenbaums, then sold the properties to Mongo Holdings, also owned by the Bierenbaums, for $10,345,191, *i.e.*, for more than $3 million more than MEX paid for them that same day.

- MEX then leased the properties back from Mongo Holdings for twenty years.

Thus, on a single day, the Bierenbaums moved six properties across three of their own companies. And while the Bierenbaums will inevitably argue that MEX purportedly "gained" over $3 million from the same to Mongo, that ignores the fact that, as part of the transaction, MEX agreed to pay inflated rents for the properties

that, over time, cost MEX millions more than the $3 million purported "gain."[2]

The Bierenbaums' scheme had other aspects as well. For example, to create the appearance that MEX's fuel supply contracts were worth over $100 million, the Bierenbaums caused their commercial real estate broker and business partner, Andrew Ackerman, to create a purported fuel supply contract valuation to provide to the banks. But the Bierenbaums did not disclose to the banks that Ackerman worked as a broker in connection with MEX's Sale-Leaseback Transactions, had "received over $1,000,000 in commissions for that work," and "stood to gain potentially millions more in commissions if MEX obtaining financing," *i.e.*, that his purported valuation was materially biased. *See* Complaint ¶ 91. The Bierenbaums also neglected to inform the banks that Ackerman "had no formal training on valuing Fuel Supply Contracts, (ii) had only attempted to value Fuel Supply Contracts on a standalone basis two or three times in twenty years; and (iii) was not knowledgeable of, and did not even attempt to comply with, any recognized valuation standards." *Id.* ¶ 93.

While there are additional components to the Bierenbaums' scheme, and substantially more evidence proving its existence and impact to MEX, the above provides a detailed outline of what the Trustee will prove in this case.

---

[2] While Mongo later sold the properties to a REIT, it was only able to sell the properties at a higher price because the Bierenbaums caused MEX to agree to lease the properties at an artificially inflated rate.

In their description below, the Bierenbaums and their side companies try to shift the blame for MEX's demise onto Lamar Frady and Turjo Wadud, who became MEX's Co-CEOs after the Bierenbaums completed the LBO. While Messrs. Frady and Wadud certainly engaged in unlawful conduct, much (but not all) of that conduct was a continuation of the Sale-Leaseback Ponzi scheme that the Bierenbaums created.

The Bierenbaums also try to shift the blame to First Horizon Bank, arguing that it forced MEX into Chapter 7 bankruptcy and caused MEX not to sell its fuel supply contracts. Not so. First Horizon Bank, as DIP Agent (the "DIP Agent") for a syndicate of lenders (collectively, the "Lenders"), provided financing to MEX to support a sale process during the Chapter 11 bankruptcy cases. This additional financing was for over $46 million (on top of the over $176 million that the Lenders loaned to MEX prior to the bankruptcy cases). Both MEX and, later a chapter 11 trustee, repeatedly tried to sell the fuel supply contracts, but could not find any party interested in acquiring them for any price. Indeed, MEX retained experienced investment bankers to market the assets – who were paid from the proceeds of the Lenders' debtor-in-possession financing – but they were unable to find a buyer interested in closing a sale of the assets. Even the last party interested in buying the assets, *i.e.* Arko/GPM, ultimately withdrew its offer. Thus, while the Bierenbaums claim that the fuel supply contracts were worth over $100 million, the proof is in the

pudding: in bankruptcy, no entity was willing to offer more than $30 million for the contracts (and even that offer did not close).

As is evident from the record in the bankruptcy cases, the DIP Agent filed a motion to appoint a chapter 11 trustee or, in the alternative, to convert the cases to chapter 7. The DIP Agent sought a disinterested fiduciary to effectuate a going concern sale due to MEX's inability to maximize value as a debtor-in-possession. Janet Northrup was appointed as Chapter 11 Trustee. The Chapter 11 Trustee was unable to close a sale because the remaining buyer – Arko/GPM – withdrew from the sale process.

**Defendants' Summary:**

Defendants Barry and Gail Bierenbaum founded MEX in 2000. They began with a single store in Hiawassee, Georgia. From those humble beginnings, they grew MEX into a very successful fuel jobber. MEX purchased fuel from the major oil companies, like Exxon and Marathon, and sold it to gas stations and convenience stores. They grew the business by adding more locations and entering into long-term fuel supply agreements with those gas stations and convenience stores. At each of those locations, MEX had the exclusive right to supply the location fuel over a term of many years.

While the Bierenbaums owned and controlled MEX, the company had excellent credit and promptly paid the oil companies and its other vendors. In fact,

MEX made it a point to pay its bills ahead of schedule to obtain discounts from the oil companies and to ensure excellent service from its vendors and service providers.

Under the Bierenbaums' ownership, MEX never operated many retail locations, and it operated no retail locations after 2008. Rather, MEX focused on selling fuel to a network of independent dealers who operated their own stores. The dealers committed to purchase a minimum amount of fuel every year and pay MEX for any shortfall. As a result, MEX earned a steady stream of income from each of its dealer locations. For some of those locations, MEX also leased the real estate and equipment to those dealers. And MEX typically sold additional services to its dealers. By adding more locations with quality dealers throughout the Southeast, MEX added more fuel supply agreements, more tenants, more revenue streams, and more profit.

By 2010, MEX was supplying fuel to approximately 180 dealers in Georgia and beyond. As the Trustee alleges, MEX sold and assigned most of its fuel supply agreements to Empire Petroleum. But MEX continued to work in the fuel business during this time. And in 2013, MEX re-purchased 40 fuel supply agreements from Empire Petroleum, which assigned them back to MEX. MEX was able to sell and then repurchase those fuel supply agreements via assignment because the agreements had no language restraining MEX's ability to buy or sell them.

14

*MEX Enjoys Years of Extended Success and Growth*

In 2015, MEX began to further grow the business, building its network of dealers by entering and acquiring more fuel supply agreements. Consolidating existing debt and obtaining credit on favorable terms was critical to this business plan. In 2015, MEX entered into a Credit Agreement for IberiaBank (now known as First Horizon Bank) to provide $65 million in loans. Those loans included a line of credit for MEX to acquire real estate for dealer locations that would allow MEX to add more fuel supply agreements and lease property to the dealer customers. For most of these new locations, MEX would not hold the real estate long term. Instead, MEX sold the real estate to a third-party real estate investment trust (REIT) and leased the property back. MEX would then sublease the property to the dealer, which operated the location and bought fuel exclusively from MEX.

This sale-leaseback strategy benefitted MEX by adding more dealers, gas stations, and convenience stores from which MEX earned multiple revenue sources. Like many other businesses in the convenience store space, sale leasebacks allowed MEX to put its capital to higher and better uses than making mortgage payments to hold real estate. And from the very outset of its credit relationship with IberiaBank, the bank knew about and readily approved MEX's use of sale-leaseback transactions to grow the business. IberiaBank helped MEX use its new credit line for this purpose, knew about and actively approved the transactions as they happened.

Indeed, IberiaBank had a front row seat as MEX used the proceeds from its sale-leaseback transactions to pay down its credit line and then use the available credit to keep growing by acquiring additional locations and fuel supply contracts.

Anticipating this growth, MEX entered into employment incentive agreements with its long-time executive team. Beyond their relatively modest salaries, MEX agreed to pay bonuses to Turjo Wadud, Lamar Frady, and Ali Husain based on increases to the company's earnings before interest, taxes, depreciation, and amortization (EBITDA) over time. The 2015 contracts included a formula to calculate the compensation that those executives would earn if MEX went through any change in control.

### The Bierenbaums Sell Their MEX Shares

In 2018, the Bierenbaums explored several options for a succession plan for MEX because they had no family who wanted to run the business. By that time, independent analysis confirmed that MEX's fuel supply agreements were worth more than $100 million and the business was worth even more. If the Bierenbaums had sold the business to other buyers, MEX would have owed the executive team tens of millions of dollars due to the significant increases in the company's EBITDA.

Proud of the work they had all done to build MEX and confident of its prospects, the Bierenbaums and the executive team developed a succession plan that allowed the Bierenbaums to sell their MEX shares and allowed the executive team

to continue running the business.  The plan benefitted MEX because it allowed MEX to forego millions of dollars in taxes that would resulted from an asset sale, allowed MEX to avoid paying out millions more in incentive pay to the executive team members, and established an orderly succession plan that allowed the business to continue.

In October 2018, the Bierenbaums sold some of their shares to Wadud, Frady, and Husain via stock purchase agreements.  At the same time, they entered into a Stock Redemption Plan and Agreement that committed them to sell their remaining shares to MEX over a five-year term at the same valuation.  MEX also entered into a 2018 Credit Agreement to borrow $85 million from IberiaBank to pay off the 2015 debt, fund the initial share redemption, and extend further credit to help MEX continue to grow and execute its sale-leaseback strategy.

From October 2018 to March 2020, the Bierenbaums remained MEX's majority owners and continued to run the company.  After excellent results in 2019, IberiaBank and the executive team were eager to complete the Stock Redemption Plan.  Given the significant increase in MEX's value, the Bierenbaums would have profited far more from remaining at MEX or exploring the other offers they received. But they honored their commitment and amended the Stock Redemption Agreement to allow MEX to redeem the remainder of their shares in March 2020.  By selling

their shares and resigning from any role at MEX, the Bierenbaums no longer owed the company any fiduciary or statutory duties after March 12, 2020.

At the same time, the new owners caused MEX to enter a third Credit Agreement with IberiaBank for $160 million to pay off the existing debt, fund the remaining stock redemption, and extend even more credit to support MEX's continued growth and sale leaseback strategies.   Because the Bierenbaums were leaving MEX, they did not play any role in obtaining the 2020 Credit Agreement and they did not sign it.   Those March 2020 transactions closed days before the Covid-19 pandemic caused the U.S. economy to stop in its tracks.   A couple of months later, First Horizon Bank acquired IberiaBank.

Upon information and belief, the 2020 stock redemption and Credit Agreement were approved by the nine banks that participated in the syndicate that underwrote and funded the $160 million loan.   In addition, the major oil companies that supplied MEX with fuel had to approve the change in MEX's ownership.   Many additional MEX vendors and business partners had to approve the change in control as well.   Based on MEX's success, strong financial results, and a twenty-year history of paying its bills and loans ahead of schedule, they all approved the transactions. That litany of experienced and sophisticated firms knew that MEX was strong and solvent at the time; only the Trustee contends otherwise some five years later.

*MEX's New Owners Continue to Run MEX Without the Bierenbaums*

After the new owners took over MEX, they wanted to run the company their own way.   Even though IberiaBank had insisted that MEX engage the Bierenbaums to consult for the company, the new owners soon asked the Bierenbaums to stop coming to the office and stopped listening to their advice.   By June 2020, the Bierenbaums had terminated the consulting agreement, and they came to know less and less about MEX's operations.

For the next two years, MEX continued to grow and continued to increase its EBITDA.   MEX's new owners expanded into new business lines, and aggressively moved into retail operations by having the company operate gas station locations and travel centers.   In October 2021, First Horizon (which had acquired IberiaBank) arranged yet another Credit Agreement to loan MEX more than $200 million to pay off the 2020 loans and finance additional growth.   Because the Bierenbaums had departed MEX, they had nothing to do with the 2021 Credit Agreement either. And thus by 2021, MEX had paid off any loan that had anything to do with paying the Bierenbaums for their shares.

In 2021, MEX also went into business with Blue Owl Capital, Inc., which operated a REIT that apparently loaned MEX $1 billion (and perhaps as much as $3 billion) to acquire more real estate for sale leaseback transactions.[3]   By the end of

---

[3] MEX initially went into business with Oak Street Capital, Inc., a REIT that Blue Owl acquired.  For simplicity, Defendants will simply refer to Blue Owl.

2022, MEX had acquired hundreds of new locations, sold them to Blue Owl, and then leased them back from Blue Owl.  The scope, scale, and speed of this expansion was breathtaking.  Upon information and belief, MEX acquired more than $800 million in new real estate in a single year.  Given the size of this relationship, Blue Owl put one of its own executives, Jared Sheiker, on MEX's board of directors.  Once again, the Bierenbaums had nothing to do with MEX's relationship with Blue Owl.

Also in 2021, MEX sold three percent of its shares to a third-party called West Hill Ranch.  Upon information and belief, West Hill Ranch transferred assets valued at $10 million for those shares, which implies that those parties agreed MEX's total enterprise value was more than $300 million and more than three times the value at which the Bierenbaums agreed to sell the company in 2018.

### MEX's Bankruptcy

In early 2023, it appears that Blue Owl declared administrative defaults on the leases for many of its MEX locations.  The dispute over those defaults evidently led MEX to file for Chapter 11 relief in bankruptcy court in March 2023, more than five years after the Bierenbaums had committed to sell their shares and more than three years after they left the company.

MEX told the bankruptcy court that it intended to exit the retail business and get back to the core fuel supply business.  By virtue of the 2021 Credit Agreement,

First Horizon was MEX's largest secured creditor.  In April 2023, First Horizon loaned MEX nearly $40 million more to fund operations in the bankruptcy.

At this time, First Horizon was under contract to be acquired by TD Bank.  On May 4, 2023, however, the two banks announced that they were terminating their merger agreement due to regulatory concerns.  First Horizon's share price plummeted, reducing the bank's market capitalization by $3 billion.

In the summer of 2023, MEX and its professional advisors—including FTI Consulting, Inc., Raymond James & Associates, Inc., and Grant Thornton, LLP—were working to auction off some or all MEX's business and assets.  Although MEX had audited financial results through 2021, it had not completed those results for 2022 or any part of 2023.  To attract buyers and maximize value, MEX hired Grant Thornton to finalize the company's financial results.  In July 2023, however, it appears First Horizon directed MEX to halt this work.

In August 2023, MEX tried to conduct an auction despite the lack of reliable financial results.  The auction was not successful, producing only a single bid that First Horizon rejected as insufficient.  First Horizon then sent a notice of default for the post-bankruptcy loan it had issued to allow MEX to continue operating.  A week later, First Horizon filed a motion asking the bankruptcy court to appoint a Chapter 11 trustee or convert the bankruptcy case from a Chapter 11 reorganization to a Chapter 7 liquidation.  In those filings, First Horizon said that the value of filing

claims—like this one—would exceed the proceeds it would receive from the auction process. As one of the creditor banks evidently said at the time, they preferred to see MEX "burn in Chapter 7" rather than keep trying to save it.

At First Horizon's request, the bankruptcy court converted the case to a Chapter 7 liquidation, appointed the Trustee, and rejected MEX's remaining leases and fuel supply agreements. Those fuel supply agreements were tremendously valuable because they gave MEX the exclusive right to supply the dealer—or any replacement dealer—with fuel at those locations, even if MEX no longer owned or leased the real estate to the dealer. That meant that MEX had the right to continue earning money by selling fuel at each of those locations, even if it could no longer control the real estate. By rejecting those fuel supply agreements, the Trustee and/or First Horizon destroyed hundreds of millions in value at the expense of MEX and all its stakeholders. And in the wake of that catastrophic blunder, that value has been transferred to the other fuel jobbers that have stepped in to replace those fuel supply agreements.

*The Trustee's Claims*

The Trustee—represented by the same lawyers who represent First Horizon in the bankruptcy—spent the next 18 months conducting discovery to investigate claims for MEX. The Trustee has asserted claims against the Bierenbaums and their Family Office companies as described in the Trustee's submission above. In short,

the Trustee wants to look back seven years to 2018 to blame the Bierenbaums for MEX's 2022 business decisions, MEX's 2023 bankruptcy petition, and MEX's subsequent collapse at the hands of First Horizon and the others responsible for MEX's disastrous bankruptcy.

At the same time, however, the Trustee has blamed those same failings on other parties.  In another complaint filed in this District, the Trustee alleges that MEX's new owners, Turjo Wadud and Lamar Frady, and a long list of alleged co-conspirators caused MEX's collapse and are liable for hundreds of millions of dollars.  The Trustee alleges that this intervening misconduct is so severe that it violates the criminal law, constitutes a pattern of racketeering, and gives rise to Georgia RICO claims.  Thus, it is not the Bierenbaums who seek to blame the new owners; the Trustee has already done so.

The Trustee similarly alleged that Blue Owl and Jared Sheiker—who sat on MEX's board—caused MEX's failure.  After sending a $250 million demand, the Trustee settled with those defendants for $15 million.  And on information and belief, the Trustee has blamed MEX's auditors and other professionals for the company's failure as well.

At the end of the day, the evidence will show that Gail and Barry Bierenbaum are a true American success story. From one small store in Blue Ridge, Georgia, they built one of the country's largest real estate and petroleum distribution

businesses. They ran a safe, profitable, and solvent business that delivered exceptional financial results and benefitted their employees, their many independent dealers, vendors, service providers, and even MEX's lenders. And while they used credit to grow MEX's business, they paid off over $150 million in debt years ahead of schedule without a single notice of violation from any lender. Before and after they left MEX, the Bierenbaums used their good fortune to serve and improve their community through philanthropy that supports the homeless, public safety, and education. And when they left MEX, they did so via a thoughtful and responsible succession plan that benefitted the company and left it poised to achieve even greater heights.

Three years after they departed, MEX was in serious financial trouble due to business decisions and alleged misconduct that had nothing to do with the Bierenbaums. MEX's new owners aggressively sought out new business opportunities, including operating hundreds of retail locations. By all indications, First Horizon and the associated syndicate banks provided no oversight and demanded no compliance from MEX as they made new and ever larger loans to the company. In a single year, Blue Owl provided another $800 million to fund a massive expansion of MEX's business and its operational footprint. When MEX ran into trouble, it filed a bankruptcy case that has turned into a disaster and destroyed value of its fuel supply contracts overnight. After all this, the Trustee contends that

the people who built MEX from the ground are responsible for its destruction, even while the same Trustee alleges that a long list of other parties destroyed MEX via a pattern of racketeering activity.

Accordingly, the Bierenbaums and the other Defendants deny the Trustee's claims and deny the Trustee can recover anything on her claims. In addition to other legal defects, MEX released many of the claims the Trustee now asserts in its shoes. In Counterclaim Count I, the Bierenbaums further seek to recoup or set off any damages based on the Stock Repurchase Plan and Agreement, in which MEX agreed to indemnify the Bierenbaums against any claims, losses, liabilities, demands, suits, causes of action, judges and expenses (including attorneys' fees and court costs) arising out of their roles as officers, directors, or shareholders. In Counterclaim Count II, Defendants Mongo Holdings and Taylor Mercantile seek to recoup or set off any damages awarded against them based on the indemnification provisions contained in any leases between MEX as tenant and Mongo or Taylor Mercantile as landlord.

**c. The legal issues to be tried are as follows:**

**Plaintiff's Statement:**

The Trustee anticipates that the following preliminary and non-exhaustive list of issues will be in dispute in this matter:

- Whether the Bierenbaums breached their fiduciary and Statutory Duties to MEX by engaging in the transactions detailed in the Complaint, including, *inter alia*, the Redemption Agreement, the Redemption Amendment, the LBO, the Sale-Leaseback Transactions, the Transfers, the Taylor Mercantile Transfers, and the Distributions.

- Whether Defendants Taylor Mercantile, LLC, Mongo Holdings, LLC, Mongo BG, and/or 504N Ventures, LLC aided and abetted the Bierenbaums' breach of fiduciary and Statutory Duties to MEX.

- Whether the Defendants engaged in a civil conspiracy in connection with the transactions detailed in the Complaint, including, *inter alia*, the Redemption Agreement, the Redemption Amendment, LBO, the Transfers, the Taylor Mercantile Transfers, the Sale-Leaseback Transactions, and the Distributions.

- Whether the Trustee can void or avoid the Transfers and Obligations detailed in the Complaint that Defendants caused MEX to make or incur under federal and Georgia fraudulent transfer statutes.

- Whether the Trustee can recover from Defendants the Transfers detailed in the Complaint that Defendants caused MEX to make or incur under federal and Georgia fraudulent transfer statutes.

- Whether Defendants Taylor Mercantile, LLC, Mongo Holdings, LLC, Mongo BG, and 504N Ventures, LLC are alter egos for purposes of, *inter alia*, (i) obtaining the relief sought in the Complaint and (ii) recovering funds belonging to or owed to the Estate.

- Whether the Trustee is entitled to punitive damages against Defendants.

- Whether the Bierenbaums, aided and abetted by the corporate Defendants, engaged in conflicted and/or self-interested transactions.

- Whether the Bierenbaums, aided and abetted by the corporate Defendants, breached their fiduciary duties and/or Statutory Duties to MEX in connection with or relating to the LBO, Redemption Agreement, Redemption Amendment, Transfers, Taylor Mercantile Transfers, Obligations, Distributions, and/or Sale-Leaseback Transactions.

- Whether MEX was insolvent at the time of, or became insolvent as a result of, the Redemption Agreement, Redemption Amendment, LBO, Distributions, Transfers, Taylor Mercantile Transfers, and/or Redemption Obligations.

- Whether the Bierenbaums, aided and abetted by the corporate defendants, operated MEX, at least in part, as a Ponzi scheme, particularly with respect to the Sale-Leaseback Transactions.

27

- Whether the Bierenbaums are entitled to indemnification, setoff, or recoupment under the Stock Redemption Agreement.

- Whether the corporate Defendants are entitled to indemnification based on leases underlying individual C-Stores.

- Whether the Defendants acted with unclean hands.

- Whether the Trustee is permitted to assert claims for and seek to avoid unlawful and/or fraudulent transfers for a ten-year period.

**Defendants' Statement:**

The Defendants anticipate that the following preliminary and non-exhaustive list of issues will be in dispute in this matter

- Whether the Trustee's Complaint states a claim against each Defendant.

- Whether the applicable statutes of limitations, statutes of repose, and extinguishment statutes bar the Trustee's claims.

- Whether the Trustee is barred from avoiding certain transfers under 11 U.S.C. § 546(e).

- Whether any of the funds the Trustee seeks to recover through its avoidance claims were "earmarked" for any Defendant.

- Whether the Trustee is barred from avoiding certain transfers under 11 U.S.C. § 550.

- Whether there is an "actual unsecured creditor" with an unpaid claim

that could successfully avoid any of the transfers alleged in the Complaint.

- Whether there is an "applicable unsecured creditor" under the applicable state law to set aside any of the transfers described in the Complaint.

- Whether MEX was insolvent at any time relevant to the Trustee's claims and Defendants' defenses.

- Whether MEX's fuel supply agreements were assignable to third parties in accordance with the governing Georgia law and demonstrated past practice.

- Whether the Trustee is barred from avoiding certain transfers because the transfers were made in the ordinary course of MEX's business.

- Whether the Trustee's avoidance claims are barred because the recipient took any alleged transfer in good faith and for reasonably equivalent value.

- Whether the Trustee's avoidance claims are barred because the funds transferred came from a third party and were expressly earmarked to pay the transfer obligations the Trustee seek to avoid.

- Whether the Trustee's avoidance claims are barred because any

Defendant was a mere conduit for funds that were returned to MEX

- Whether the Defendants' alleged acts, omissions, or decisions were made in good faith and/or with ordinary care.

- Whether the transactions alleged in the Complaint were fair to MEX at the time of the transaction or were otherwise in compliance with O.C.G.A. §§ 14-2-862 or 14-2-863.

- Whether the business judgment rule bars the Trustee's claims.

- Whether Defendants disclosed all material information regarding MEX's financial condition to MEX's creditors, including IberiaBank, First Horizon, and any syndicate banks that participated in the 2015, 2018, 2020, and 2021 Credit Agreements.

- Whether MEX benefitted from the Sale Leaseback transactions alleged in the Complaint.

- Whether Defendants disclosed all material information regarding any Sale Leaseback transaction challenged in the Complaint to MEX's creditors, including IberiaBank, First Horizon, and any syndicate banks that participated in the 2015, 2018, and 2020 Credit Agreements.

- Whether MEX's primary creditors IberiaBank, First Horizon, and any syndicate banks knew of and approved the Sale Leaseback transactions

challenged in the Complaint.

- Whether the Trustee's claims are barred by Defendants' reasonable reliance on advice of MEX's counsel (not their own personal counsel) or the advice of MEX's accountants, tax advisors, and other experts.

- Whether the Trustee's attempt to bring a derivative claim is barred, in whole or in part, by the absence of a required statutory demand on MEX.

- Whether the Trustee's claims for any violation of statutory or fiduciary duty are barred because they rely on alleged acts or omissions that took place after the Bierenbaums relinquished their MEX shares and resigned from their employment with and all other roles and responsibilities to MEX.

- Whether the terms of the parties' contracts—including individual leases, the Share Redemption Agreement, and First Amendment to the Share Redemption Agreement—barred any of the Trustee's claims or imposed a duty to defend and indemnify certain Defendants.

- Whether the doctrines of recoupment and/or set-off bar or reduce the Trustee's claims for damages.

- Whether other persons or entities caused MEX's alleged collapse.

- Whether the negligence or misconduct of other persons, entities, or

their representatives caused the rejection, impairment, or other loss of MEX's fuel supply agreements and other assets.

- Whether the Trustee's claim for damages is barred or reduced by non-party fault pursuant to O.C.G.A. § 51-12-33 or because those non-parties' (including MEX and its post-March 12, 2020 owners, Blue Owl, Jared Sheiker, IberiaBank, First Horizon, counsel for First Horizon, MEX's professional advisors) conduct caused the injuries alleged.

- Whether the Trustee's claims are barred by judicial estoppel based on the Trustee or MEX's representations in other litigation.

- Whether the Trustee's claims invoke reverse veil piercing in violation of Georgia law.

**d. The cases listed below (include both style and action number) are:**

**(1) Pending Related Cases:**

- *In re Mountain Express Oil Co.*, No. 23-90147 (Bankr. S.D. Tex.)

- *Northrup v. Wadud, et al.*, No. 1:25-cv-01401 (N.D. Ga.)

**(2) Previously Adjudged Related Cases:**

None.

2.    This case is complex because it possesses one (1) or more of the features listed below (please check):

___ (1) Unusually large number of parties

 X  (2) Unusually large number of claims or defenses

 X  (3) Factual issues are exceptionally complex

 X  (4) Greater than normal volume of evidence

 X   (5) Extended discovery period is needed

___ (6) Problems locating or preserving evidence

___ (7) Pending parallel investigations or action by the government

 X  (8) Multiple use of experts

____ (9) Need for discovery outside United States boundaries

 X   (10) Existence of highly technical issues and proof

____ (11) Unusually complex discovery of electronically stored information

3.    Counsel:

The following individually named attorneys are designated as lead counsel for the parties:

Plaintiff:                         Steven J. Rosenwasser (GA Bar No. 614908)
                                   Rosenwassers@gtlaw.com
                                   John D. Elrod (GA Bar No. 246604)
                                   ElrodJ@gtlaw.com
                                   Greenberg Traurig, LLP
                                   3333 Piedmont Road NE
                                   Terminus 200, Suite 2500
                                   Atlanta, GA 30305

Defendant:                    Ronan P. Doherty
                              Georgia Bar No. 224885
                              Bondurant, Mixson & Elmore, LLP
                              3900 One Atlantic Center
                              1201 West Peachtree Street NW
                              Atlanta, GA 30309
                              doherty@bmelaw.com

**4.   Jurisdiction:**

**Is there any question regarding this Court's jurisdiction?**

Yes _____    No __X__

**5.   Parties to This Action:**

**(a) The following persons are necessary parties who have not been joined:**

None.

**(b) The following persons are improperly joined as parties:**

None.

**(c) The names of the following parties are either inaccurately stated or necessary portions of their names are omitted:**

None.

**(d) The parties shall have a continuing duty to inform the Court of any contentions regarding unnamed parties necessary to this action or any contentions regarding misjoinder of parties or errors in the statement of a party's name.**

**6.  Amendments to the Pleadings:**

Amended and supplemental pleadings must be filed in accordance with the time limitations and other provisions of Fed. R. Civ. P. 15. Further instructions regarding amendments are contained in LR 15.

**(a) List separately any amendments to the pleadings which the parties anticipate will be necessary:**

<u>Plaintiff</u>:  The Trustee does not currently intend on amending her Complaint but reserves the right to do so in accordance with the Federal Rules of Civil Procedure, the Local Rules, and this Court's Standing Order.

<u>Defendants</u>:  Defendants do not currently intend to amend their pleadings but reserve the right to do so in response to any amended Complaint or otherwise in accordance with the Federal Rules of Civil Procedure, the Local Rules, and this Court's Standing Order.

**(b) Amendments to the pleadings submitted LATER THAN THIRTY (30) DAYS after the preliminary planning report is filed or should have been filed will not be accepted for filing, unless otherwise permitted by law.**

The parties seek to extend this time in accordance with the proposed Scheduling Order below.

**7.    Filing Times For Motions:**

**All motions should be filed as soon as possible. The local rules set specific filing limits for some motions. These times are restated below. All other motions must be filed WITHIN THIRTY (30) DAYS after the preliminary planning report is filed or should have been filed, unless the filing party has obtained prior permission of the Court to file later. Local Rule 7.1A(2).**

The parties seek to extend this deadline in accordance with the proposed Scheduling Order below.

**(a) Motions to Compel: before the close of discovery or within the extension period allowed in some instances. Local Rules 37.1.**

**(b) Summary Judgment Motions: within thirty (30) days after the close of discovery, unless otherwise permitted by Court order. Local Rule 56.1.**

As reflected in the proposed Scheduling Order below, the Parties wish to alter the deadline for Summary Judgment Motions.

**(c) Other Limited Motions: Refer to Local Rules 7.2A, 7.2B, and 7.2E, respectively, regarding filing limitations for motions pending on removal, emergency motions, and motions for reconsideration.**

**(d) Motions Objecting to Expert Testimony:** *Daubert* **motions with regard to expert testimony no later than the date that the proposed order is submitted. Refer to Local Rule 7.2F.**

As reflected in the proposed Scheduling Order below, the Parties wish to alter the deadline for *Daubert* Motions.

As noted below, the Parties dispute whether the Defendants should be permitted to file seriatim partial motions for summary judgment, *i.e.*, whether Defendants should be permitted to file any partial summary judgment motions during discovery and then a file another summary judgment motion at the close of discovery.

**8.   Initial Disclosures:**

**The parties are required to serve initial disclosures in accordance with Fed. R. Civ. P. 26. If any party objects that initial disclosures are not appropriate, state the party and basis for the party's objection. NOTE: Your initial disclosures should include electronically stored information. Refer to Fed. R. Civ. P. 26(a)(1)(B).**

The Parties agree to exchange initial disclosures on or before June 13, 2025.

**9. Request for Scheduling Conference:**

**Does any party request a scheduling conference with the Court? If so, please state the issues which could be addressed and the position of each party.**

Plaintiff's Position: Plaintiff seeks a conference with the Court to resolve at least two issues.

First, contrary to the Federal Rules of Civil Procedure and the Local Rules, Defendants seek to require the Trustee and this Court to incur substantial additional time and resources addressing seriatim summary judgment motions. Specifically, Defendants have requested that they be permitted to file a summary judgment motion during discovery and then file a **second** summary judgment motion after discovery. Nothing in the Rules permits such seriatim motions, which would, among other things, (i) unfairly prejudice the Trustee by requiring her (and the Estate) to incur double the time and expense on dispositive motions; (ii) require this Court to incur time and resources responding to two fulsome sets of summary judgment briefing; (iii) likely delay fact and expert discovery given that the parties will inevitably have to devote substantial time and resources to briefing and arguing summary judgment in the middle of discovery; (iv) unfairly prejudice the Trustee and the Estate by providing Defendants with two "bites at the apple"; (v) constitute an improper attempt to circumvent the page limits by effectively doubling the number of pages Defendants have to argue summary judgment; and (vi) create scheduling issues and disputes given the likelihood that Defendants' first summary judgment motion may (a) require expert testimony that will not be completed until fact discovery is over and/or (b) documents and/or testimony that has not been obtained at the time the first

summary judgment motion is filed. For these and other reasons, the Eleventh Circuit has held that it "certainly do[es] not approve in general the piecemeal consideration of successive motions for summary judgment." *Fernandez v. Nat'l Life Ins. Co.*, 906 F.2d 559, 569 (11th Cir. 1990).[4]

Moreover, and significantly, even if Defendants were successful on a *first* partial summary judgment motion, it would not limit the scope of discovery or otherwise advance this case. Indeed, there is substantial overlap between most, if not all, of the Trustee's claims. As a result, even if Defendants were somehow able to obtain summary judgment on a few claims (something the Trustee disputes), that would not limit the scope of discovery or otherwise materially advance this case.[5]

Second, consistent with their improper attempt to get two "bites at the apple," Defendants are trying to require at least some ***third-party*** witnesses to sit for two depositions. Defendants' request to require some third-party witnesses to sit for two

---

[4] *See also, e.g., United States v. Morten*, 2023 U.S. Dist. LEXIS 141129, at *2 (M.D. Fla. July 24, 2023) (denying request for multiple summary judgment motions because "two motions for summary judgment will waste – not conserve – judicial resources"); *Tripro Consulting, LLC v. Caci, Inc.*, 2024 U.S. Dist. LEXIS 219012, at *6 (M.D. Fla. Dec. 4, 2024) ("The court notes first that successive motions for summary judgment are not favored in this circuit."); *Essex Ins. Co. v. Foley*, 827 F. Supp. 2d 1326, 1329 n.2 (S.D. Ala. 2011) ("no federal litigant has an absolute right to bring multiple, piecemeal motions for summary judgment.").

[5] For that reason, the *Cordoba* case Defendants cite below is irrelevant, *i.e.*, it involves a situation where an early summary judgment motion would substantially limit discovery, which is not the case here. Moreover, that case involves a fee dispute and not a request to file multiple motions.

depositions violates the plain language of Federal Rule of Civil Procedure 30(d)(1), which states that "a deposition is limited to **1 day** of 7 hours."[6]

The first witness at issue is Rodney Hall, a third-party witness who works for First Horizon Bank. Defendants claim that they should be permitted to depose Mr. Hall twice, *i.e.*, once in the next few weeks and again later in discovery. Defendants claim that they should be permitted to violate Rule 30(d)(1)'s requirement that a deposition be completed in "1 day" because of purported health concerns about Mr. Hall. Those concerns are unfounded. As the Trustee's has informed Defendants, while Mr. Hall underwent bypass surgery several months ago, he has recovered from that surgery and his prognosis is good. In fact, Mr. Hall has returned to work full time and just completed a one-week vacation to Mexico. Mr. Hall has informed the Trustee that, according to his doctors, there is no valid basis for any concern that he may not be available for a deposition later in this case. If necessary, Mr. Hall can provide a Declaration to this effect.

Notably, Defendants do not dispute the Trustee's information relating to Mr. Hall's health. They simply speculate that he might have some issue at some point in

---

[6] *See, e.g,. Kimera Labs, Inc. v. Jayashanker*, 346 F.R.D. 146, 150 (S.D. Fla. 2024) (denying request for second deposition because "the Federal Rules limit depositions to seven hours over one day"); *Gipson v. Hyundai Power Transformers USA, Inc.*, 2018 U.S. Dist. LEXIS 125423, at *5-6 (M.D. Ala. July 26, 2018) (denying request for a second deposition as it "would violate the one-day limitation of Federal Rule of Civil Procedure 30(b)(1)").

the future. But that is true of all witnesses. Any witness, critical or not, could be hit by a car, suffer an unexpected heart attack, or some other unfortunate event that would make them unable to testify. Such speculation does not provide a basis for taking multiple depositions. If it did, every witness could be subject to numerous depositions so long as they collectively did not exceed seven hours. That is not the rule. Rather, the rule is a deposition must be completed in "1 day."

In any event, to allay Defendants' purported concern, the Trustee has informed Defendants that they can take Mr. Hall's deposition early in the discovery period, *i.e.*, in the next month or so. However, if the Defendants decide to do so, that will be the only deposition they can take of Mr. Hall in this case. Alternatively, Defendants can wait until this case proceeds and take his deposition later. What they cannot do is take Mr. Hall's deposition twice.

Defendants have also asked to depose another third-party witness, James Johnston, Jr., twice. Again, Defendants claim that Mr. Johnston has a purported health issue necessitating two depositions. The Trustee has reason to disbelieve that claim. Among other things, the Trustee took Mr. Johnston's Rule 2004 examination last year and, at that time, he did not appear to be in an imminent danger. Rather, the Trustee understood that he had a medical condition (for privacy reasons it will not be disclosed here) that was being treated.

Despite the Trustee's belief that two depositions of Mr. Johnston were unwarranted, the Trustee was open to allowing such a process if (i) Mr. Johnston agreed to it; (ii) there was a medical basis for the request; and (iii) Defendants agreed that, if the Trustee allowed two depositions for Mr. Johnston because of his unique circumstance (if shown), Defendants would not use that cooperation as a basis to depose other witnesses more than once. As shown below, Defendants are now trying to use the Trustee's cooperation against her by arguing that the Trustee's position with respect to Mr. Johnston serves as a basis for deposing Mr. Hall twice. For that reason and others (*e.g.* Defendants have not provided the Trustee with additional information about Mr. Johnston's health and the purpose of the attempt to reach a compromise was to avoid motions practice on this issue for both witnesses), the Trustee does not agree to two depositions of Mr. Johnston. Contrary to Defendants' claim below, the Trustee did not change her position. Rather, Defendants did not agree to the Trustee's terms or provide the requisite information.

The Trustee has informed Defendants that, if they so elect, they can move forward with Mr. Johnston's deposition early in the discovery period. But again, that will be their only deposition of Mr. Johnston. The Trustee should not be forced to incur time and expense participating in two or more depositions per witness based on Defendants' unsupported (and in the case of at least Mr. Hall incorrect) claims about a witness's health.

In their discussion below, Defendants make much of the fact that the Trustee deposed Mr. Johnston on two separate days in connection with the Bankruptcy proceedings. Defendants' discussion omits the fact that Mr. Johnston testified over two days because he was subject to two separate and independent depositions – one in his individual capacity and another as the Rule 30(b)(6) corporate representative for The Johnston Law Firm.

Defendants' Position: Defendants seek a conference with the Court to address the following case management issues.

*First*, Defendants intend to conduct targeted discovery to confirm basic facts regarding the transactions the Trustee has alleged, including the dates, payment details, and other facts that will confirm the Trustee has no viable legal claim for relief.  Although the Complaint elides some of these points, that very basic evidence will allow the Defendants to present a succinct and undisputed record on which the Court can make partial summary judgment rulings that may eliminate $100 million from dispute and cut years off the discovery period.

The Trustee opposes any such attempt to narrow the case in favor of forcing the Defendants to make all their summary judgment arguments regarding the Trustee's 360-plus paragraph Complaint and her eleven claims against seven defendants in one giant filing at the end of discovery.  But nothing in the Federal Rules, the Local Rules, or this Court's Standing Order restricts any party to a single

summary judgment motion.[7]  And it only takes a glance at the Trustee's behemoth of a Complaint to appreciate that targeted motions for partial summary judgment will make this case far more efficient and manageable for the Court and the parties alike.  Under those circumstances, the Eleventh Circuit has approved early summary judgment motions and said "we expect that district judges will be open to such motions" where the defendant "apprises the court that a prompt decision will likely avoid significant unnecessary discovery."[8]

Nor is there anything unfair, one-sided, or burdensome about the Defendants' intention to trim this case via partial summary judgment.  The Local Rules permit a defendant to defer any further proceedings by filing a motion to dismiss.  The Federal Rules also permit a defendant to move to trim the complaint via motions for judgment on the pleadings.  Here, Defendants seek to obtain the same result via partial summary judgment motions.  The only difference is that the Trustee will not be able to preserve her dubious claims via artful pleading.  Instead, the Trustee will have to confront the indisputable evidence she knows—or should know—bar her claims.

---

[7] *See Cordoba v. Dillard's, Inc*., 419 F.3d 1169, 1188 (11th Cir. 2005) (noting that the Federal Rules do not limit a defendant to a single summary judgment motion).
[8] *Id*. (reversing a fee award in part because the prevailing party could and should have avoided legal expense by moving for summary judgment at the outset of the case).

Finally, an early summary judgment decision will meaningfully narrow the scope of discovery. For instance, Defendants expect to move for judgment on the Trustee's claims regarding the 2018 Stock Redemption Agreement. If they succeed, that will substantially narrow both the time frame and scope of necessary discovery, and it will dramatically reduce the value of the Trustee's case. It is no answer for the Trustee—like every plaintiff—to say Defendants will not succeed on their motion. The point is that they may succeed in a way that significantly narrows the dispute. And thus in this case, motions for partial summary judgment are consistent with Fed. R. Civ. P. 1's command to "secure the just, speedy, and inexpensive determination of every action and proceeding."

Second, the Defendants have asked to modify the standard deposition procedures to preserve the testimony of two key fact witnesses due to serious concerns about their health. From 2015 through the MEX bankruptcy filing in 2023, Rodney Hall was IberiaBank's—and then First Horizon's—main point of contact with MEX. Mr. Hall helped arrange the 2015 Credit Agreement that consolidated MEX's existing debt and provided the credit platform that allowed MEX to grow its business. Over many years, Mr. Hall learned about MEX's business and its formula for success. And he was instrumental in placing the larger 2018, 2020, and 2021 Credit Agreements that followed. Given the Trustee's allegations (and omissions) about those matters, Mr. Hall is a critical witness.

Although the Defendants would ordinarily seek to take Mr. Hall's deposition after First Horizon and the Trustee produce his documents, they have serious concerns about his health. Earlier this year, Mr. Hall underwent open-heart surgery and apparently received a triple-bypass. Although the Trustee's counsel reports that the operation was a success and that Mr. Hall's prognosis is good, the Defendants cannot wait months for documents to take his deposition.

James T. Johnson is another critical witness. Mr. Johnston is a lawyer and CPA. He was a long-time lawyer for MEX and the Bierenbaums. By virtue of that work, Mr. Johnston was involved in and has substantial knowledge of the matters alleged in the Complaint, including (1) the terms and value of MEX's fuel supply agreements, (2) the 2015 employee incentive plans, (3) the 2018 Stock Redemption Agreement, (4) the 2020 First Amendment to the Stock Redemption Agreement, and (5) MEX's sale leaseback transactions, both before and after the Bierenbaums left MEX. And as the Trustee notes above, Mr. Johnston has also suffered some recent health challenges that make it important to preserve his testimony.

The Trustee knows that Mr. Johnston is a significant witness. That is why the Trustee subjected demanded his documents and took a Rule 2004 deposition examination over two days. In sharp contrast to the position the Trustee takes here, she took an initial day of testimony from Mr. Johnston in December 2024 and then resumed his deposition for another day in January 2025 after receiving additional

documents.  The Trustee relies on her presentation of some of that testimony in the Complaint.

Given their age and known health challenges, the Defendants proposed a similar procedure for their depositions of Mr. Hall and Mr. Johnston in this case.  To preserve important testimony, the Defendants sought to take these depositions before discovery had even opened.  Having now conferred at length with the Trustee, Defendants propose to begin the depositions of these two witnesses shortly after discovery opens.    To avoid prejudicing either side, the Defendants propose to suspend each deposition after a couple of hours and to continue them after the relevant documents have been produced, just as the Trustee did for Mr. Johnston and other witnesses during the Rule 2004 process.    Contrary to the Trustee's protestations, Fed. R. Civ. P. 30(d)(1) expressly allows the parties to stipulate or the Court to order this type of relief from the default rule of a single, seven-hour day.[9]

The Trustee initially agreed to Defendants' proposal for Mr. Johnston, the witness she had already deposed over three days.  But the Trustee objected to the same procedure for Mr. Hall without any explanation why the Defendants should be

---

[9] *Cf. Reger v. All Things Gel, LLC*, No. 22-cv-81772, 2024 WL 1657299, at *2 (S. D. Fla. Mar. 5, 2024) (magistrate judge granting a protective order that allowed a witness to split his deposition over several days to accommodate his medical challenges); *Onebeacon American Ins. Co. v. Diplomat Hotel Corp.*, No. 1:12-cv-0435-SCJ, 2013 WL 12063891, at *4 (N.D. Ga. June 19, 2013) (granting a motion to continue a deposition over multiple days to accommodate scheduling conflicts that prevented the requesting party from completing the deposition in a single day).

forced to risk the opportunity preserve his testimony while they wait for MEX and First Horizon to produce his documents.  In this context, however, the Court should know that the Trustee's counsel also represents First Horizon, Mr. Hall's employer, and will represent Mr. Hall at the deposition.  And to avoid having to justify why the Trustee's lawyers want to treat one of their own clients differently from Mr. Johnston, the Trustee has now withdrawn her offer to permit Defendants to split Mr. Johnston's deposition too.

The Defendants are trying to preserve evidence, not seeking any procedural advantage.  Several of the witnesses in this case are elderly, including Gail and Barry Bierenbaum.  But the Trustee and her counsel have long had access to these witnesses and have taken full advantage of the Trustee's right to conduct pre-action Rule 2004 examinations.  Rather than ignore the risks presented by the recent, serious health challenges to Mr. Hall and Mr. Johnston, the Defendants are asking for a reasonable accommodation to protect their rights to obtain evidence.  Accordingly, the Defendants ask the Court to allow them an opportunity to preserve this important testimony in a manner that protects the rights of all parties.

**10.  Discovery Period:**

**The discovery period commences thirty days after the appearance of the first defendant by answer to the complaint. As stated in LR 26.2A, responses to**

initiated discovery must be completed before expiration of the assigned discovery period.

Cases in this Court are assigned to one of the following three discovery tracks: (a) zero month discovery period, (b) four months discovery period, and (c) eight months discovery period. A chart showing the assignment of cases to a discovery track by filing category is contained in Appendix F. The track to which a particular case is assigned is also stamped on the complaint and service copies of the complaint at the time of filing.

Please state below the subjects on which discovery may be needed:

**Plaintiff's Anticipated Discovery:**

The Trustee has not yet served her written discovery on Defendants. The Trustee currently anticipates seeking discovery relating to, among other things, the following topics:

- Documents discussing, referring to, or relating to the Redemption Agreement, Redemption Amendment, Credit Agreement, LBO, Transfers, Taylor Mercantile Transfers, Distributions, and/or the Obligations.

- Documents discussing, referring to, underlying, and relating to any Sale-Leaseback Transactions involving MEX.

- Documents discussing, referring to, underlying, and relating to any transactions between MEX and any Defendant.

- Documents discussing, referring to, underlying, and relating to any transactions between one or more Defendants and Vault Equity Partners, 42 Real Estate, ANDBAR, Sancus, KPPM, and other entities.

- All budgets, forecasts, projections, analyses, studies, and other documents relating to the revenues, income, liabilities, debts, obligations, and/or profitability of any Sale-Leaseback Transactions and other transactions to which MEX was a party.

- All budgets, forecasts, projections, analyses, studies, and other documents relating to the revenues, income, liabilities, debts, obligations, and/or profitability of any convenience store that a Defendant purchased from, sold to, leased from, or leased to MEX.

- For any properties that one or more Defendants sold to, purchased from, leased to, or leased from MEX, all related leases, subleases, branding agreements, rebate agreements, and/or fuel supply contracts.

- Documents discussing or referring to MEX's financial status, including, without limitation, MEX's profitability, solvency, and/or bankruptcy.

- Documents discussing, referring to, or otherwise relating to any tax deductions, tax credits, depreciation, bonus depreciation, or other tax benefits that any Defendant claimed or received arising out of or relating to any business or transaction involving MEX.

- Documents discussing, referring to, underlying, supporting, or otherwise relating to any appraisal or valuation of any convenience store that one or more Defendant sold to, purchased from, leased to, leased from, transferred to, or assigned to MEX.

- Documents discussing, referring to, underlying, supporting, or otherwise relating to any appraisal or valuation of any fuel supply contract that one or more Defendant sold to, purchased from, leased to, leased from, transferred to, or assigned to MEX.

- Documents discussing, referring to, underlying, supporting, or otherwise relating to any appraisal or valuation of any leases, subleases, rebate agreements, branding agreements, and other agreements that one or more Defendant sold to, purchased from, leased to, leased from, transferred to, or assigned to MEX.

- Defendants' bank statements, credit card statements, and tax returns.

- All documents discussing, referring to, or otherwise relating to the value, marketability, and/or transferability of fuel supply contracts.

51

- All documents discussing, reflecting, or otherwise relating to any instance where one entity owned or controlled by the Bierenbaums paid any debt, liability, bill, invoice, or obligation owed by another entity owned or controlled by the Bierenbaums.

- Documents sufficient to show what persons/entities were named on the accounts for and/or paid bills, invoices, and debts associated with the corporate Defendants' offices, including, but not limited to, the persons/entities who were named on and paid the lease, utilities, phone bill, wifi bill, insurance, repairs, maintenance, and taxes.

- Documents relating to Defendants' indemnification claim.

- Documents relating to Defendants' affirmative defenses.

- To be clear, the Trustee will not seek any documents that Defendants have already produced in the related and above-referenced bankruptcy case, *In re Mountain Express Oil Co.*, No. 23-90147 (Bankr. S.D. Tex.). Moreover, the Trustee will not seek any emails in which the most recent email in an email chain was sent to an email with the domain ending in mtnexpressoil.com so long as such email includes all earlier emails in the email chain.

The Trustee anticipates serving further discovery as the case proceeds and information is received in the discovery process.

**Defendants' Anticipated Discovery:**

The Defendants have not served her written discovery on the Trustee or the relevant third parties. The Defendants anticipate seeking discovery relating to, among other things, the following topics:

1.  The allegations raised in Plaintiff's complaint, including but not limited to, Plaintiff's allegation that:

    a.  MEX was insolvent at any point from January 1, 2018 to August 2022.

    b.  Whether the Defendants—as opposed to other persons or entities— were responsible for MEX's alleged "collapse."

    c.  The advice of MEX's counsel, accountants, advisors, and other professionals concerning MEX's solvency and any transaction, act, or omission challenged in the Complaint.

    d.  The value of MEX's fuel supply agreements at all relevant times.

    e.  The value of MEX's business at all relevant times.

    f.  The facts and circumstances surrounding MEX's post-March 12, 2020 decline.

    g.  The value MEX received from the sale-leaseback transactions and the added liquidity and access to capital.

    h.  The nature and identity of predicate claims the Trustee asserts on behalf of predicate unsecured creditors.

i.   Information exchanged between First Horizon and any other syndicate banks before and after making loans to MEX, including but not limited to communications about the Share Redemption Plan and Agreement, the First Amendment to the Share Redemption Plan and Agreement, and MEX's sale-leaseback transactions.

j.   Documents regarding the due diligence IberiaBank, First Horizon, or any other bank conducted regarding MEX, its business, and the value of any collateral in connection with the 2015, 2020, and 2021 Credit Agreements, as well as any other extensions of credit to MEX.

k.   Documents sufficient to show that IberiaBank, First Horizon, and other banks took and perfected security interests in MEX's fuel supply agreements as a condition of extending credit to MEX, together with any analysis of the assignability of those agreements for the purpose of securing debt and allowing the banks to acquire and sell those agreements to recover value.

l.   Communications between MEX and IberiaBank, First Horizon, and other banks regarding MEX's regular financial reports and reports regarding the company's compliance with any debt covenants.

m.  Documents sufficient to show that IberiaBank, First Horizon, and other banks were on notice of and approved MEX's sale leaseback transactions at all relevant times.

n.  Documents sufficient to show that while the Bierenbaums owned and operated MEX, the company used the proceeds from sale-leaseback transactions to pay down its credit lines with IberiaBank, First Horizon, and other banks.

o.  Documents sufficient to show the revenue and other benefits that MEX earned on sale-leaseback transactions during the relevant time periods.

p.  Documents regarding the due diligence the oil companies conducted before approving continued sales of fuel on credit to MEX despite the change in MEX's ownership and control.

q.  Bank records reflecting the amount and timing of payments underlying the Trustee's transfer claims.

r.  Communications among IberiaBank, First Horizon, and any syndicate banks concerning loans issued to MEX.

s.  Communications between IberiaBank and First Horizon regarding loans issued to MEX.

t.  Communications between First Horizon and TD Bank Group regarding loans issued to MEX.

u.  Documents and communications regarding whether and how MEX's financial difficulties, financial reporting, or bankruptcy filing impacted TD Bank's proposed purchase of First Horizon.

v.  Documents and communications between MEX and Oak Street Capital, Blue Owl and Jared Sheiker regarding Blue Owl's extension of billions of dollars to dramatically expand MEX's sale-leaseback activity.

w.  Documents and communications regarding Jared Sheiker's service on the MEX board of directors, his violations of any fiduciary duties owed to MEX, and any conflict-of-interest transactions with MEX.

x.  Due diligence materials created, exchanged or reviewed in connection with Blue Owl's acquisition of Oak Street Capital, including any documents or communications regarding the value of Oak Street Capital's business relationship with MEX .

y.  Documents and communications regarding the West Hill Group's 2021 purchase of a 3 percent ownership interest in MEX and any information regarding the valuation that West Hill Group and/or MEX placed on MEX's business and shares at that time.

z.  Communications between the West Hill Group, MEX and others regarding alleged misconduct by MEX and its new owners, as alleged in the Complaint.

aa. Communications between MEX, First Horizon, Blue Owl and others regarding MEX's 2022 failure to produce financial reports and failure to continue complying with its debt covenants.

bb. Communications between MEX, First Horizon, Blue Owl and others regarding MEX's lease defaults;

cc. Communications between MEX, First Horizon, Blue Owl and others regarding MEX's consideration of and decision to file for bankruptcy protection.

dd. Communications and other documents regarding the MEX bankruptcy, including but not limited to First Horizon's role in providing post-petition financing to MEX, preventing MEX from completing financial reports, support or opposition for MEX's 2023 attempt to auction assets, request to appoint a Chapter 7 trustee, and demand to reject MEX's valuable fuel supply agreements.

ee. Communications and reports to First Horizon management and any syndicate banks regarding the quality of the underwriting that First Horizon and others conducted before extending credit to MEX, including but not limited to any communications with or documents provided to First Horizon's CEO Bryan Jordan on that topic.

ff. Communications and reports to First Horizon management and any syndicate banks regarding MEX's inability to produce financial reports in 2022, lease defaults, and its consideration of and decision to seek bankruptcy protection in 2023.

gg. Non-privileged documents and communications regarding the extensive investigation that First Horizon and its counsel conducted regarding MEX's collapse.

hh. Documents and communications between First Horizon and any regulatory or supervisory agency regarding First Horizon's loans to MEX, First Horizon's supervision of MEX's compliance with any applicable loan covenants, and First Horizon's loss on its loans to MEX.

2. Defendants' defenses:

a. The nature of the payments made concerning any transfer the Trustee seeks to avoid.

b. The application of statutes of limitations, statutes of response, and extinguishment statutes.

c. Whether the challenged transfers were made in the ordinary course of business or otherwise protected by the business judgment rule.

d. Whether the transactions at issue were fair to MEX or protected by the business judgment rule.

e. The role third-parties played and the effect of their conduct on MEX's financial status and its alleged collapse.

The Defendants anticipate serving further discovery as the case proceeds and information is received in the discovery process.

**If the parties anticipate that additional time beyond that allowed by the assigned discovery track will be needed to complete discovery or that discovery should be conducted in phases or be limited to or focused upon particular issues, please state those reasons in detail below:**

**Agreed Upon Issues:**

Considering (i) this is a complex case involving numerous parties; (ii) there are nearly a dozen common law and statutory claims; (iii) the anticipated volume of documents that will need to be located, reviewed, and produced; (iv) the potential for a large number of depositions; (v) the potential complex and technical nature of some of the evidence; and (vi) the need for expert discovery, the Parties agree that an extended discovery period is warranted. Subject to this Court's approval, the Parties have negotiated and agreed upon a discovery schedule that is set forth in the proposed Scheduling Order below.

**Disputed Issues:**

**The Trustee**: The Trustee believes that this case should follow the normal discovery process, *i.e.*, a single fact discovery period where all parties can seek and obtain discovery followed by an expert discovery period.

The Trustee understands that, notwithstanding the Defendants' position below, Defendants are not attempting to limit or restrict discovery or otherwise bifurcate discovery. Further, so long as discovery is properly sought and in accordance with the Rules and applicable case law, the Defendants are free to seek discovery in the order they prefer.

The Trustee disputes Defendants' positions relating to the validity of the Trustee's claims, but that dispute is outside the scope of this part of the JPPR. At the appropriate time, the Trustee will demonstrate that her claims have merit and that Defendants' argument that the Trustee's claims are subject to a four-year statute of limitations is incorrect. Among other things, Georgia applies a six-year statute of limitations where, as here, the duty arises out of a contract. Defendants also ignore the ten-year statute of limitations applicable to some of the Trustee's statutory claims.

**Defendants' Position**:

Before filing this action, the Trustee spent more than 18 months conducting Rule 2004 discovery in the *In re Mountain Express Oil Co.*, bankruptcy case. In

addition, the Trustee has long had access to all MEX's records, documents, emails and other electronic records. And because the Trustee's counsel also represented—and continues to represent—First Horizon, the Trustee has benefited from the many additional months of work counsel has devoted to investigating MEX's 2023 collapse.

Although several Defendants produced documents and sat for Rule 2004 examinations, the Defendants have not yet conducted any discovery. The Defendants similarly have not had access to MEX's records or their MEX email accounts since March 2020. Accordingly, the first phase of Defendants' discovery will focus on the Trustee's production of the Rule 2004 discovery record, MEX's production of records relevant to the claims and defenses, and First Horizon's production of evidence regarding the series of Credit Agreements it made with MEX. And while the Defendants do not seek to restrict the Trustee's discovery rights, they do not believe that there can be much—if any —relevant discovery the Trustee could obtain from them beyond the Rule 2004 material they have already produced.

Defendants will also prioritize initial discovery regarding certain defenses to the Trustee's claims. Defendants contend that the Trustee's avoidance claims under 11 U.S.C. § 544(b) are unavailable based on (1) the applicable statutes of limitation; (2) the absence of a predicate unsecured MEX creditor in whose shoes the Trustee

can litigate its § 544(b) claims; and (3) the safe harbor that 11 U.S.C. § 546(e) provides for securities transactions. Defendants similarly contend that Georgia's four-year statute of limitation bars many of the Trustee's state law claims. Rather than litigate those issues on pleadings that omit or obfuscate critical points, the Defendants will conduct an initial phase of focused discovery that will allow the Court to decide them on succinct partial motions for summary judgment.

**11.    Discovery Limitation and Discovery of Electronically Stored Information:**

**(a) What changes should be made in the limitations on discovery imposed under the Federal Rules of Civil Procedure or Local Rules of this Court, and what other limitations should be imposed?**

The Parties consent and agree, pursuant to Federal Rule of Civil Procedure 5(b)(2)(E), that service may be made by electronic mail, with copies sent to all attorneys of record for the party served.

Per Fed. R. Civ. P. 30(a)(2), the parties stipulate and agree to allow each side to take up to 25 depositions of fact witnesses, including Fed. R. Civ. P. 30(b)(6) depositions, but excluding expert depositions. The parties further state that they have conferred regarding Defendants' concerns that they may have to take as many as 50 depositions of fact witnesses to address the allegations of the Complaint. The Trustee does not agree that number is warranted and has informed Defendants that

she believes they will need to show "good cause" to take more than 25 depositions. Defendants disagree that any "good cause" requirement applies. Rather than force a dispute at the outset of discovery, the parties have agreed to keep conferring on this issue as discovery progresses and to bring any disagreements for the Court to resolve in accordance with the Federal Rules at the appropriate time.

If a witness concurrently testifies both in his/her individual capacity and as a corporate representative (*e.g.*, Mr. Bierenbaum concurrently testifies both in his individual capacity and as the Fed. R. Civ. P. 30(b)(6) representative for Mongo Holdings), the parties agree that such deposition shall count as one deposition if that deposition is completed in one day (assuming the party taking the deposition is permitted seven hours on the record). If a witness is deposed for six hours in his/her individual capacity and then another five hours as a Rule 30(b)(6) designee on a different day, that would constitute two depositions.

The parties may have a dispute about the length of time a person may be deposed if he/she is deposed both in his/her individual capacity and as a Fed. R. Civ. P. 30(b)(6) corporate representative. Rather than force a dispute now based on hypothetical scenarios, the parties have agreed to keep conferring on this issue as discovery progresses and to bring any disagreements for the Court to resolve in accordance with the Federal Rules and this Court's Standing Order at the appropriate time. To that end, the parties agree that the party taking a deposition and the witness

sitting for the deposition should have a clear understanding of how much deposition time they will have before the deposition begins.

The Parties agree to meet and confer in good faith as to whether it is appropriate to continue a Fed. R. Civ. P. 30(b)(6) deposition over more than a single day and/or sequenced by topic, though still subject to the presumptive seven-hour limit per corporate representative deposition. The parties similarly agree to meet and confer in good faith as to whether a Rule 30(b)(6) topic may exceed the presumptive seven-hour limit.

**(b) Is any party seeking discovery of electronically stored information?**

**__X__ Yes ___ No**

**If "yes,"**

**(1) The parties have discussed the sources and scope of the production of electronically stored information and have agreed to limit the scope of production (e.g., accessibility, search terms, date limitations, or key witnesses) as follows:**

The Parties have begun the meet and confer process, pursuant to Fed. R. Civ. P. 26(f) and anticipate stipulating to a protocol governing ESI discovery in this matter. The Parties propose a deadline to submit an ESI Protocol to the Court by June 20, 2025. If the Parties are unable to reach an agreement on an ESI Protocol by that date, they will notify the Court that there is a discovery dispute by e-mail no

later than June 20, 2025, following the procedures in this Court's Standing Order. See Standing Order Regarding Civil Litigation, Section II.B.

**(2) The parties have discussed the format for the production of electronically stored information (e.g., Tagged Image File Format (TIFF or .TIF files), Portable Document Format (PDF), or native), method of production (e.g., paper or disk), and the inclusion or exclusion and use of metadata, and have agreed as follows:**

The Parties anticipate including an agreement regarding the format of production in their ESI Protocol. The parties propose a deadline to submit an ESI Protocol to the Court by June 20, 2025. If the Parties are unable to reach agreement by that date, they will notify the Court that there is a discovery dispute by e-mail no later than June 20, 2025.

**12.  Other Orders:**

**What other orders do the parties think that the Court should enter under Rule 26(c) or under Rule 16(b) and (c)?**

The Defendants seek a Protective/Confidentiality Order to protect the confidential information that they and other third parties have already produced in the MEX bankruptcy case and that they may produce in this action. While the Trustee believes that the protections in the Federal Rules of Civil Procedure and Local Rules (*e.g.*, redacting social security numbers and account numbers) are

sufficient, the Trustee will consent to a fair and reasonable Protective/Confidentiality Order that (i) is not unduly burdensome to the Trustee and the Court and (ii) does not impede or prejudice her ability to examine witnesses or otherwise litigate this action.

**13.  Settlement Potential**

**(a) Lead counsel for the parties certify by their signatures below that they conducted a Rule 26(f) conference that was held on May 14, 2025, and that they discussed a potential settlement.**

**For Plaintiff:**

**Lead counsel (signature): /s/ Steven Rosenwasser**

Other participants: John Elrod; William Eye

**For Defendant:**

Lead counsel (signature): /s/ Ronan Doherty

Other participants: John Rains, Mollie Fiero

**(b) All parties were promptly informed of all offers of settlement and following discussion by all counsel, it appears that there is now:**

**( ) A possibility of settlement before discovery.**

**( ) A possibility of settlement after discovery.**

**( ) A possibility of settlement, but a conference with the judge is needed.**

**(X ) No possibility of settlement at this time.**

**(c) Counsel ( ) do or (X) do not intend to hold additional settlement conferences among themselves prior to the close of discovery.**

**(d) The following specific problems have created a hindrance to settlement of this case.**

**Plaintiff:** The parties materially disagree on whether MEX was insolvent at and after the time of the LBO and whether Defendants' conduct was lawful and/or breached fiduciary and statutory duties. Given that and other disagreements between the parties, the parties view the risks and exposure of this case materially differently, which makes further settlement discussions unfruitful at this time.

**Defendant**: In addition to the disagreements cited above, the Defendants vigorously deny the Trustee's allegations and deny harming MEX in any way. Defendants Gail and Barry Bierenbaum founded MEX and built it over twenty years. By the time the Bierenbaums sold their shares and departed MEX in March 2020, MEX was profitable, paid its bills on time, entirely solvent, and had bright prospects for the future. Given that record of success—and all that happened to MEX after they departed—the Defendants fundamentally reject the Trustee's claim that these Defendants are responsible for MEX's subsequent collapse and bankruptcy some three years later.

14.    **Trial by Magistrate Judge:**

**Note: Trial before a Magistrate Judge will be by jury trial if a party is otherwise entitled to a jury trial.**

**(a) The parties (__) do consent to having this case tried before a magistrate judge of this Court. A completed Consent to Jurisdiction by a United States Magistrate Judge form has been submitted to the clerk of court this day _____, of 20.**

**(b) The parties ( X ) do not consent to having this case tried before a magistrate judge of this Court.**

[*Signatures on Following Page*]

Dated June 4, 2025,

**Attorneys for the Plaintiff Janet**
**Northrup, as Chapter 7 Trustee**

**Attorneys for Defendants Barry**
**Bierenbaum, Gail Bierenbaum,**
**Taylor Mercantile, LLC, Mongo**
**Holdings, LLC, Mongo Holdings BG**
**Investments, LLC, and 504N**
**Ventures, LLC**

/s/ Steven J. Rosenwasser
Steven J. Rosenwasser
GA Bar No. 614908
rosenwassers@gtlaw.com
John D. Elrod
GA Bar No. 246604
elrodJ@gtlaw.com
William E. Eye
GA Bar No. 688914
eyew@gtlaw.com

Greenberg Traurig, LLP
Terminus 200
3333 Piedmont Road, NE
Suite 2500
Atlanta, GA 30303
Tel. 678-553-2100

/s/ Ronan P. Doherty
Ronan P. Doherty
Georgia Bar No. 224885
doherty@bmelaw.com
John H. Rains
Georgia Bar No.
rains@bmelaw.com
Juliana Mesa
Georgia Bar No.
mesa@bmelaw.com
Mollie M. Fiero
Georgia Bar No.
fiero@bmelaw.com

Bondurant, Mixson & Elmore, LLP
3900 One Atlantic Center
1201 W. Peachtree Street, NW
Atlanta, Georgia 30309
Tel. 404-881-4100

## **SCHEDULING ORDER**

Upon review of the information contained in the Joint Preliminary Report and Discovery Plan form completed and filed by the parties, the Court orders that the time limits for adding parties, amending the pleadings, filing motions, completing discovery, and discussing settlement are as set out in the Federal Rules of Civil Procedure and the Local Rules of this Court, except as herein modified:

| Event | Deadline |
|---|---|
| Deadline to Amend the Pleadings | June 13, 2025 and thereafter in accordance with the Federal Rules |
| Exchange Initial Disclosures | June 13, 2025 |
| Fact Discovery Opens | June 13, 2025 |
| Deadline to submit Stipulated Protective Order and ESI Protocol or to notify the Court regarding disputes about the ESI Protocol and Protective Order | June 20, 2025 (protective order)<br><br>June 20, 2025 (ESI Protocol or report of disputes relating thereto) |
| Briefing for Any Motion for Judgment on the Pleadings | July 25, 2025 – deadline for Defendants to move<br><br>September 26, 2025 – deadline for Trustee to respond (if filed)<br><br>November 19, 2025 – deadline for Defendants' reply |
| Close of Fact Discovery | August 31, 2026 |
| Affirmative Expert Disclosures Per the Federal Rules | September 11, 2026 |
| Deadline to depose Affirmative Experts | October 23, 2026 |

| Rebuttal Expert Disclosures Per the Federal Rules | November 6, 2026 |
|---|---|
| Deadline to depose Rebuttal Experts | December 18, 2026 |
| Dispositive and *Daubert* Motion Deadline | January 22, 2027 (*Daubert* motions) January 29, 2027 (dispositive motions) |
| Opposition to Dispositive and *Daubert* Motion Deadline | Sixty days after the motion is filed |
| Reply in Support of Dispositive and *Daubert* Motion Deadline | Thirty days after the opposition is filed |
| Pre-Trial Conference | TBD after rulings on dispositive motions and *Daubert* motions |
| Trial | TBD |

The Parties agree that, in the event a brief or other deadline falls near or during the Thanksgiving or December holidays, they will work in good faith and cooperatively on extensions subject to Court approval.

IT IS SO ORDERED, this_____day of_____, 20___.

_____
SARAH E. GERAGHTY
UNITED STATES DISTRICT JUDGE

71